LOUIS R. MILLER, State Bar No. 54141
smiller@millerbarondess.com
DANIEL S. MILLER, State Bar No. 218214
dmiller@millerbarondess.com
BRIAN PROCEL, State Bar No. 218657
bprocel@millerbarondess.com
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 552-4400
Facsimile:     (310) 552-8400

Attorneys for Plaintiff
SCC ALAMEDA POINT, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCC ALAMEDA POINT, LLC, a limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>CITY OF ALAMEDA, a municipal corporation; ALAMEDA REUSE AND REDEVELOPMENT AUTHORITY, a Joint Powers Authority; COMMUNITY IMPROVEMENT COMMISSION OF THE CITY OF ALAMEDA, a public body corporate and politic; ANN MARIE GALLANT, an individual; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | **CASE NO. 3:10-cv-05178-BZ**<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>1) **VIOLATION OF THE CONTRACT CLAUSE OF UNITED STATES CONSTITUTION/INJUNCTIVE RELIEF/SPECIFIC PERFORMANCE;**<br><br>2) **BREACH OF CONTRACT/ MANDATORY INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE;**<br><br>3) **BREACH OF CONTRACT/DAMAGES;**<br><br>4) **ACTUAL FRAUD/CORRUPTION/ DAMAGES; AND**<br><br>5) **DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1    Plaintiff SCC Alameda, LLC ("SCC Alameda") alleges claims against Defendants the City

2    of Alameda (the "City"), the Alameda Reuse and Redevelopment Authority ("Redevelopment

3    Authority"), the Community Improvement Commission of the City of Alameda ("Improvement

4    Commission," and together with the City and the Redevelopment Authority, "Alameda"), Anne

5    Marie Gallant and Does 1 through 10, inclusive (collectively, "Defendants"), as follows:

## INTRODUCTION

6    **1.**    When a governmental entity unilaterally attempts to renege on the material terms of a

7    contract, the United States Constitution, the United States Supreme Court and the lower federal

8    courts repeatedly have held that such impairment or destruction of contract rights is unconstitutional.

9    Through a dishonest and surreptitious scheme, ongoing and undiscovered for several months prior to

10   the actions in issue here, that is what occurred and gives rise to the claims in this case.

11   **2.**    Government is precluded from impairing contracts between private parties and is

12   also, and especially, precluded from such impairment where government itself is a party to the

13   contract.  Article I, section 10, clause 1, the Contract Clause of the United States Constitution,

14   explicitly provides that "No State shall . . . pass any . . . law impairing the obligation of contracts."

15   The Supreme Court has held that impairment or destruction of a governmental entity's own contract,

16   as occurred here, is subject to even more stringent review under the Contract Clause than a contract

17   between private parties.

18   **3.**    As explained below, the parties hereto entered into an extensive and detailed contract

19   providing for exclusive good faith negotiations and cooperation toward approval of entitlements for

20   development of a major residential/commercial/retail project adjacent to San Francisco Bay.  In

21   furtherance of that contract, SCC Alameda has expended in excess of $17 million, thousands of

22   hours and a great deal of work over the preceding three plus years.

23   **4.**    While it is anticipated that defendants will contend that they could deny SCC

24   Alameda's entitlement application and kill the project at any time, that is not what the good faith

25   exclusive negotiation contract here allows.  To the contrary, that contract requires the governmental

26   entities to cooperate and negotiate in good faith and in a commercially reasonable manner to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

complete the entitlement process including, among other things, the critically-important environmental review under California law.

5.      Until last year, the parties cooperated and negotiated in good faith toward completion of the entitlement process.  But recently, everything changed.  Instead of cooperation and good faith negotiations, defendants changed course and ultimately destroyed the project.

6.      SCC Alameda, on the other hand, tried over and over again to work through the process, not knowing that defendants had resolutely determined to reverse course and kill the project.  In the process, defendants continued to accept millions of dollars from SCC Alameda while defendants worked on their "secret" alternative to SCC Alameda's project.

7.      The contract in issue here explicitly provides that the parties "shall negotiate diligently and in good faith" and in a "commercially reasonable" manner toward completion of the project.  But certain members of City government including, among others, Interim City Manager Anne Marie Gallant have acted in bad faith, portraying SCC Alameda in a false light and vilifying and disparaging SCC Alameda and its development plan.

8.      SCC Alameda was supposed to "partner" with the City in the development of Alameda Point for the benefit of the community.  But the Interim City Manager—who is paid $250,000 a year plus $75,000 more in perks—has gone in the opposite direction, sabotaging the process and failing and refusing to negotiate in good faith.

9.      The motive of the Interim City Manager, previously concealed, has now been exposed:  She and others want to oust SCC Alameda as the developer, make the project a "public" development and effectively take it over.  She, and others, are seeking to put themselves in charge of a complex multi-year, multi-million dollar project, despite having no development experience or expertise, so they can perpetuate themselves in public office and receive remuneration for "services rendered" indefinitely.

10.     The real victim here, in addition to SCC Alameda, is the community.  By their scheme, Gallant and others are seeking to destroy a development that will significantly enhance the environment and add value to the community.  SCC Alameda is highly qualified and experienced in

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

99360.2

1   land development; and is ready, willing and able to move forward in good faith and develop

2   Alameda Point.

3        11.    The actions of the Interim City Manager here are especially egregious because SCC

4   Alameda has spent millions of dollars and thousands of hours working on the project, paying for

5   City staff including Interim City Manager Gallant and for third party consultants and contractors, all

6   of which has greatly benefited the project.

7        12.    This is a case of a governmental bureaucrat gone out of control and taking advantage

8   to enrich herself.  The success of this development relies on the efficiency and expertise of SCC

9   Alameda.  Governmental officials such as Interim City Manager Gallant have neither the experience

10  nor expertise to develop a project like this and should not be permitted to manipulate, disrupt and

11  exploit the project for their own ends.

12       13.    SCC Alameda has satisfied each and all of the milestones specified in the contract,

13  except for one which defendants prevented, thereby excusing SCC Alameda's satisfaction of that

14  milestone; and as a result, the contract has been automatically extended by its terms and remains in

15  effect.

16       14.    Realizing that SCC Alameda had satisfied the contractual milestones, the City of

17  Alameda prematurely and precipitously accelerated the entitlement process on July 20, 2010, by

18  voting to reject SCC Alameda's entitlement application.  The vote occurred before the contractually

19  mandated components of the application, including environmental review and good faith

20  negotiation, could be completed.

21       15.    Alameda's actions effectively destroyed SCC Alameda's contract rights.  They are

22  the epitome of bad faith and the polar opposite of the cooperation and good faith negotiations

23  defendants agreed to in their very own contract.  As such, there has been breach of contract and a

24  violation of SCC Alameda's constitutional rights under the Contract Clause of the United States

25  Constitution.

26       16.    Gallant's fraud and corrupt secret plan have caused damages to SCC Alameda,

27  including out-of-pocket expenses in excess of $17 million and consequential damages in excess of

28  $100 million, including lost profits.  Gallant's fraud was done intentionally with complete disregard

99360.2

of SCC Alameda's rights, constituting oppression, fraud and/or malice.  SCC Alameda is entitled to exemplary and punitive damages in an amount appropriate to punish Gallant, and to deter such despicable conduct in the future.

**FACTS**

**A.**   **The Project—Alameda Point**

17.   This action seeks to remedy the improper attempt by the City of Alameda to destroy a major real estate development project with the developer, plaintiff SCC Alameda.  The development of this project—Alameda Point—is of critical importance to SCC Alameda and the community, and has undergone a great deal of planning and work.

18.   Alameda Point is a master-planned development consisting of approximately 918 acres of prime water-front land on the east side of San Francisco Bay with views of the Golden Gate Bridge and the downtown San Francisco skyline ("Alameda Point").  Alameda Point is owned by the United States Department of the Navy ("Navy"), with the City exercising land use control.  The land formerly housed the Alameda Naval Air Station.

19.   The Naval Air Station was decommissioned in 1997, and Alameda has been trying to redevelop the property since that time.  The property is one of the last remaining opportunities for a large-scale mixed use development in the Bay Area.

20.   There are extensive environmental issues with respect to the project.  The Naval Air Station was listed as a Superfund cleanup site in 1999; and no less than 25 locations on the base were identified as needing remediation.  The property has soil and groundwater contamination, including two landfills that require remediation.  A large portion of Alameda Point sits just above the water level, so hydrological analysis and accommodation must be done to avoid flooding.  Portions of the property have been designated as a historic district determined eligible for listing on the National Register of Historic Places.  There are also geotechnical and traffic issues, and a myriad of other development issues.

21.   The City has been trying to have the property developed for 17 years.  Most recently, Alameda Point Community Partners, a partnership comprised of Morgan Stanley, Shea Homes and Centex Homes, sought to develop the project.  In July 2006, the City of Alameda announced a deal

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

4

**THIRD AMENDED COMPLAINT**

1   with the Navy, but in September 2006, Alameda Point Community Partners withdrew from the

2   development.

3          22.     In October 2006, the Redevelopment Authority authorized the selection of another

4   qualified developer to create a master-planned community.  SCC Alameda was chosen on May 8,

5   2007 as master developer of Alameda Point.

6          23.     In large scale master-planned developments, it is customary for the developer and

7   City to enter into an agreement to negotiate exclusively to completion of the entitlement process;

8   such developments require millions of dollars of costs, countless hours and years of planning before

9   entitlements are approved and a development agreement can be finalized.  Good faith negotiation

10  contracts are critical in this industry and are legally enforceable under governing law.

11  **B.      The Exclusive Negotiation Agreement**[1]

12         24.     SCC Alameda is an experienced land developer specializing in developing major

13  master-planned communities.  SCC Alameda entered into an Exclusive Negotiation Agreement on

14  July 18, 2007 (the "Exclusivity Agreement") with the Redevelopment Authority, the Improvement

15  Commission and the City.

16         25.     Under the Exclusivity Agreement, Alameda must negotiate exclusively with SCC

17  Alameda concerning the project.  Section 9.2.1 of the Exclusivity Agreement states, "It is because of

18  the qualifications and identity of [SCC Alameda] that Alameda is entering into this Agreement with

19  [SCC Alameda]."

20         26.     The project contemplated by the Exclusivity Agreement would create much needed

21  jobs and additional housing in the Bay Area, including low-income affordable housing.  Under the

22  Exclusivity Agreement, the property would be conveyed first by the Navy to Alameda, and then to

23  SCC Alameda.

24         27.     A good faith requirement was of paramount importance to SCC Alameda because it

25  was agreeing to expend millions of dollars and thousands of hours of time in pursuit of the project.

26  _____

27  [1] The Exclusivity Agreement is attached hereto as Exhibit A.  The First Amendment to the
    agreement entered into on March 6, 2008 is attached hereto as Exhibit B and the Second
28  Amendment entered into on October 7, 2008 is attached hereto as Exhibit C.

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

99360.2

Specifically, section 3 of the Exclusivity Agreement requires Alameda to "negotiate diligently and in good faith" and "use commercially reasonable efforts" to complete the following tasks, among others:

- negotiation of a Finalized Navy Term Sheet among the Redevelopment Authority, SCC Alameda and the Navy (Section 3.1);
- joint preparation by SCC Alameda and Alameda of a project pro forma containing all financial considerations of the project (Section 3.2.4);
- submission of entitlement application and subsequent approvals (Section 3.2.6);
- preparation of documents required for environmental review as required by CEQA (Section 3.4);
- ensure the continuity of its staff throughout the life of the project (Section 3.7.1.1); and
- respond to each submission of SCC Alameda required under the Exclusivity Agreement within a reasonable time (Section 3.7.1.2).

28.    SCC Alameda agreed to pay all third party pre-development costs and to reimburse City staff working on the project.  It has invested in excess of $17 million in Alameda Point in reliance on Alameda's promise to act in good faith, cooperate and be commercially reasonable in negotiating to completion of the entitlement process.

29.    Given the importance of the term sheet with the Navy, the parties agreed that the Redevelopment Authority would not meet with the Navy without giving SCC Alameda a chance to participate in the meeting:

20.2    Alameda Contract.  [The Redevelopment Authority] agrees that it will not meet, or engage in negotiations, with any governmental officials or staff whose approval is required to a Transaction Document[2], concerning the Project or the Project Site without

[2] "Transaction Documents" includes virtually all documents, plans and agreements provided for in

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

6
THIRD AMENDED COMPLAINT
99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

reasonable prior notice to [SCC Alameda].  [The Redevelopment
Authority] shall keep [SCC Alameda] informed of the substance of
any such meetings and negotiations and shall permit [SCC Alameda]
to participate in the same.  Subject to this <u>Section 20.2</u>, Alameda may,
in the routine course of governmental affairs, contact (or be contacted
by), discuss, or meet with the Navy or any other governmental entity,
and [SCC Alameda] acknowledges that such contact, discussions,
meetings, or responses may pertain in whole, or in part, to the Project
and/or the Project Site.

30.      Alameda further agreed not to communicate with the Navy in a manner that would
prejudice SCC Alameda's rights:

20.3    <u>Prejudice Parties Interests</u>.  Alameda and [SCC Alameda]
agree to refrain from knowingly engaging in contacts or
communications with government officials (other than Alameda staff)
in a manner reasonably expected to prejudice the interests of the other
Party.

**C.      SCC Alameda Performed Under The Agreement**

31.      SCC Alameda was and is committed to this project.  Starting in August 2007, SCC
Alameda held multiple community meetings.  These meetings were well attended by city residents,
city staff and elected officials.  Upon finalizing the community planning process, the plan was
presented to City sanctioned commissions throughout Alameda, which included the Redevelopment
Authority and the Planning Commission.  During 2008/2009, the Mayor and other City
Councilmembers spoke out in favor of the plan.

32.      SCC Alameda met the first milestone under the Exclusivity Agreement by submitting
its draft development master plan in September 2008.  After the City expressed support for the plan,
SCC Alameda sought input from the Redevelopment Authority, the Housing Commission,

the Exclusivity Agreement (Section 3).

7

99360.2

Transportation Commission, Historical Advisory Board, Sports Commission, Economic Development Commission, Recreation and Parks Commission and Board of Education, among others.

33.    After receiving extensive additional community input, SCC Alameda submitted a detailed master plan in December 2008 (the "Master Plan"). The Master Plan encompasses all aspects of the project, including the layout of the project, transportation, open space, implementation and infrastructure. The Master Plan also contains an extensive proposal regarding environmental sustainability for all phases of the development, including issues relating to water, carbon neutrality, use of sustainable materials and minimizing waste.

34.    As part of the Master Plan, SCC Alameda agreed to dedicate and develop approximately 146 acres of park and recreational space. This would include a San Francisco Bay trail, park and recreational facilities, a gymnasium, baseball and soccer fields, basketball and tennis courts, a football/lacrosse field, schools, infrastructure, traffic mitigation, a picnic area, as well as community and neighborhood parks.

35.    In accordance with the milestones in the Exclusivity Agreement, Alameda and SCC Alameda agreed on a joint project pro forma in December 2008. The pro forma contained the financial considerations of the project and was created by Alameda's financial consultant.

36.    The agreed upon pro forma was jointly submitted to the Navy for review in January 2009. The parties were cooperating and acting in good faith to provide the Navy with an agreed upon pro forma and working towards finalizing a term sheet with the Navy.

37.    When SCC Alameda was chosen to develop this project, Councilmembers referred to the development as a "public – private" partnership and assured SCC Alameda that it would be treated accordingly. Despite an extremely difficult real estate and credit market, SCC Alameda worked diligently to keep the project on track.

38.    As the real estate market deteriorated, SCC Alameda and Alameda agreed to extend the timing of certain milestones provided for in the Exclusivity Agreement. A First Amendment to the Exclusivity Agreement was executed on March 6, 2008, and a Second Amendment to the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

99360.2

1    Exclusivity Agreement was executed on October 7, 2008. The Second Amendment extended the

2    exclusive negotiating period until July 20, 2010.

3           39.     As the parties negotiated and (at least insofar as SCC Alameda was concerned)

4    worked through the issues, they encountered problems that had to be addressed including, among

5    other things, a City Charter provision that prohibited multi-family development in the City and at

6    Alameda Point. Accordingly, after consultation and at the direction of the City, it was decided to put

7    a measure on the ballot to change the density requirement, but the measure was voted down.

8           40.     Thereafter, SCC Alameda made adjustments, continued on and, in fact, redoubled its

9    efforts to move forward with the Alameda Point project. While a temporary setback, rejection of the

10   ballot measure did not affect the overall viability of the project.

11          41.     Not knowing the secret agenda of the Interim City Manager and her cohorts, it

12   appeared to SCC Alameda that the project, like most complex real estate development projects, was

13   proceeding in due course pursuant to the good faith/cooperation/commercially reasonable contract

14   between the parties.

**D.     The Process Is Corrupted—Ann Marie Gallant**

16          42.     On April 1, 2009, the City hired Anne Marie Gallant as its Interim City Manager.

17   After Gallant was hired, things changed.

18          43.     After becoming Interim City Manager, Gallant reversed course on the pro forma and

19   claimed the parties never reached an agreement. After repudiating the prior agreed upon pro forma,

20   she stonewalled SCC Alameda's attempts to negotiate the pro forma in good faith. [3]

---

[3] Ann Marie Gallant has jumped from job to job leaving a trail of questionable conduct in her wake.
In 2000, Gallant "resigned" from the Los Angeles Community Redevelopment Agency ("CRA")
amid controversy surrounding her role in the City's purchase of land at twice its market value. In
seeking board approval, Gallant concealed an appraisal valuing the property at half the purchase
price. When asked if this controversy was a factor in Gallant's resignation, the CRA administrator
stated, "You can read between the lines." In addition, Gallant was suspended from the CRA for
submission of a disputed expense account claim.

From 2000 to 2003, Gallant worked at the City of Carson, experiencing attendance issues and
frequent unexplained absences (25%-50% of the time). After being placed on involuntary leave, she
filed suit against the City. During her time at Carson, her driver's license was suspended twice for
misdemeanor failure to appear; and the City requested the refund of the $400 a month car allowance
she took during the period of her license suspension.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

99360.2

44.     Gallant has recruited Alameda City Attorney Terry Highsmith to her cause; Highsmith has stated: "We're starting to think we would be better off without a developer." That sentiment was expressed despite the fact that Alameda had an obligation to cooperate in good faith and move forward in a commercially reasonable manner with the project.

45.     The Exclusivity Agreement provides that so long as SCC Alameda meets certain milestones, the exclusive negotiation period would automatically extend beyond the expiration date of July 20, 2010.  SCC Alameda satisfied these milestones including, among other things, submitting a Master Plan for the property, an infrastructure plan, a sports complex master plan, the Development and Disposition Agreement ("DDA") and an entitlement application, which includes a project description.

46.     SCC Alameda satisfied all of the milestones required for automatic extension of the exclusive negotiation period, except for one that could not be performed due to Alameda's intransigence and bad faith lack of cooperation.  The only remaining milestone provides that SCC Alameda must agree on a term sheet between the Navy and the Redevelopment Authority.  By its own admission, Alameda blocked satisfaction of that milestone.

**E.     Alameda's Bad Faith**

47.     Alameda has made satisfaction of this final milestone impossible by repudiating the prior agreed upon pro forma, secretly meeting with the Navy, providing the Navy with false information, failing and refusing to work cooperatively with SCC Alameda and the Navy, and preventing SCC Alameda from entering into a term sheet with the Navy.  By doing so, Alameda acted contrary to Section 19 of the Exclusivity Agreement which states:

---

In 2004, Gallant signed a 3-year contract as City Manager of the City of Gustine, California; she left that job after serving less than a year.  In 2005, she became City Manager of King City, California; but after less than a year, she left to become City Manager of Desert Hot Springs.  She resigned from Desert Hot Springs in 2007 in a closed session meeting of the City Council addressing her job performance.

The relevant question is:  Did the City of Alameda conduct due diligence and learn about the foregoing before promoting Ms. Gallant to City Manager and putting her in charge of the Alameda Point project (and the City)?

THIRD AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400    FAX:(310) 552-8400

<u>Cooperation</u>.  In connection with this Agreement, the Parties shall reasonably cooperate with one another to achieve the objectives and purposes of this Agreement, including cooperating with each other in preparing and negotiating the Transaction Documents with third parties identified in <u>Section 3</u> above.  In so doing, the Parties shall each refrain from doing anything that would render its performance under this Agreement impossible.

48.     As such, satisfaction of this milestone has been frustrated and prevented and is, therefore, excused.  Because Alameda has prevented satisfaction of the Navy Term Sheet milestone, it cannot assert that failure as a bar to extension of the Exclusivity Agreement.

49.     The City was having weekly calls with the Navy without SCC Alameda.  This constitutes a violation of section 20.2 of the Exclusivity Agreement, which requires Alameda to give SCC Alameda prior notice of any negotiations/meetings so it could participate.  Alameda further failed to inform SCC Alameda of the substance of the meetings/negotiations with the Navy, which also is a breach of Section 20.2.  Alameda's disregard of SCC Alameda's contractual rights is evidence of the Defendants' bad faith.

50.     Alameda also agreed to the "best of its ability" to maintain continuity of its staff throughout the life of the project (Section 3.7.1.1).  Alameda brought in Interim City Manager Gallant in April 2009; the City Manager plays a substantial role with respect to not only Alameda Point, but also as to city operations generally.  The City of Alameda's website defines the role of the City Manager as follows: "As chief executive officer, the City Manager provides the leadership and direction for the operation and management of all City departments."

51.     Far from maintaining continuity, Gallant has done everything in her power to disrupt and destroy SCC Alameda's project, in contravention of the Exclusivity Agreement.  Among other things, she reshuffled the staff of the City, the Redevelopment Authority and the Improvement Commission—effectively stacking the deck to reconfigure a staff she could control.

52.     Gallant has undermined SCC Alameda's ability to move forward with the Exclusivity Agreement; has impaired and impeded the entitlement process; has prematurely cut off state-

11

99360.2

mandated environmental review; and has destroyed SCC Alameda's right to a full, fair and complete review of its application for entitlements.

53.    She, and others, have spoliated and destroyed evidence; and have corrupted the entitlement process and prevented its completion.

54.    There are five Alameda City Councilmembers (including the Mayor). Councilmember Lena Tam has been supportive of SCC Alameda's project. In an attempt to impugn SCC Alameda's reputation and intimidate Tam from voting on any SCC Alameda-related matter, Gallant hired attorneys to report Tam to the Alameda County District Attorney's Office. The attorneys wrote letters on May 26 and July 2, 2010 accusing Tam of providing confidential information to SCC Alameda in criminal violation of the Brown Act.

55.    Gallant wrapped SCC Alameda into the character assassination of Councilmember Lena Tam, in order to co-opt any vote by Ms. Tam regarding the project (Tam abstained from the vote on July 20th). Gallant is using intimidation tactics to have her way. The District Attorney rejected the charges against Tam and criticized them as being racially and politically motivated.

56.    Gallant has shown she will stop at nothing to derail SCC Alameda's project. SCC Alameda is informed and believes that she has been secretly supplying information to opponents of Alameda Point, and Gallant has admitted destroying emails and spoliating substantive evidence regarding the project. Gallant was also caught trying to over-bill SCC Alameda on the project, including for her own time (Gallant billed SCC Alameda for 20% of her time, yet admitted that she only spent 10-15% of her time).

**F.    Meetings With Gallant**

57.    Former Assistant City Manager David Brandt negotiated and signed the Exclusivity Agreement on behalf of the City. He also worked extensively on Alameda Point and dealt directly with SCC Alameda under the Exclusivity Agreement. In mid-2009, Gallant took over Alameda Point and took the lead on the negotiations with SCC Alameda.

58.    Brandt was instructed by Gallant in mid-2009 to not agree to anything with SCC Alameda. Brandt was further instructed by Gallant to stall until the expiration of the Exclusivity

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   Agreement so the City could get SCC Alameda off the Project.  Gallant told Brandt that she wanted

2   SCC Alameda off the Alameda Point project.

3         59.   From May 2009 to June 2010, the City and SCC Alameda had weekly meetings at

4   Alameda City Hall to discuss Alameda Point and work on the development.  Gallant attended 15-20

5   of the meetings with SCC Alameda including, but not limited to, meetings on May 1, 2008, May 18,

6   2009, June 5, 2009, July 1, 2009, July 23, 2009, July 30, 2009, August 20, 2009, September 3, 2009,

7   September 10, 2009, September 17, 2009, October 1, 2009, October 8, 2009, October 22, 2009,

8   October 29, 2009, December 3, 2009, December 17, 2009 and January 14, 2010.

9         60.   City staff attending these meetings primarily were Gallant, Deputy City Manager

10   Jennifer Ott, Assistant City Attorney Donna Mooney, City Planner Andrew Thomas, and Director of

11   Public Works Matt Naclerio.  On behalf of SCC Alameda, Frank Faye, Pat Keliher, Nick Kosla,

12   Amy Freilich and Teresa Sousa attended these meetings.

13         61.   At no time during any of the meetings with SCC Alameda did Gallant disclose her

14   secret plan to take over Alameda Point with her in charge of the project.  Nor did Gallant ever

15   disclose that she sought to work with other developers behind SCC Alameda's back.

16         62.   To the contrary, Gallant encouraged SCC Alameda to continue spending money to

17   develop the project, so she and the City could appropriate SCC Alameda's work product for their

18   own use after ousting SCC Alameda.  Specific meetings where Gallant told SCC Alameda to move

19   forward with the project and continue spending money, while concealing her and the City's scheme,

20   are set forth below:

21       •   On June 5, 2009, Amy Freilich and Pat Keliher of SCC Alameda attended a

22           meeting with Gallant.  At this meeting Gallant lied and said that she is a "strong

23           supporter" of SCC Alameda and promised that she "will honor the Exclusivity

24           Agreement."  In furtherance of her and the City's hidden agenda, Gallant also said

25           at this meeting that SCC Alameda had a "good plan and good project" and that

26           the "site plan is 90 to 95 percent perfect."

27       •   In a meeting on September 17, 2009, Gallant told SCC Alameda representatives

28           Amy Freilich and Nick Kosla that the City needs more money from SCC

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Alameda to pay for consultants, such as economic planning systems consultants, and to pay for City staff time.  Gallant told SCC Alameda to provide for additional funds to pay these development-related expenses.  These statements were made in furtherance of Gallant's and the City's scheme to misappropriate SCC Alameda's work and take over the project for themselves.

63.   Further sandbagging and fraudulent inducements by Gallant include:

- In a meeting on October 1, 2009, Gallant told SCC Alameda representatives that they must move forward and pay pre-development costs so the project will remain on track.  Gallant insisted that SCC Alameda continue paying pre-development costs and promised to inform the City Council of the progress in January 2010.

- In a meeting on October 8, 2009, Gallant made revisions to SCC Alameda's development plan and said that the density issue (number of units) was "solved." Gallant stated that the City agreed with SCC Alameda's proposed density for the project and instructed SCC Alameda to move forward with the development.

- In a meeting on October 22, 2009, Gallant made several revisions to draft cash flow projections prepared by SCC Alameda.  At this meeting, Gallant told SCC Alameda to continue working on the project and said that the project was moving in the right direction.  Kosla and Gallant discussed extending the Exclusivity Agreement from July 2010 as certain items, such as the environmental impact report, would likely take longer.  Gallant told Kosla to keep working hard on the project and that the City would work with SCC Alameda in June 2010 to extend the Exclusivity Agreement.  At this meeting, Gallant insisted that SCC Alameda pay for additional consultants.

- In a meeting on October 29, 2009, Gallant confirmed that the City agreed with SCC Alameda's financial projections and again encouraged SCC Alameda to move forward with the project.  While encouraging SCC Alameda to work hard and keep spending money on the project, Gallant inquired about the amount of money spent so far in pre-development costs.

14

99360.2

- In a meeting on January 14, 2010, SCC Alameda representative Nick Kosla told Gallant about SCC Alameda's plan to submit its optional entitlement application pursuant to the Exclusivity Agreement. Gallant encouraged the submission of the optional entitlement application and provided Kosla with guidance and direction on how to submit the application.

64.    Gallant stopped attending meetings around February 2010. The weekly meetings continued with Jennifer Ott leading the meetings for the City. At meetings from February 2010 to June 2010, Ott (presumably instructed by Gallant) continued to insist on SCC Alameda spending more money on the project to pay City staff time and to pay third-party consultants to address, among other things, issues related to environmental, contamination, the tidelands trust exchange, legal and traffic.

65.    This was all done by Gallant to obtain as much of SCC Alameda's work product as possible before pulling the plug. Gallant was making SCC Alameda pay to develop the project so she could steal the work product and use it for herself. All of Gallant's statements were made to induce SCC Alameda to spend money on the project while she pursued her own corrupt agenda.

## G.    The City Council Vote

66.    On July 16, 2010, without advance warning, Gallant caused a Staff Report to be sent to the Redevelopment Authority, the Improvement Commission, the Mayor and the other Alameda Councilmembers (the "Staff Report"). The Staff Report virtually admitted that the City had prevented SCC Alameda from negotiating a term sheet with the Navy. It states:

> Finalized **Navy Term Sheet**. As discussed at the June 15, 2010
> meeting (Exhibit 5), *Alameda has not engaged the Navy in*
> *negotiations of the Navy Term Sheet* related to the Modified OEA
> because of the need for a well-defined project description, a thoughtful
> phasing plan and a mutually agreed upon project proforma for the
> Density Bonus Option. As discussed at previous Alameda meetings,
> staff has serious concerns with key assumptions in the project
> proforma and could not negotiate the project's ability to support a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

15

99360.2

significant land payment to the Navy until these issues of financial infeasibility were resolved. *As a result, the Navy Term Sheet was not agreed to by the Navy, Alameda, and [SCC Alameda] and [SCC Alameda] failed to satisfy the Navy Term Sheet mandatory performance milestone* by July 20, 2010 per the [Exclusivity Agreement] (Italics added).

67. Because she prevented the Navy Term Sheet and thus knew that the Exclusivity Agreement would be extended by operation of law, Gallant came up with a new tactic—an end run around that Exclusivity Agreement.

68. To that end, and without any prior discussion with SCC Alameda, Gallant put on the agenda for July 20, 2010 a vote to deny SCC Alameda's entitlement application. Gallant stated that even if SCC Alameda is correct and that the Exclusivity Agreement is extended and remains in effect, the City Council should deny SCC Alameda's pending entitlement application and kill the project once and for all.

69. SCC Alameda filed an Entitlement Application as provided for in the Exclusivity Agreement in March 2010 (the "Entitlement Application"). California Environmental Quality Act ("CEQA") environmental review was proceeding as contemplated, and SCC Alameda had committed to spend approximately $4 million to complete the process over the next year. It was never contemplated that Alameda could, or would, refuse to negotiate further, or that it would summarily and prematurely (without completion of the environmental impact report required by state law) deny the entire Entitlement Application and destroy the project.

70. CEQA requires that Alameda perform an analysis of the environmental impact of its actions. Alameda's decision will impact the local environment and will have a significant impact on Alameda Point—which has multiple serious environmental impacts including, among others, being recognized as a "historic district."

71. The City, the Redevelopment Authority and the Improvement Commission are obligated to proceed in good faith under the Exclusivity Agreement including completion of CEQA

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

99360.2

1   review, and completion of the good faith/commercially reasonable negotiation process with respect

2   to the Entitlement Application, before making a final determination.  This has not taken place.

3        72.     Instead, the City Council vote on July 20, 2010 was premature and a rush to

4   judgment, in contravention of the Exclusivity Agreement.  Alameda made no effort to cooperate and

5   work out issues with SCC Alameda in a commercially reasonable good faith manner as required by

6   the Exclusivity Agreement.

7        73.     SCC Alameda has negotiated in good faith and performed all of its obligations under

8   the Exclusivity Agreement.  SCC Alameda put another $720,000 into escrow accounts on July 20,

9   2010 to pay City staff salaries associated with the project and other pre-development costs provided

10  for in the Exclusivity Agreement.

11       74.     The motivation behind Alameda's decision to destroy the Exclusivity Agreement is

12  evident:  Interim City Manager Gallant wanted SCC Alameda removed as the developer of Alameda

13  Point and the project taken over by the City, through a public development corporation, with her in

14  charge.  Gallant had, and has, a "secret plan" for development of the project.  She is a blatantly

15  corrupt public official seeking to line her own pockets.

16       75.     While Gallant pursued her "secret plan," SCC Alameda continued to put millions of

17  dollars into Alameda Point to pay City salaries and consultants associated with the project.  The City

18  continued to accept money from SCC Alameda but, unknown to SCC Alameda, stopped negotiating

19  in good faith and cooperating with SCC Alameda.

20       76.     The July 20th vote on SCC Alameda's Entitlement Application destroyed SCC

21  Alameda's rights under the Exclusivity Agreement.  In bad faith, Alameda created a phony list of

22  "justifications" for voting down the application.  For example, the Staff Report stated that negative

23  traffic impact was a reason for denial of SCC Alameda's Entitlement Application; but the

24  environmental impact report was not close to being finished, so this conclusion is premature at best.

25  Furthermore, Alameda agreed with the traffic impact in 2008, and the assumptions from then did not

26  change in the Entitlement Application.

27       77.     The Staff Report also cited "Risk of Project Infeasibility and Adverse Outcomes,"

28  stating that City consultant Economic & Planning Systems and City staff "believe that the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

17

99360.2

1   assumptions in [SCC Alameda's] project pro forma do not take into account significant changes in

2   the real estate market since 2006, overestimate project revenues, and underestimate project costs."

3   But the City and its consultant previously agreed to the pro forma and all revenue/cost assumptions

4   in December 2008.

5       78.    The Staff Report also stated that the Entitlement Application "does not commit to

6   developing a balance of jobs and housing...." This is another trumped up excuse. Pre-Gallant,

7   Alameda agreed with the jobs/housing balance provided for in the phasing plan in 2008. The March

8   2010 Entitlement Application actually increased the commercial component of the project (because

9   of the City's request for more jobs at the site).

10      79.    The Staff Report also provided that the impact on endangered species is a reason to

11  deny the Entitlement Application. But City staff attended meetings with the Fish and Wildlife

12  Service and other organizations and approved of SCC Alameda's plan in 2008; and the Sierra Club

13  supported SCC Alameda's plan.

14      80.    In derogation of the good faith negotiation agreement, and at the urging of Gallant,

15  the City Council voted to deny SCC Alameda's Entitlement Application on July 20, 2010. Just a

16  few hours later, a City official allied with Gallant stated:

17          "The expiration of the Exclusive Negotiating Agreement (ENA) with

18          [SCC Alameda] provides a great opportunity to sensibly re-use the

19          former NAS Alameda with sound development at Alameda Point...*As*

20          *an alternative to having a Master Developer, I am requesting the*

21          *Council/[Redevelopment Authority] to evaluate an approach that has*

22          *a non-profit local development corporation, chartered and mandated*

23          *by the City of Alameda, to facilitate implementing the plan for*

24          *Alameda Point*." (Italics added).

25      81.    Since Gallant became Interim City Manager, she and certain others have put one over

26  on the public with their hidden scheme to take over the project. Unbeknownst to SCC Alameda, the

27  City Council vote on July 20, 2010 was a set-up; the scheme to deny the project was put in place

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  months before; and the vote was the culmination of that scheme.  As such, it should be set aside so

2  the good faith negotiation/cooperation process can be completed.

3        82.    The City Council vote sought to extinguish the ability of SCC Alameda to obtain

4  redress under the contract.  As such, it is unconstitutional and an unlawful impairment under the

5  Contract Clause; and it should be declared null and void.

6        83.    By this action, SCC Alameda seeks declaratory and injunctive relief requiring

7  Alameda to perform under the terms of the Exclusivity Agreement.  Injunctive relief is appropriate.

8  In the Exclusivity Agreement, the parties expressly bargained for "mandatory or injunctive relief" as

9  a remedy in the event that Alameda reneged.

10        84.    SCC Alameda also seeks declaratory relief that the Exclusivity Agreement remains in

11  effect by its terms; and it seeks injunctive relief requiring that Alameda negotiate exclusively with

12  SCC Alameda toward completion of environmental review and the entitlement process.  In addition,

13  SCC Alameda seeks injunctive relief preventing Alameda from otherwise pursuing development of

14  Alameda Point unless and until Alameda complies with the Exclusivity Agreement.

15        85.    SCC Alameda also seeks specific performance of the Exclusivity Agreement

16  requiring Alameda to negotiate diligently and in good faith, including engaging the Navy so the

17  parties can finalize the Navy Term Sheet.  Alameda has impaired SCC Alameda's contractual rights

18  by improperly and prematurely voting to deny the Entitlement Application, thereby destroying its

19  own agreement.

20        86.    In the alternative to injunctive relief/specific performance, SCC Alameda seeks

21  recovery of damages, including without limitation out-of-pocket expenses in excess of $17 million

22  and lost profits in excess of $100 million against all Defendants.  In addition, SCC Alameda is

23  entitled to exemplary or punitive damages against Gallant personally.

24  **H.**    **Spoliation Of Evidence**

25        87.    California Government Code Section 34090 requires that city records be maintained

26  for at least two years and allows the destruction of records only upon legislative approval and written

27  permission of the city attorney after that time has passed.

28

THIRD AMENDED COMPLAINT

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

88.     In spite of this law, the City of Alameda has a policy of destroying emails after 30 days.  Each City department is supposed to maintain hard copies of emails.  However, in a recent deposition, Interim City Manager Gallant admitted that she did not save or make hard copies of any emails regarding SCC Alameda or the project during the time period from April 2009 to June 2010.  The emails related to the project during this time period were deleted and not saved.

89.     In her deposition, Gallant also acknowledged that she communicated frequently by email with SCC Alameda, City Staff and Council Members about the project; and that many of those emails and attachments related to substantive issues pertaining to entitlements, environmental review, the Exclusivity Agreement and the City's negotiations with SCC Alameda.

90.     Gallant testified that she knew about the City's policy of destroying emails after 30 days.  Gallant did not save any project related emails despite knowing that disputes had arisen with SCC Alameda as early as 2009.

91.     Because of the foregoing, SCC Alameda cannot obtain critical emails/documents which are necessary to prove its claims in this lawsuit and, as a result, has been severely and irreparably prejudiced.  SCC Alameda reserves the right to seek appropriate redress from the Court for this spoliation of evidence and violation of law.

**I.     The City Endorses The SCC Alameda Transportation Plan That It Previously Rejected**

92.     The July 20, 2010 Staff Report made a finding that SCC Alameda has made limited progress concerning transportation.  However, the City had, and has, in its possession a 57-page document entitled "Alameda Point Transportation Strategy 2009."  In creating this Transportation Strategy, SCC Alameda worked closely with Fehr & Peers, the consultant used by the City on other projects and specifically chosen by the City for Alameda Point.

93.     After SCC Alameda provided Fehr & Peers with the "Land Map" and other information on Alameda Point, Fehr & Peers over the course of several months developed the Alameda Point Transportation Strategy.  SCC Alameda and Fehr & Peers collaborated closely and worked long and hard on the Transportation Strategy, which provides a detailed analysis and proposal for ferry and bus services, a residential "EcoPass" system and a car-sharing plan, among other things.

99360.2

94.     On August 10, 2010, just a few weeks after the July 20, 2010 decision to oust SCC Alameda, the City participated in The Association of Defense Communities Annual Conference. City officials gave a presentation on behalf of the City relating to transportation on Alameda Point.

95.     Incredibly, the City relied on and presented the unique concepts found in the SCC Alameda/Fehr Transportation Strategy.  City officials even utilized the most critical documents therein developed by SCC Alameda; and they appropriated for themselves months, and thousands of dollars, of work by SCC Alameda (copies thereof are attached as Exhibit D).

96.     The City touted and took credit for the same strategy on which it criticized SCC Alameda; and the City embraced the strategy on which it earlier relied to expel SCC Alameda from the Alameda Point project.

97.     At the conference, a top City official described the transportation plan exactly as SCC Alameda proposed:

> As we redevelop the base, let's do what we can to create a mixed-use, transit-oriented development.  From day one, the issue has been: how do we deal with the transportation issues, were at the forefront of the community of Alameda's mind. Promoting sustainable development, development that will not have a huge environmental impact and is sustainable, cost-effective and is green, has always been a major principle underlying everything we do at Alameda Point.   As I keep saying, at every single community meeting, the first question that comes up on every single plan: what are you going to do about the transportation problem?

> We don't need to build the entire transit services from day one, you can phase them in. So, we have a system of phases which we envision, where you build the first phase, begin integrating your transit services, shuttle services, the things you can afford to do with a limited amount of development.  Then, as you build the second phase and add to Alameda Point, you also improve your transit services and transportation programming and make them more and more robust.  And then the third phase, you have the full transportation program.

> So not only are you increasing the transit services and facilities on the base, but each phase, car share programs, bike share programs, shuttle services to the various BART stations, offsite improvements, improvements to the transportation system city-wide are also improving with each phase.  So that by the time you get to the year 2025 when you have full build-out, you have the full impact of all these new homes and employees, you also have all the benefits of your transportation strategy.

98.     This action by the City is the height of hypocrisy and dishonesty, and it further demonstrates the City's bad faith herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

**PARTIES**

99.     SCC Alameda is a Delaware limited liability company with its principal place of business in Orange County, California.

100.    The City of Alameda is a charter law city duly organized under the laws of the State of California.

101.    The Alameda Reuse and Redevelopment Authority is a Joint Powers Authority established by the City of Alameda and the Community Improvement Commission under the California Joint Exercise of Powers Act.

102.    The Community Improvement Commission of the City of Alameda is a public body corporate and politic.

103.    Ann Marie Gallant is an individual residing in the City of Alameda and currently serves as the Interim City Manager of Alameda.

104.    SCC Alameda is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to SCC Alameda for the wrongs alleged herein.  The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to SCC Alameda at this time. Accordingly, SCC Alameda sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

**JURISDICTION**

105.    The jurisdiction of this Court is invoked pursuant to Article 3, Section 2, of the United States Constitution and 28 U.S.C. Section 1331, in that the action arises under the Contract Clause of the United States Constitution.  SCC Alameda's right to relief depends on resolution of substantial questions of federal law.  Jurisdiction is also invoked pursuant to 28 U.S.C. Section 1367 and principles of supplementary and ancillary jurisdiction.

**VENUE**

106.    SCC Alameda initially brought this action in the Central District of California (Santa Ana) pursuant to 28 U.S.C. Section 1391(b)(2) and (c).  Alameda objected to the venue, and to avoid

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

further dispute, the parties resolved all issues related to venue by stipulating to transfer this action to the Northern District of California.

## FIRST CAUSE OF ACTION

### Violation of The Contract Clause of the United States Constitution/

### Injunctive Relief/Specific Performance

### (Against City of Alameda, Alameda Reuse and Redevelopment Authority and Community

### Improvement Commission of The City of Alameda)

107.    SCC Alameda repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

108.    SCC Alameda hereby seeks declaratory, equitable and injunctive relief to prevent Alameda from violating, and continuing to violate, the Contract Clause of the United States Constitution.  This claim is also brought pursuant to 42 U.S.C. Section 1983.

109.    Alameda and SCC Alameda have an existing contractual relationship that provides SCC Alameda with valuable contractual rights.  Among other things, SCC Alameda has the right to good faith negotiation of the Exclusivity Agreement and cooperation in carrying out the tasks provided for therein.

110.    Acting under color of state law, Alameda has caused SCC Alameda to suffer a substantial deprivation of its contract rights in violation of the federal constitution.  By voting to deny the entire Entitlement Application prematurely and while the Exclusivity Agreement is in effect, Alameda destroyed SCC Alameda's contractual rights.

111.    By voting to deny the Entitlement Application, Alameda has interfered with and destroyed its own contract, subjecting its actions to heightened scrutiny and a more stringent examination under the Contract Clause than with laws affecting contractual relationships between private parties.

112.    The July 20, 2010 vote to deny the Entitlement Application was improper and unconstitutional; as such, it is, and should be declared, null and void.

THIRD AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

99360.2

## SECOND CAUSE OF ACTION

### Breach of Contract/Mandatory Injunctive Relief and Specific Performance

### (Against City of Alameda, Alameda Reuse and Redevelopment Authority and Community

### Improvement Commission of The City of Alameda)

113.    SCC Alameda repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

114.    Alameda breached its obligations under the Exclusivity Agreement by failing and refusing to cooperate and negotiate in good faith.  Specifically, Alameda has violated the Exclusivity Agreement by, among other things: (1) failing and refusing to negotiate a Finalized Navy Term Sheet in good faith; (2) repudiating the pro forma previously agreed to by the parties and then refusing to work cooperatively with SCC Alameda to prepare the project pro forma; (3) failing and refusing to ensure the continuity of its staff throughout the life of the project; (4) failing and refusing to respond to SCC Alameda's document submissions within a reasonable time; and (5) refusing to undertake the environmental review in good faith and failing to complete the CEQA review and entitlement process.

115.    Alameda further breached the Exclusivity Agreement by conducting regular meetings and calls with the Navy without providing SCC Alameda the opportunity to participate in such meetings/calls, not disclosing the substance of such meetings/calls with the Navy and making false statements to the Navy to prejudice SCC Alameda's contractual rights.

116.    SCC Alameda performed under the terms of the Exclusivity Agreement, except where performance was excused by Alameda's breach.

117.    SCC Alameda is entitled to a mandatory injunction and/or specific performance of the Exclusivity Agreement.

118.    Alameda breached the terms of the Exclusivity Agreement.  SCC Alameda seeks specific performance of the Exclusivity Agreement, including, but not limited to, an order requiring Alameda to comply with the contractual terms that it breached.

119.    Pursuant to the express terms of the Exclusivity Agreement, SCC Alameda is entitled to "mandatory or injunctive relief" as a result of Alameda's breach.

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

120.    SCC Alameda seeks an order requiring Alameda to perform under the terms of the Exclusivity Agreement, including the obligations to: (1) negotiate a Finalized Navy Term Sheet in good faith; (2) work cooperatively with SCC Alameda to prepare the project pro forma; (3) ensure the continuity of its staff throughout the life of the project; (4) respond to SCC Alameda's document submissions within a reasonable time and process the project entitlements; and (5) undertake the environmental review in good faith and complete the CEQA review and entitlement process.

## THIRD CAUSE OF ACTION

### Breach of Contract/Damages

### (Against City of Alameda, Alameda Reuse and Redevelopment Authority and Community Improvement Commission of The City of Alameda)

121.    SCC Alameda repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

122.    As an alternative to injunctive relief/specific performance, SCC Alameda is entitled to damages for breach of the Exclusivity Agreement.

123.    Alameda breached its obligations under the Exclusivity Agreement by failing and refusing to cooperate and negotiate in good faith.  Specifically, Alameda has violated the Exclusivity Agreement by, among other things: (1) failing and refusing to negotiate a Finalized Navy Term Sheet in good faith; (2) repudiating the pro forma previously agreed to by the parties and then refusing to work cooperatively with SCC Alameda to prepare the project pro forma; (3) failing and refusing to ensure the continuity of its staff throughout the life of the project; (4) failing and refusing to respond to SCC Alameda's document submissions within a reasonable time; and (5) refusing to undertake the environmental review in good faith and failing to complete the CEQA review and entitlement process.

124.    Alameda further breached the Exclusivity Agreement by conducting regular meetings and calls with the Navy without providing SCC Alameda the opportunity to participate in such meetings/calls, not disclosing the substance of such meetings/calls with the Navy and making false statements to the Navy to prejudice SCC Alameda's contractual rights.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

125.    SCC Alameda performed under the terms of the Exclusivity Agreement, except where performance was excused by Alameda's breach.  Upon entering into the Exclusivity Agreement, SCC Alameda expected, at a minimum, that Alameda would not engage in unlawful conduct.

126.    The limitation of liability clause in section 7.4 of the Exclusivity Agreement is null and void, and does not apply, because contracts shielding unlawful conduct from liability are against public policy.  Alameda's unlawful conduct includes failing to allow completion of CEQA review and summarily and prematurely denying SCC Alameda's Entitlement Application.

127.    California Civil Code Section 1668 provides: "CERTAIN CONTRACTS UNLAWFUL. All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."  Defendants' bad faith and unlawful conduct prevents Alameda from hiding behind the limitation on damages in the Exclusivity Agreement.

128.    SCC Alameda fully complied with the administrative claim process.  SCC Alameda filed an administrative claim against Alameda for damages on September 27, 2010.  Alameda rejected SCC Alameda's administrative claim on November 12, 2010.

129.    SCC Alameda is entitled to damages according to proof at trial, including out-of-pocket expenses in excess of $17 million and lost profits in excess of $100 million.

### FOURTH CAUSE OF ACTION

### Actual Fraud/Corruption/Damages

### (Against Anne Marie Gallant)

130.    SCC Alameda repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

131.    Commencing in 2009, Interim City Manager Anne Marie Gallant repeatedly told SCC Alameda representatives that the project was on track and/or that any issues would be worked through.  While saying one thing, she was covertly doing just the opposite, working to oust SCC Alameda from, and set herself up as the person in charge of, the project.

THIRD AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

99360.2

132.    Gallant fraudulently concealed from SCC Alameda her "secret plan" to oust SCC Alameda and create a public project. She undertook this scheme corruptly, for the self-serving purpose of perpetuating herself in office (her current contract expires in four months).

133.    While Gallant pursued her "secret plan," SCC Alameda continued to put millions of dollars into Alameda Point to, among other things, pay City salaries (including Gallant's) and consultants associated with the project. Gallant induced SCC Alameda to continue funding the project and to do work on the project knowing that all of the money/work done by SCC Alameda would be appropriated in pursuit of Gallant's "secret plan."

134.    Despite Gallant's secret plan, she told SCC Alameda to move forward and conduct an environmental impact report on the project. Gallant was encouraging SCC Alameda to spend money on the project while pursuing her secret plan surreptitiously behind SCC Alameda's back.

135.    Gallant spearheaded the effort to oust SCC Alameda from the project. She worked on amassing facts she believed to be harmful to SCC Alameda on completely unrelated matters in order to kill the project.

136.    SCC Alameda is also informed and believes that Gallant uses her personal computer to conduct Alameda City business in order to conceal her fraudulent activity from discovery and Public Records Act requests.   Gallant caused or at least acquiesced in the destruction of critical emails from her City email account related to the project.

137.    Despite claiming that she spent 20% of her time on Alameda Point, only one email from Gallant's City account prior to May 2010 has been produced in SCC Alameda's Public Records Act lawsuit against Alameda. Gallant's emails have been destroyed.

138.    After saying that everything was on track or would be worked out, Gallant orchestrated the creation of a phony list of "justifications" to support voting down SCC Alameda's entitlement application. For example, Alameda agreed with the traffic impact of the Project in 2008, and the assumptions from then did not change in the Entitlement Application. Yet Gallant listed this as a justification for voting down the application.

139.    The Staff Report also cited "Risk of Project Infeasibility and Adverse Outcomes," stating that City consultant Economic & Planning Systems and City staff "believe that the

27

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

99360.2

assumptions in [SCC Alameda's] project pro forma do not take into account significant changes in the real estate market since 2006, overestimate project revenues, and underestimate project costs." But in late 2008, the City and its consultant previously agreed to the pro forma and all revenue/cost assumptions.

140.    The Staff Report also stated that the Entitlement Application "does not commit to developing a balance of jobs and housing...." This is another trumped up excuse. Alameda previously agreed with the jobs/housing balance provided for in the phasing plan in 2008. The March 2010 Entitlement Application actually increased the commercial component of the project (because of the City's request for more jobs at the site).

141.    The Staff Report also provided that the impact on endangered species is a reason to deny the Entitlement Application; but City staff attended meetings with the Fish and Wildlife Service and other organizations and approved of SCC Alameda's plan in 2008.

142.    Having accomplished her scheme to oust SCC Alameda from the project, Gallant is now appropriating SCC Alameda's work product and passing it off as her own.

143.    Unbeknownst to SCC Alameda, the City Council vote on July 20, 2010 was a set-up; the scheme to deny the project was put in place months before by Gallant; and the vote was the culmination of that scheme. Gallant's corrupt self-serving motivation was to entrench herself as head of a public agency in charge of the multi-year complex project.

144.    The July 20, 2010 Staff Report confirms the fraud and corruption of Gallant. Virtually every one of the items cited in the Report either had been, or was in the process of being, satisfied. In fact, Gallant and her lackeys in Alameda represented just that to SCC Alameda, thereby inducing SCC Alameda's reliance and continuing work on the project. Specifically:

(a)    The Report cites a supposed "Lack of Commitment to Mixed-Use Transit-Oriented Development," when Gallant knew full well and previously had acknowledged that this was not an issue.

(b)    The Report cites "Jobs/Housing Imbalance" as a basis for denial of the entitlements, but again, Gallant and her staff previously had acknowledged that there was no such problem.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

(c)     The Report claims as a basis for denial that there is a "Need for Economic Development Strategy," but omits that this very matter had been discussed with Gallant and satisfied.

(d)     The Report cites "Traffic Impacts" as a reason for denial, but as with respect to the other items therein, this issue had been previously addressed and acknowledged to be on track by Gallant.

(e)     The Report references "Impacts to Endangered Species" as a reason for denial; this is yet another about-face and ambush, contrary to the repeated discussions and prior assurances from Gallant and others that there was no such impediment.

(f)     The Report relies on "Risk of Project Infeasibility and Adverse Incomes" in claiming that the project pro formas were inadequate, but fails to acknowledge that Gallant and the City previously had reviewed and approved the very same financial pro formas.

(g)     Last, and perhaps most galling, the Report references "Lack of Community Support" as a reason for denial, but omits that it was the Redevelopment Authority Board (led by Gallant) which insisted on putting the initiative on the ballot that Gallant now claims evidences lack of community support.

145.    For over a year leading up to SCC Alameda's ouster, Gallant laid in wait and lied to and sandbagged the plaintiff, then ambushed them with the Staff Report of July 20, 2010.

146.    Gallant's fraud and secret plan have caused damages to SCC Alameda, including out-of-pocket expenses in excess of $17 million and lost profits in excess of $100 million.  Gallant's fraud was done intentionally with complete disregard of SCC Alameda's rights, constituting oppression, fraud and/or malice.  SCC Alameda is entitled to exemplary and punitive damages in an amount appropriate to punish Gallant, and to deter such despicable conduct in the future.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

## FIFTH CAUSE OF ACTION

### Declaratory Relief

### (Against City of Alameda, Alameda Reuse and Redevelopment Authority and Community

### Improvement Commission of The City of Alameda)

147.    SCC Alameda repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

148.    Alameda has prevented SCC Alameda's performance under the Exclusivity Agreement.  SCC Alameda has satisfied all other conditions requiring automatic extension of the Exclusivity Agreement except as excused by Alameda's breach.

149.    An actual controversy has arisen and now exists between SCC Alameda and Alameda concerning their respective rights and duties.

150.    SCC Alameda requests a judicial determination of the parties' rights and duties as set forth herein.  A judicial declaration is necessary and appropriate in order that the parties may ascertain their respective rights, duties and obligations.

151.    Specifically, SCC Alameda requests a declaration that Alameda breached the Exclusivity Agreement by repudiating the pro forma previously agreed to by the parties and failing and refusing to: (1) negotiate a Finalized Navy Term Sheet in good faith; (2) work cooperatively with SCC Alameda to prepare the project pro forma; (3) ensure the continuity of its staff throughout the life of the project; (4) respond to SCC Alameda's document submissions within a reasonable time and process the project entitlements; and (5) undertake the environmental review in good faith and complete the CEQA review and entitlement process.

152.    SCC Alameda further requests a declaration that (1) the Exclusivity Agreement is automatically extended past July 20, 2010, until such time that Alameda complies with its contractual obligations, and that the defendants be precluded and estopped from contending to the contrary; and (2) that the July 20, 2010 vote to deny the Entitlement Application was improper and unconstitutional, and that the vote be set aside.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

THIRD AMENDED COMPLAINT

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PRAYER FOR RELIEF

WHEREFORE, SCC Alameda respectfully prays for judgment against Defendants, and each of them, as follows:

## FIRST CAUSE OF ACTION

1.     For a declaration that the July 20, 2010 vote to deny the Entitlement Application was improper and unconstitutional; and that the vote be declared null and void and set aside.

## SECOND CAUSE OF ACTION

2.     For specific performance and declaratory relief as specified below.

3.     For specific performance, including an order requiring Alameda to: (1) negotiate a Finalized Navy Term Sheet in good faith; (2) work cooperatively with SCC Alameda to prepare the project pro forma; (3) ensure the continuity of its staff throughout the life of the project; (4) respond to SCC Alameda's document submissions within a reasonable time and process the project entitlements; and (5) undertake the environmental review in good faith and complete CEQA review and the rest of the entitlement process.

## THIRD CAUSE OF ACTION

4.     For compensatory damages in excess of $100 million, or an amount according to proof at trial.

## FOURTH CAUSE OF ACTION

5.     For compensatory damages in excess of $100 million, or an amount according to proof at trial.

6.     For punitive and exemplary damages against Gallant.

## FIFTH CAUSE OF ACTION

7.     For declaratory relief, including a declaration that Alameda breached the Exclusivity Agreement by repudiating the pro forma previously agreed to by the parties and failing and refusing to: (1) negotiate a Finalized Navy Term Sheet in good faith; (2) work cooperatively with SCC Alameda to prepare the project pro forma; (3) ensure the continuity of its staff throughout the life of the project; (4) respond to SCC Alameda's document submissions within a reasonable time; and

THIRD AMENDED COMPLAINT

99360.2

(5) undertake the environmental review in good faith and complete CEQA review and the rest of the entitlement process.

8.      For a declaration that the Exclusivity Agreement is automatically extended past July 20, 2010, until such time that Alameda complies with its contractual obligations; and that the defendants be precluded and estopped from contending that the contract is no longer in effect.

9.      For a declaration that the July 20, 2010 vote to deny the Entitlement Application was improper and unconstitutional; and that the vote be declared null and void and set aside.

## FOR ALL CAUSES OF ACTION

10.      For attorneys' fees and costs of suit.

11.      For such other and further relief as the Court may deem just and proper.

DATED:  November 10, 2011          MILLER BARONDESS, LLP


By: _____
      Louis R. Miller
      Attorneys for Plaintiff
      SCC ALAMEDA POINT, LLC

THIRD AMENDED COMPLAINT

99360.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1

## **DEMAND FOR JURY TRIAL**

2       If and to the extent available at law, Plaintiff SCC Alameda Point, LLC hereby demands a

3  jury trial pursuant to Rule 38(a) of the Federal Rules of Civil Procedure.

4

5  DATED:  November 10, 2011          MILLER BARONDESS, LLP

6

7                                      By:_____
                                          Louis R. Miller
8                                         Attorneys for Plaintiff
                                          SCC ALAMEDA POINT, LLC
9

10

THIRD AMENDED COMPLAINT

# EXHIBIT A

## ALAMEDA POINT
## EXCLUSIVE NEGOTIATION AGREEMENT

THIS ALAMEDA POINT EXCLUSIVE NEGOTIATION AGREEMENT (this "**Agreement**") is entered into as of July 18, 2007 (the "**Effective Date**"), by and between the **ALAMEDA REUSE AND REDEVELOPMENT AUTHORITY**, a Joint Powers Authority established by the City of Alameda and the Community Improvement Commission under the California Joint Exercise of Powers Act and a public entity lawfully created and existing under the State of California (the "**ARRA**"), the **COMMUNITY IMPROVEMENT COMMISSION OF THE CITY OF ALAMEDA**, a public body corporate and politic (the "**CIC**"), and the **CITY OF ALAMEDA**, a municipal corporation (the "**City**", and together with ARRA and CIC, "**Alameda**") and **SCC Alameda Point LLC, a Delaware limited liability company** ("**Developer**").  Alameda and Developer are individually referred to as a "**Party**" and collectively referred to as the "**Parties**".

### RECITALS

This Agreement is entered into upon the following facts, understandings and intentions of the Parties:

A.      The United States of America, acting by and through the Department of the Navy ("**Navy**") is the owner of certain real property located within the City of Alameda, State of California commonly referred to as the former Alameda Naval Air Station, now known as "**Alameda Point**", which was closed as a military installation and is subject to disposal pursuant to and in accordance with the Defense Base Closure and Realignment Act of 1991, as amended (Pub. Law No. 101-510).  The property that is the subject of this Agreement consists of approximately 1000 acres located at Alameda Point referred to as "**Phase 1**", "**Phase 2**" (including the area commonly known as the "Northwest Territories"), and "**Phase 3**" (which is included strictly for purposes of entitlement at a programmatic level) (collectively, the "**Project Site**").  Phase 1, Phase 2 and Phase 3 are shown on the "**Map of the Project Site**", attached hereto as Exhibit A.  Phase 1 and Phase 2 are sometimes referred to collectively as the "**Property**".  Certain portions of Alameda Point are not part of the Project Site.

B.      In accordance with procedures established under federal and California state law governing the planning, disposition and reuse of closed military bases, ARRA adopted the Alameda Point Community Reuse Plan (the "**Community Reuse Plan**") on January 31, 1996, with subsequent amendments in 1997.

C.      On March 3, 1998, the City Council of the City approved and adopted (1) the Community Improvement Plan (the "**APIP Community Improvement Plan**") for the Alameda Point Improvement Project (the "**APIP Project**") by Ordinance No. 2754.  The property subject to the APIP Community Improvement Plan is referred to herein as the "**APIP Project Area**". The Project Site is located within the APIP Project Area.

D.      Subsequently, in October 1999, the Navy issued a Final Environmental Impact Statement for the Disposal and Reuse of Naval Air Station Alameda and the Fleet and Industrial

Exhibit _A_

Page _94_

Supply Center, Alameda Annex and Facility.  The Record of Decision regarding the disposal and reuse was issued by the Navy on February 29, 2000.

E.      The Navy and ARRA entered into a Lease in Furtherance of Conveyance dated June 6, 2000, as amended by that certain Amendment No. 1 to the Lease in Furtherance of Conveyance between the United States of America and the Alameda Reuse and Redevelopment Authority for the Former Naval Air Station Alameda, dated November 28, 2000 (the "**LIFOC**"), and a No-Cost Economic Development Conveyance Memorandum of Agreement dated June 6, 2000 (the "**EDC MOA**").

F.      In 2003, the City amended its General Plan to incorporate the policies and land use designations contained in the Community Reuse Plan.  The allowable number of residential units and commercial square footage differed from those contained in the ARRA's 1998 EDC application.  As a result, the Navy questioned whether ARRA remained eligible for a No-Cost EDC.  In lieu of submitting an amendment to the No-Cost EDC application, ARRA elected to negotiate a "For-Cost" EDC with the Navy.

G.      In 2004, ARRA committed $3.5 million to a pre-development effort to:  (1) prepare a land plan in conjunction with the community that would identify key entitlement issues and provide more certainty to the project approval process and which culminated in the Alameda Point Preliminary Development Concept dated February 1, 2006, prepared by ROMA Design Group (the "**PDC**"); and (2) negotiate a draft conveyance term sheet ("**Draft Navy Term Sheet**") with the Navy.

H.      On October 4, 2006, ARRA authorized a Request for Qualifications ("**RFQ**") process to select a developer willing to redevelop the Project Site.  SCC Acquisitions, Inc., a California corporation ("**SCC Acquisitions**"), an affiliate of Developer, responded to the RFQ through an initial response on or about December 4, 2006 and through a subsequent response on March 8, 2007 (the "**Developer Response**").

I.      On May 8, 2007, based on the Developer Response, ARRA selected SCC Acquisitions to have an exclusive 60-day due diligence period (the "**Due Diligence Period**") to determine its interest in becoming the new master developer of the Project Site and entering into this Agreement.

J.      On May 14, 2007, ARRA and SCC Acquisitions dba SunCal Companies entered into that certain Alameda Point Memorandum of Agreement (the "**Developer MOA**"), which, among other things, established a sixty (60) day period for the negotiation of this Agreement.

K.      The purposes of this Agreement are to (1) define the redevelopment and entitlement of the Project Site (the "**Project**") (2) provide a framework for the negotiation of the terms of a Disposition and Development Agreement (the "**DDA**") for the Project and the Property, and (3) establish timeframes for and to set forth the process by which the Parties shall negotiate and execute the DDA and the Transaction Documents (as defined in Section 3 below).

In consideration of the mutual covenants contained herein, Alameda and Developer agree as follows:

2

Exhibit _A_
Page _35_

Section 1.  <u>Negotiations</u>.

    1.1    <u>Good Faith Negotiations</u>.  The Parties, during the Exclusive Negotiation Period set forth in <u>Section 2.1</u> of this Agreement, shall negotiate diligently and in good faith to prepare the Transaction Documents (as defined in <u>Section 3</u> below) and complete the tasks set forth in <u>Section 3</u> below relating to the Project and the Project Site.

    1.2    <u>Exclusive Negotiations</u>.  During the Exclusive Negotiation Period, Alameda covenants and agrees that it shall negotiate exclusively with Developer regarding the Project and the Project Site and shall not solicit, market to or negotiate with any other person or entity regarding the Project and the Project Site or solicit or entertain bids or proposals to do so; except that Alameda may, in the routine course of governmental affairs, contact (or be contacted by), discuss, or meet with the Navy or any other governmental entity or Alameda may respond to inquiries regarding Phase 3, and Developer acknowledges that such contact, discussions, meetings, or responses may pertain in whole, or in part, to the Project and/or the Project Site. The Parties acknowledge that the Navy may, in its discretion, pursue an alternative disposition of the Phase 3 portion of the Project Site.

    1.3    <u>Not a DDA</u>.  The Parties do not intend this Agreement to be a DDA, purchase agreement, ground lease, license, option or similar contract.

Section 2.  <u>Term</u>.

    2.1    <u>Term of this Agreement</u>.  The term of this Agreement (the "**Exclusive Negotiation Period**") shall commence on the Effective Date and, subject to extension pursuant to Section 2.2 below, shall terminate on the second anniversary of the Effective Date.

    2.2    <u>Extension of the Exclusive Negotiation Period</u>.

    2.2.1    <u>Mutual Extension</u>.  The Parties acknowledge that their ability to prepare the Transaction Documents and complete the tasks set forth in <u>Section 3</u> below is dependent to some extent on reaching agreement with certain third parties, including the Navy (for the transfer of the Property) and the California State Lands Commission (with respect to the public trust), and may also be dependent on achieving certain regulatory approvals and satisfying certain other conditions that are outside of their control.  If before the execution of the DDA by the Parties, any of such third-party agreements, regulatory approvals or other conditions are not finalized, obtained or satisfied, then to the extent practical the Parties shall in good faith negotiate the DDA and characterize such third-party agreements, regulatory approvals or other conditions as conditions precedent to the obligations of the Parties to the close of escrow for conveyance of the Property pursuant to the DDA.  Notwithstanding the foregoing, if the Parties are unable to meet the date for completion of the Non-Mandatory Milestone (as defined in <u>Section 4.3</u> below) for the DDA set forth on the Schedule of Performance (Non-Mandatory Milestones) attached hereto as <u>Exhibit B-2</u> (the "**Non-Mandatory Milestone Schedule of Performance**") due to the inability of the Parties to complete a Transaction Document because of the action(s) or inaction(s) of a third party, then the Exclusive Negotiation Period may be extended up to one (1) year by the mutual agreement of Developer and Alameda (as determined by its Board of Directors, Board of Commissioners and City Council).

3



Exhibit 4
Page 36

2.2.2    Progress Extension.  If Alameda can make the following findings (as determined by its Board of Directors, Board of Commissioners and City Council):  (a) that Developer has met all of the Mandatory Milestones (as defined in Section 4.2 below), as the same have been extended as provided herein, or except to the extent the Mandatory Milestone for the Project Pro Forma (as defined in Section 3.2.4 below) has been waived by Alameda pursuant to Section 4.2.2 below; (b) Developer has provided a Project description sufficient to permit the City to review the Project under the California Environmental Quality Act (Public Resources Code §§ 21000-21177) ("**CEQA**"); and (c) Developer's Entitlement Application (defined in Section 3.2.6 below)  has been filed with the City, the Exclusive Negotiation Period shall be extended automatically until Alameda has made its final determination with respect to the approvals requested in the Entitlement Application and the period for any legal challenge thereto has passed without such challenge, or if such challenge has been made, such challenge has been fully and finally resolved.

2.2.3    Litigation Force Majeure Extension.  The Exclusive Negotiation Period shall be extended automatically in the manner provided in Section 5 below.

2.3    Expiration of the Term of this Agreement.  This Agreement shall automatically terminate upon the earlier of (i) the effective date of a Conditional Acquisition Agreement (the "**CAA**") (as described in Section 3.3 below) executed by the Parties, or (ii) expiration of the Exclusive Negotiation Period, as extended pursuant to Section 2.2 above, and neither Party shall have any further right or obligation under this Agreement except with respect to any obligation which expressly survives the termination or expiration of this Agreement.

Section 3.    Tasks to be Completed.  During the Term, Alameda (or the applicable constituent thereof) and Developer shall negotiate diligently and in good faith the following agreements or documents and use commercially reasonable efforts to complete the following tasks within the time periods provided in the Schedules of Performance (as defined in Section 4.1 below) as the same may be amended pursuant to Section 2.2 above.  The term "**Transaction Documents**" shall include all documents, plans and agreements described in this Section 3.

3.1    Finalized Navy Term Sheet.  Developer shall participate with Alameda to negotiate with the Navy to finalize the Draft Navy Term Sheet, setting forth the terms and conditions for the conveyance of Alameda Point to ARRA, in a manner satisfactory to Alameda and Developer (the "**Finalized Navy Term Sheet**"), which shall, to the extent possible, be consistent with the Plans (as defined in Section 3.2 below) and other objectives contained herein.

3.2    Project Planning.  Developer, at its sole cost, but subject to review and comment by Alameda, shall generate the necessary analysis, plans, studies and pro formas to be able to fully describe all aspects of the proposed Project and to prepare the DDA (and, if applicable, a CAA).  Developer shall work with and make presentations to staff, elected and appointed representatives of Alameda, other governmental entities and community stakeholder groups as mutually determined by the Parties to permit preparation of the DDA (and, if applicable, a CAA).  The purposes of these presentations will be to keep decision makers abreast of the process and to solicit input from key stakeholders regarding the plan.  The final DDA (and, if applicable, a CAA) shall be based on and incorporate the following plans (collectively, the "**Plans**") and the Project Pro Forma (as defined in Section 3.2.4 below):

4

3.2.1   Development Concept.  Developer shall prepare a "**Development Concept**" setting forth conceptual designs for the Project and Project Site and a fully descriptive program of uses.  The Development Concept shall include an update of that certain Sports Complex Master Plan prepared by Moore Iacofano Goltsman, Inc. dated May 19, 1997 (the "**Sports Complex Master Plan**").  It shall include a description of the phasing plan for the Project and a proposed scope of work and schedule of performance, including all key milestones for design, development and construction to completion of the Project.

3.2.2   Infrastructure Plan.  Developer shall prepare an "**Infrastructure Plan**" which shall set forth the existing infrastructure associated with the Project Site and shall describe improvements and engineering required to implement the proposed Development Concept.  In preparation of the Infrastructure Plan, Developer shall analyze the existing infrastructure and prepare a detailed analysis of infrastructure requirements, including a circulation, traffic, transportation and parking plan, a phasing plan and a financing plan (including initial construction cost estimates) for development of required infrastructure.  The Infrastructure Plan shall include analysis of the environmental and geotechnical condition of the Project Site and identification of environmental issues to be resolved and associated cost estimates.

3.2.3   Business Plan.  Based upon the Development Plan and the Infrastructure Plan, Developer shall prepare a "**Business Plan**" that describes the financial and organizational characteristics of the Project in detail sufficient to support negotiation of the DDA (and, if applicable, a CAA).  Specifically, the Business Plan will (i) include an organizational plan, a marketing program, a phasing and financing plan, a public benefit plan, a public financing plan, a feasibility analysis, a project schedule, a project pro forma in electronic spreadsheet format, (ii) include documentation and descriptions of all key cost and revenue assumptions and resulting ~~financial returns, and any additional supporting narrative, (iii) include Developer's plan for~~ financing the Project and related financial assurances, and (iv) provide an overview of how the Project will commence, function, achieve success, manage risk, raise capital and provide fiscal neutrality to Alameda (as described in Section 3.2.4.2), taking into account initial assessments of infrastructure cost and phasing, environmental issues, market analysis, economic modeling, financial modeling and other required technical studies.  The Business Plan shall be consistent with Section 3.7.5 hereto.  It is the intent of the Parties that negotiations of the Business Plan shall be contemporaneous with negotiations of the Development Concept.

3.2.4   Project Pro Forma.  Alameda and Developer shall jointly prepare a pro forma for the Project (the "**Project Pro Forma**").  Alameda and its financial consultant shall control and maintain the Project Pro Forma, which shall be made readily available to Developer in electronic spreadsheet format.  The Project Pro Forma shall reflect that except as described in Section 3.7.5 below, Alameda shall have no financial obligation associated with Developer's development on, or related to, the Project Site.  The Project Pro Forma shall contain all financial considerations of the Project to be incorporated into the DDA, including a method for calculating the following elements:

3.2.4.1   IRR.  The unleveraged internal rate of return ("**IRR**") to Developer for the Project, which IRR shall be based upon all appropriate costs (as defined in the Project Pro Forma), including personnel costs, incurred by Developer directly related to the Project and the Project Site, including pre-development expenditures and an agreed upon general

5

and administrative fee, to achieve an IRR to Developer of twenty percent (20%) to twenty-five percent (25%), provided, however, the precise IRR shall be subject to negotiation of the Parties as part of the DDA.

3.2.4.2   Fiscal Neutrality.  Developer shall pay the required costs for acquisition of the Property and shall cooperate in implementing a municipal services district or other funding mechanism(s) (public or private) to ensure the Project is fiscally neutral with respect to the City General Fund.  The funding mechanism is intended to (a) result in no negative impact to the City's General Fund, taking into consideration the reasonably anticipated revenues to the City's General Fund from the Project Site, and (b) avoid negative effects to the existing or future operations of the City.  The model for the funding mechanisms provided in the Project Pro Forma shall provide for future fiscal neutrality and preserve the current fiscal neutrality with respect to the General Fund, which shall include funding for normal and customary municipal services, such as police and fire services.

3.2.5   Entitlement Plan.  Developer shall develop an "**Entitlement Plan**" for the Project and the Project Site that shall include a list and provide a timeline for obtaining all land use entitlements and approvals it will seek from the City, including (a) a General Plan amendment, if required, (b) a master plan (the "**Master Plan**") pursuant to the MX zoning designation in the Alameda Municipal Code (the "**MX Zoning**") for the development of the Project Site, (c) a zoning amendment(s), (d) subdivision approval, (e) a development agreement (the "**Development Agreement**") prepared pursuant to California Government Code Section 65864 *et seq.*, vesting in Developer the right to develop the Project to the scope, uses, densities and intensities described in the Master Plan and other implementing regulatory documents and necessary to implement the Development Plan, (f) environmental review pursuant to CEQA, and if applicable, the National Environmental Policy Act ("**NEPA**"), (g) an agreement between Developer and Alameda to provide for expedited processing by the City of all land use entitlement applications including all environmental review required under CEQA and funding thereof by Developer (the "**Expedited Processing Agreement**"), and (h) such other entitlements and approvals as Developer may request for the Project Site.  Developer shall use Best Efforts (as defined in Section 15.5 below) to implement and prosecute to completion the Entitlement Plan.

3.2.5.1   Project Master Schedule.  As a component of the Entitlement Plan, the Developer shall prepare and maintain a project master schedule (the "**Project Master Schedule**") that sets forth, in reasonable detail, the expected tasks necessary to complete all of the Mandatory and Non-Mandatory Milestones, Entitlements, and at the Developer's discretion, subsequent approvals and the anticipated dates that these tasks are expected to be completed. The Developer shall submit the initial Project Master Schedule to the ARRA within thirty (30) business days from the Effective Date of this Agreement and shall update such schedule and deliver the updated schedule to the ARRA on a quarterly basis thereafter.

3.2.6   Entitlement Application.  In order to meet the Mandatory Milestone for the Entitlement Application, Developer shall submit its application for the following items contemplated in the Entitlement Plan: (i) an initial draft of the Master Plan which shall include all applicable components required under MX Zoning; (ii) application for CEQA review; and (iii) an Expedited Processing Agreement (collectively, the "**Entitlement Application**").

Exhibit _A_
Page _39_

Subsequent to submittal of the Entitlement Application, Developer shall use Best Efforts to submit all required supplemental information sufficient for the Entitlement Application to be promptly determined to be complete by Alameda. Subsequent approvals will be necessary in order to develop the Project, which may include, without limitation, development plans; master demolition, infrastructure, grading and phasing plan; subdivision approvals; design review approvals; demolition permits; improvement agreements; infrastructure agreements; grading permits; building permits; site plans; sewer and water connection permits; and other similar requirements.

      3.3    CAA. On Developer's request and using the information developed in the Plans, Alameda and Developer shall negotiate a CAA which will provide the framework for the proposed transaction and the terms of the DDA, including but not limited to, the terms by which ARRA shall acquire and convey the Property to Developer (the "**Property Transfer(s)**"). If a CAA is developed within the Exclusive Negotiation Period, it is the intent of the Parties that the CAA will set forth (i) a development program consistent with the Plans and the Project Pro Forma and (ii) the terms and conditions precedent to the Property Transfer(s) including, without limitation, approval of the CEQA Documents (as defined in Section 3.4 below) and the DDA by Alameda. Upon the request of Developer, Alameda shall take all necessary action to place the CAA on the agendas of each constituent of Alameda for a determination by each as to whether to approve the CAA and upon approval thereof, Developer and Alameda shall execute the CAA. The CAA shall also include provisions described in Section 3.6.6 below.

      3.4    CEQA Documents. The Plans shall be of sufficient specificity to permit the subsequent preparation of the documents required for environmental review of the Project as required by CEQA (the "**CEQA Documents**"), including an environmental impact report or such other information and reports as may be required to permit Alameda to comply with the requirements of CEQA. Preparation of the CEQA Documents shall be a Non-Mandatory Milestone and shall commence following satisfaction of the Mandatory Milestone for the Entitlement Application. Execution of the DDA by the Parties and the closing of the Property Transfer(s) under the DDA shall be contingent upon certification of the CEQA Documents and adoption of the mitigation measures described therein.

      3.5    Conditions to Property Transfer(s). The following shall be conditions precedent to the Property Transfer:

          3.5.1   An amendment of the EDC MOA to permit a conveyance of the Property from the Navy to ARRA in accordance with the Finalized Navy Term Sheet (the "**EDC MOA Amendment**").

          3.5.2   As required by the Finalized Navy Term Sheet, Developer shall provide evidence adequate to ARRA of Developer's ability to secure environmental insurance, including but not limited to a Cleanup Cost Cap policy and a Pollution Legal Liability policy (the "**PLL Policy**") or policies to the extent such are required to execute any necessary Early Transfer, provided that the PLL Policy shall not only be acceptable to the Navy, but shall also be acceptable to Alameda and shall name Alameda as additional insured(s), which acceptance by Alameda shall not be unreasonably withheld.

Exhibit _A_
Page _40_

3.5.3   Environmental documents including financial assurance to regulators, early transfer package including a Finding of Suitability for Early Transfer (the "**FOSET**") and Covenant Deferral Request (the "**CDR**"), Environmental Services Cooperative Agreement (the "**ESCA**") or Early Transfer Cooperative Agreement (the "**ETCA**") or similar agreement, and consent orders among the environmental regulatory agencies and other State of California and federal officials to the extent such documents are necessary to facilitate conveyance of the Property pursuant to the schedule of performance to be included in the DDA.

3.5.4   A tidelands trust exchange agreement or similar agreement between the City and the California State Lands Commission to implement the exchange of lands into and out of the tidelands trust area (the "**Tidelands Trust Exchange Agreement**"), pursuant to California legislation adopted in 1999.

3.5.5   An amendment of that certain Memorandum of Agreement Among the United States Navy, the Advisory Council on Historic Preservation and the California State Historic Preservation Officer Regarding the Layaway, Caretaker Maintenance, Leasing and Disposal of Historic Properties on the Former Naval Air Station, Alameda, California, dated September 1, 1999 (the "**Section 106 Memorandum**").

3.5.6   A predator management agreement or similar agreement ("**Predator Management Agreement**") among Alameda, Developer and the U.S. Fish & Wildlife Service (the "**USFWS**") or other parties related to the effort to manage the predators of the California Least Tern pursuant to the Biological Opinion issued by the Navy on March 22, 1999 (the "**USFWS Biological Opinion**"), in furtherance of the Endangered Species Act.

3.5.7   Environmental review of the Project pursuant to CEQA, and if applicable, NEPA, and certification by the lead agency of the CEQA Documents (collectively, "Certification"), with all relevant appeal periods with respect to each such Certification having expired without the filing of a challenge or appeal, or if a challenge to or appeal of any Certification is filed, with such challenge or appeal resolved in a manner reasonably satisfactory to Developer that shall permit construction of the Project substantially as described in the DDA and the Entitlement Application filed with Alameda.

3.5.8   Approval by the City and, as applicable, the CIC, ARRA or any other relevant governmental agency, of the following zoning and entitlement applications and agreements for the Project ("**Approvals**"), with all relevant appeal periods with respect to each such Approval having expired without the filing of a challenge or appeal, or if a challenge to or appeal of any Approval is filed, with such challenge or appeal resolved in a manner reasonably satisfactory to Developer that shall permit construction of the Project substantially as described in the DDA and the Entitlement Application filed with Alameda:

3.5.8.1   The entitlements and approvals described in Section 3.2.5(a) through (g);

3.5.8.2   DDA (as described in Section 3.6 below);

3.5.8.3   APIP Community Improvement Plan amendment and Five-Year Implementation Plan amendment, if required;

8

Exhibit A

Page 41

3.5.8.4   Zoning map amendment;

3.5.8.5   Development Plan and Design Review, at Developer's sole discretion;

3.5.8.6   Parcel, Tentative or Vesting Tentative Maps, at Developer's sole discretion.

3.5.9   If applicable, revision of the USFWS Biological Opinion (the "**USFWS Biological Opinion Revision**").

3.5.10   If applicable, a biological opinion issued by the National Oceanic & Atmospheric Administration National Marine Fisheries Service (the "**NMFS Biological Opinion**").

3.6   <u>DDA</u>. The DDA will provide the mechanics and execution of the business terms, will define the legal and administrative mechanisms to implement the Property Transfer(s) and will establish the essential terms and framework of the Property Transfer(s), including specifying funding sources, Project phasing, the scope of development, terms of the Property Transfer(s), a schedule of performance, environmental clean-up responsibilities of Developer and the Navy, and specific obligations of Developer and Alameda in carrying out redevelopment of the Project Site. Subject to Section 3.6.6 below, it is the intention of the Parties that the Persons holding the Ownership Interests in Developer as of the date hereof shall continue to exercise management and control of Developer throughout the term of the DDA. The DDA shall be consistent with the terms of the CAA if the Parties enter into a CAA, and shall include the following key terms and provisions:

3.6.1   <u>Planning and Financial Terms</u>. The DDA shall incorporate the provisions of the Development Plan, the Infrastructure Plan and the Business Plan and shall include all financial considerations for the Project, including those described in the Business Plan and Project Pro Forma, as updated and refined per CEQA (and if applicable, NEPA) review of the Project.

3.6.2   <u>Transaction Documents</u>. All applicable terms of the completed Transaction Documents, and provision for completion and incorporation of applicable terms of all Transaction Documents that are to be completed after execution of the DDA, and if applicable, prior to close of escrow pursuant to <u>Section 2.2.1</u> above.

3.6.3   <u>Environmental Remediation Liability</u>. The DDA will provide for the liability of the Parties, if any, in respect of any environmental remediation on, or related to, the Project or Project Site.

3.6.4   <u>Project Completion</u>. Use of regulatory and financial mechanisms to achieve completion of the development of each phase of the Project in a prompt and reasonable manner, and remedies of Alameda for failure to complete. Such mechanisms shall include, but will not be limited to:

Exhibit _A_
Page _43_

9

3.6.4.1  Provisions for the development of certain uses, phases, or sub-phases concurrently with other uses, phases, or sub-phases.

3.6.4.2  Provisions for the completion or partial completion of phases or sub-phases prior to the commencement of development of other phases or sub-phases.

3.6.4.3  Provisions for the timing and manner in which Developer shall provide drawings, elevations, models and other depictions of the design and construction details for development of the Project, and the timing and method for securing all required regulatory approvals.

3.6.4.4  A schedule of performance to be attached as an exhibit to the DDA, covering the Property Transfer(s) including leasing with respect to tidelands trust lands and assignment of existing leases (such as Buildings 22 and 40), permitting and development obligations and milestones. The DDA schedule of performance shall include obligations such as the filing of applications for tentative maps; the filing of final maps; the completion of, or bonding for, infrastructure; and post-conveyance infrastructure and vertical development obligations.

3.6.4.5  Extensions for performance due to force majeure or litigation challenging entitlements, subject to periods to be negotiated in the DDA.

3.6.4.6  Appropriate financial assurances, which may include performance and payment guarantees, to assure development of conveyed phases.

3.6.4.7  Terms providing for, and assuring the development of, all affordable housing by phases pursuant to the requirements of Community Redevelopment Law; the Housing Element of the General Plan, and that certain Settlement Agreement effective as of March 20, 2001 by and among the City, CIC, ARRA, the Housing Authority, Catellus Development Corporation, Renewed Hope Housing Advocates, and Arc Ecology. The affordable housing shall include, and Developer shall be entitled to a credit against its affordable housing obligation for, those certain 157 units of multi-family attached units that may be constructed by the Housing Authority of the City of Alameda (the "**Housing Authority**") on the Project Site on terms and conditions acceptable to Alameda, the Housing Authority and Developer which may include the following:  (a) that the Housing Authority construct such units in "partnership" with Developer or a nonprofit or for-profit housing developer entity selected by the Housing Authority; (b) that the Housing Authority have an ownership interest in such housing; (c) approval by the Housing Authority of the development site(s) for such housing; (d) determination of the levels of affordability (it is the intention of the Parties that such housing shall first satisfy the very low and low income affordability requirements of the Project); (e) the site(s) be prepared for vertical development by Developer; and (f) the Housing Authority may receive a negotiated development fee.

3.6.4.8  Default and termination provisions (including reasonable cure periods), for failure to acquire portions of the Property, to apply for entitlements, or to develop the Project pursuant to the terms of the DDA and the DDA schedule of performance; which shall include rights of reverter in the CIC to conveyed land.



Exhibit _4_
Page _43_

3.6.4.9   Requirements for the Developer to negotiate in good faith to enter into a project labor agreement for the construction trades.

3.6.5   <u>Personal Property</u>. Provisions for the disposition of personal property owned by Alameda located on, or related to, the Property.

3.6.6   <u>Transfers</u>. Provisions for Transfer (as defined in <u>Section 9.2.4.5</u> below), which shall include (i) a mechanism for parties contributing debt or equity to the Project to remove Developer from day-to-day management of the entity that executes the DDA (the "**DDA Development Entity**") upon the occurrence of a default under the DDA Development Entity's operating or partnership agreement, provided that Developer is concurrently replaced with a substitute developer controlling day-to-day management that meets specified criteria as a "qualified developer", including the approval of Alameda, which approval will not be unreasonably withheld, conditioned or delayed, and (ii) the right of Developer to Transfer, on or after the date on which the DDA is signed, Ownership Interests (as defined below) in Developer so long as (A) SCC Acquisitions, LLC, a Delaware limited liability company ("**SCC Acquisitions, LLC**") or its wholly owned subsidiary shall continue to manage Developer on a day-to-day basis and have contributed to Developer an agreed percentage (with Alameda's intent for such percentage to be higher than 5%) of the cash equity contributed and to be contributed by all of the parties holding Ownership Interests in Developer and (B) Alameda has determined that Developer has the financial ability, including debt and/or equity financing, to carry out its obligations under the DDA, which determination by Alameda shall not be unreasonably withheld, conditioned or delayed.

3.6.7   <u>Leases</u>. Provisions for addressing the leases described in <u>Section 21</u> below.

3.7   <u>Certain Overall Principles and Undertakings</u>. The documents and actions contemplated in this <u>Section 3</u> shall comply with the following general principles and be consistent with the following undertakings and agreements, all of which shall be applicable to the Project as a whole.

3.7.1   <u>Dedication of Alameda Personnel; Response Time; Approvals</u>.

3.7.1.1   Alameda and its constituent entities shall dedicate staff and other resources which are adequate at all times to perform the responsibilities of Alameda under this Agreement, and to the best of its ability, Alameda and its constituent entities shall assure that there is continuity of its staff throughout the life of the Project.

3.7.1.2   Subject to the Expedited Processing Agreement, Alameda shall use Best Efforts to respond to each submission of Developer required hereunder within a reasonable period from the date of submittal of the same. Alameda and its constituent entities shall keep Developer apprised of the anticipated timing of Alameda's response.

3.7.2   <u>Project Infrastructure</u>. The planning, construction, financing and payment for on and off-site Project infrastructure are obligations of Developer and not Alameda, except to the extent that public financing is provided by Alameda for the Project as described in <u>Section 3.7.5</u> below.

Exhibit _A_
Page _44_

3.7.3   Transportation. Developer shall, in the DDA, commit to (i) the implementation of transportation mitigation measures identified for the Project pursuant to the CEQA Documents, (ii) implementation of, or compliance with, conditions of approval pertaining to transportation, and (iii) participation in transportation demand management and transportation systems management programs.

3.7.4   Compliance with CIC Requirements.  Developer shall comply, or cause compliance, with all CIC requirements applicable to development of the Project, including, but not limited to:  (i) the nondiscrimination and nonsegregation requirements of the APIP Community Improvement Plan for the APIP Project Area, and (ii) any requirements for training and employment opportunities to be extended to low-income residents of the Project Site, including requirements pursuant to those certain Standards of Reasonableness for Homeless Uses at Alameda Naval Air Station, as amended by that certain First Amendment to the Standards of Reasonableness, dated October 1999 (collectively, the "**Standards of Reasonableness**").

3.7.5   Tax Increment and Other Public Financing.

3.7.5.1   Tax Increment Financing.  To the extent contemplated by the Project Pro Forma and committed to in the DDA, and subject to any conditions imposed thereon, including demonstrated need, priority of repayment of CIC's and ARRA's existing debt and operating expenses, priority of public benefit funding, the CIC shall make tax increment generated by the Project available to obtain public financing to fund project costs eligible under applicable law.  The DDA or related documents, as applicable, shall determine the timing and phasing of development and order of priority of use of any tax increment committed to the Project by Alameda and such committed public funding shall be taken into account in the Project Pro Forma and the DDA pro forma.

3.7.5.2   Assessment Districts.  Subject to the provisions of Section 3.7.5.1 above, the DDA shall contain provisions which allow Alameda, subject to exercise of its sole discretion, to make available additional public financing, including use of assessment districts and formation of a municipal services district and/or community facilities district.  Developer shall cooperate in the formation of such assessment or taxing district.

3.7.5.3   Financial Protections.  All public financing provided by Alameda shall be conditioned upon the inclusion of customary adequate protections for the CIC of its financial position and shall require rights of profit participation after Developer receives the IRR negotiated as part of the DDA as described in Section 3.2.4.1 above.

3.7.6   Alameda Power & Telecom.  Developer understands that Alameda Power & Telecom ("**APT**") desires to market and provide telecommunications and other services to its telecommunication customers within the Project and is willing to negotiate in good faith with APT with respect to providing such services to the Project.

3.7.7   DDA and EDC MOA.  The DDA shall comport with the EDC MOA as it may be amended.

3.7.8   Conditional Commitment to Terms, Terms not Exclusive.  If the CIC and/or ARRA choose to approve and execute a DDA (and, if applicable, a CAA) with Developer

12



Exhibit _4_

Page_____ _45_

for the Project Site, and Developer elects to execute the DDA (and, if applicable, a CAA), the Parties agree that such DDA (and, if applicable, a CAA) shall contain, implement, and shall be internally consistent with, the provisions referenced, described, or set forth in this Section 3, subject to mutual written modification by the Parties. The provisions above are not intended as an exclusive list of the contents of a DDA (and, if applicable, a CAA), which is anticipated to be longer, more detailed, elaborated on, and go beyond, the above treatment of such issues.

      3.8    Delivery of Documents and Reports.

            3.8.1    Developer Documents. Developer shall provide to Alameda copies of all final reports, studies, analyses, cost estimates, material correspondence, and similar documents prepared or commissioned by Developer with respect to this Agreement, the Project and the Project Site, promptly upon their completion and following internal review by Developer, but excluding confidential or proprietary information which Alameda may not keep confidential pursuant to Section 10 below.

            3.8.2    Alameda Documents. To the extent Alameda has not provided the following to Developer during the Due Diligence Period and to the extent the following are in Alameda's possession as of the Effective Date, promptly following the Effective Date, Alameda shall provide to Developer copies of all final reports, studies, analyses, cost estimates, material correspondence, and similar documents prepared or commissioned by Alameda with respect to this Agreement, the Project, the APIP Project (including tax increment financing analysis) and the Project Site. Thereafter, Alameda shall provide to Developer copies of all reports, studies, analyses, cost estimates, material correspondence, and similar documents prepared or commissioned by Alameda with respect to this Agreement, the Project, the APIP Project (including tax increment financing analysis) and the Project Site, promptly upon their completion and following internal review by Alameda and, if applicable, acceptance by the applicable governing bodies of Alameda, but excluding confidential privileged documents. Nothing in this Section 3.8.2 obligates Alameda to undertake any studies or analyses other than as required by CEQA.

            3.8.3    Draft Documents. Notwithstanding anything to the contrary in Sections 3.8.1 and 3.8.2 above, the Parties acknowledge that it may be necessary to share with each other drafts reports, studies, analyses, cost estimates, material correspondence, and similar documents prepared or commissioned by Developer or Alameda with respect to this Agreement, the Project and the Project Site, provided such drafts are either not confidential or proprietary information of Developer which Alameda may not keep confidential pursuant to Section 10 below, or are confidential privileged documents of Alameda.

Section 4.    Schedule and Milestones.

      4.1    Schedules of Performance. The Non-Mandatory Milestone Schedule of Performance attached hereto as Exhibit B-2 sets forth the Non-Mandatory Milestones (as defined below) and initial estimated time periods for completion thereof. The Schedule of Performance (Mandatory Milestones) attached hereto as Exhibit B-1 (the "**Mandatory Milestone Schedule of Performance**") sets forth the Mandatory Milestones (as defined in Section 4.2 below) and dates for achieving the Mandatory Milestones. The Non-Mandatory Milestone Schedule of

Performance and the Mandatory Milestone Schedule of Performance are sometimes referred to herein collectively as the "**Schedules of Performance**". The Schedules of Performance may be amended by the Parties from time to time to reflect, among other things, extensions pursuant to Sections 4.2.1 or 5 below.

 4.2 Mandatory Milestones. The mandatory milestones (the "**Mandatory Milestones**") shall be: (i) the submission of (a) the Project Master Schedule as described in Section 3.2.5.1, above, (b) the Development Concept as described in Section 3.2.1 above, (c) the Infrastructure Plan as described in Section 3.2.2 above, (d) the Business Plan as described in Section 3.2.3 above, and (e) the Entitlement Application as described in Section 3.2.6 above; and (ii) mutual agreement of the Parties on the Project Pro Forma as described in Section 3.2.4 above.

  4.2.1 Mandatory Milestone Extension. The date for performance of any Mandatory Milestone may be extended by the Deputy Executive Director of the ARRA if there is a reasonable basis for such extension and so long as such extension does not exceed the Exclusive Negotiation Period, as the Exclusive Negotiation Period may be extended from time to time pursuant to Section 2.2 above.

  4.2.2 Waiver of Project Pro Forma Mandatory Milestone. The failure of Developer and Alameda to agree upon the Project Pro Forma by the date for performance set forth therefor on the Mandatory Milestone Schedule of Performance shall be deemed a waiver by Alameda of the date for performance of that Mandatory Milestone.

 4.3 Non-Mandatory Milestones. The non-mandatory milestones ("**Non-Mandatory Milestones**") shall be the completion of negotiations of the Transaction Documents listed in the Non-Mandatory Milestone Schedule of Performance attached hereto as Exhibit B-2. The dates for performance listed for the Non-Mandatory Milestones are good faith estimates by the Parties of the time required to complete the Transaction Documents. As used herein, completion of Transaction Documents means finalized and ready for approval by Alameda (by its Board of Directors, Board of Commissioners and City Council), or delivered or fully-executed, as applicable, with respect to any Transaction Document that does not require such approval by Alameda. The failure to complete such Non-Mandatory Milestones by the respective dates listed on the Non-Mandatory Milestone Schedule of Performance for any reason whatsoever shall not in and of itself constitute a default by either Party hereunder.

Section 5. Litigation Force Majeure. The Exclusive Negotiation Period, and the dates for performance of Mandatory Milestones, shall be extended for the period of any Litigation Force Majeure (as defined below); provided that any extension as a consequence of Litigation Force Majeure shall operate to extend the date for achievement of any Mandatory Milestone only to the extent that the Mandatory Milestone is affected by the event or events constituting the Litigation Force Majeure. The Parties may elect to amend this Agreement to reflect extensions pursuant to this Section 5, and such amendments shall reflect which Mandatory Milestones and Transaction Documents (and related Non-Mandatory Milestones) are so affected.

 5.1 "**Litigation Force Majeure**" means any action, proceeding, application or request before any court, tribunal, or other judicial, adjudicative or legislative decision-making

Exhibit _A_

Page _47_

body, including any administrative appeal, that is brought by a third party and seeks to challenge: (a) the validity of any action taken by Alameda with respect to a Transaction Document(s), including Alameda's selection of Developer as the developer of the Project Site, the approval by Alameda of any of the proposed Transaction Documents, the performance of any action required or permitted to be performed by Alameda hereunder or under the proposed Transaction Documents, or any findings upon which any of the foregoing are predicated; or (b) the validity of any other approval that is required for the conveyance, management or redevelopment of the Project Site as contemplated hereby and would prevent the Parties from executing the DDA with conditions, as provided above, or prevent the DDA from becoming effective, or require a material modification of the DDA, the Plans, the Entitlement Application or the Project.

Section 6. <u>Alameda Cost Recovery/Reimbursement</u>.

6.1    <u>Initial Payments</u>.  Alameda acknowledges receipt of One Hundred Thousand Dollars ($100,000) paid by SCC Acquisitions (the rights to which have been assigned by SCC Acquisitions to Developer) to ARRA as required by the Developer MOA.  Within five (5) business days after approval of, and execution by, Alameda and Developer of this Agreement (the "**Approval Date**"), Developer shall pay to Alameda an additional Nine Hundred Thousand Dollars ($900,000), for a total One Million Dollars ($1,000,000) sum (the "**Initial Payment**") that shall be placed in an interest bearing account and the Initial Payment (without interest) shall be applied to the land purchase price if the Project Site is conveyed to Developer.

6.2    <u>Developer Reimbursement of Alameda Pre-Development Costs</u>.  Developer shall reimburse Alameda for its pre-development costs, which shall consist of third-party consultant and legal costs and expenses and Alameda staff time, as such staff time shall be reflected in the Annual Budget (as defined below), related to the negotiation and preparation of this Agreement and the Transaction Documents (the "**Pre-Development Work**"), incurred from and after the Effective Date (the "**Pre-Development Costs**"), subject to the provisions of this <u>Section 6</u>.  With the exception of the Assistant City Manager, Base Reuse Division Manager, and Manager, Planning, which shall be billed at the percentage of such position's salary and benefits shown on <u>Exhibit C</u>, all employees and consultants of Alameda shall bill on an hourly basis.

6.3    <u>Initial Deposit; Annual Budget; Negotiating Costs Account Ledger</u>.  An estimate of Alameda's annual projected Pre-Development Costs for the period commencing with the Effective Date and terminating twelve (12) months later is attached as <u>Exhibit C</u> to this Agreement (the initial "**Annual Budget**").  The Annual Budget shall be evaluated and reasonably adjusted each year.  Alameda shall use good faith efforts not to exceed the Annual Budget agreed to by the Parties from time to time.   Within ten (10) days after the Effective Date, Developer shall submit a cash deposit to Alameda in an amount equal to twenty-five percent (25%) of the Annual Budget (the "**Initial Deposit**").  The Initial Deposit shall be sequestered in a separate account (the "**Negotiating Costs Account**").  Interest earned on funds in the Negotiating Costs Account shall accrue to that account.  All invoices and charges for Pre-Development Costs made against that account during the first ninety (90) days of negotiation shall be recorded on a separate ledger (the "**Negotiating Costs Account Ledger**").  If Alameda's actual Pre-Development Costs for such ninety (90) day period exceed the Initial Deposit, Alameda shall fund such costs from its own sources, but shall record a notice of deficit in the Negotiating Costs Account Ledger.

15

### 6.3.1   Mechanism for Funding Ongoing Alameda Cost Recovery.

6.3.1.1   On the ninetieth (90th) day following the Approval Date, Developer shall deposit additional funds into the Negotiating Costs Account equal to twenty-five percent (25%) of the Annual Budget plus any deficit accrued in the Negotiating Costs Account Ledger (each a "**Quarterly Deposit**").  Alameda and Developer shall continue this process for each ninety (90) day negotiating period until this Agreement is terminated; provided, however, that in any twelve (12) month period, Developer shall not be responsible for reimbursement of Pre-Development Costs in excess of the Annual Budget as attached hereto or as revised as provided below.

6.3.1.2   If a deficit or a surplus of greater than ten percent (10%) of the pro-rated Annual Budget has accrued in the Negotiating Costs Account Ledger for three (3) successive quarters, or for three (3) quarters in any calendar year, Developer and Alameda shall meet and confer in good faith to assess the sufficiency of the Annual Budget amount, and may upon the written consent of each, adjust the Annual Budget accordingly, provided, however, if Alameda determines that an increase in the Annual Budget is necessary and Developer does not agree, then Alameda shall have no obligation to perform, or cause to be performed, any Pre-Development Work for which such increased amount is necessary, pending resolution of the dispute.  Thereafter, Quarterly Deposits shall consist of twenty-five percent (25%) of the Annual Budget as revised, plus any deficit accrued in the Negotiating Costs Account Ledger.

6.3.1.3   Upon termination of this Agreement any surplus funds in the Negotiating Costs Account remaining after (a) the completion of the ninety (90) day negotiating period during which this Agreement was terminated, and (b) payment of Pre-Development Costs incurred by Alameda during such ninety (90) day negotiating period, shall be returned to Developer.  If there is a deficit noted in the Negotiating Costs Account Ledger at the conclusion of the ninety (90) day negotiating period during which this Agreement terminated, then such amount shall be due and payable by Developer.  Any extension of this Agreement as provided herein shall extend the cost recovery procedures set forth in this Section 6.3.1.  This Section 6.3.1.3 shall survive the expiration or termination of this Agreement.

6.3.1.4   Review of Negotiating Costs Account Ledger.  From time to time, upon reasonable prior notice to Alameda, Developer may review the Negotiating Costs Account Ledger to determine whether invoices and charges to the Negotiating Costs Account reflect actual Pre-Development Costs.  If Developer disputes any invoice or charge to the Negotiating Costs Account, Developer shall notify Alameda, and if the Parties so agree that an invoice or charge has been inappropriately charged against the account, Alameda shall deduct the amount of the inappropriate invoice(s) or charge(s) from the sum it is entitled to draw from the Negotiating Costs Account for the next ninety (90) day negotiating period, or if after the termination of this Agreement, a disputed invoice or charge is identified and the Parties agree that such invoice or charge was inappropriately charged, Alameda shall promptly pay such amount of Developer.

Exhibit  *4*
Page  *49*

Section 7.  Events of Default.

    7.1    Default of Developer.  Upon the occurrence of any of the events described in this Section 7.1 and, if applicable, the failure of Developer to cure such event within the respective cure period (as expressly provided in this Section 7.1), there shall be a "**Developer Event of Default**", provided if a cure period is expressly set forth in this Section 7.1, Alameda shall have first given written notice of the default (the "**Alameda Default Notice**") specifying in reasonable detail the basis for the determination of the default.  If no cure period is expressly provided in this Section 7.1 (e.g., Section 7.1.4), Alameda may provide a written notice of default with a termination notice pursuant to Section 8.1 below.

    7.1.1    Failure of Developer to Negotiate in Good Faith.  In the event that Alameda determines in its reasonable discretion that Developer has failed to negotiate diligently and in good faith as provided in Section 1.1 above, Alameda shall have the right to give an Alameda Default Notice to Developer in accordance with Section 7.1 above.  Following the receipt of such notice, Developer shall have thirty (30) business days to cure the default identified in the Alameda Default Notice by re-commencing to negotiate in good faith or by notifying Alameda that it does not consider its action or inaction a failure to negotiate diligently and in good faith. If Developer fails to cure the default within such cure period, Alameda shall have the right to terminate this Agreement by written notice to Developer; provided that Developer shall have the right to dispute such termination.

    7.1.2    Failure of Developer to Make Requested Deposits into the Negotiating Costs Account.  In the event Developer fails to make the Initial Deposit or any Quarterly Deposit pursuant to the procedure set forth in Section 6 of this Agreement, Alameda shall have the right to give written notice thereof to Developer specifying the amount of the deposit which was not made.  Following the receipt of such notice, Developer shall have fifteen (15) business days to make the required deposit and Alameda shall have the right to suspend all Pre-Development Work being performed by third parties paid by Alameda during such cure period.  If Developer has not then made the required deposit, Alameda shall have the right to terminate this Agreement by written notice to Developer.

    7.1.3    Breach by Developer of Section 9.2 of this Agreement.  If Developer makes any Transfer (as defined in Section 9.2.4.5 below) in violation of Section 9.2 below, Alameda shall have the right to give an Alameda Default Notice in accordance with Section 7.1 above to Developer.  If Developer fails to cure the default within forty-five (45) business days of having received such notice, Alameda shall have the right to terminate this Agreement by written notice to Developer.

    7.1.4    Voluntary Bankruptcy or Insolvency.  In the event that Developer becomes insolvent and/or files a voluntary petition in bankruptcy, Alameda shall have the right to terminate this Agreement by written notice to Developer.

    7.1.5    Involuntary Bankruptcy.  In the event that an involuntary petition in bankruptcy has been filed against Developer (an "**Involuntary Bankruptcy**"), Developer shall promptly notify Alameda and shall have one hundred twenty (120) days from the filing of such Involuntary Bankruptcy to cause the same to be dismissed.  If Developer fails to cause dismissal


Exhibit _A_
Page _50_

within such one hundred twenty (120) day period, Alameda shall have the right to terminate this Agreement by written notice to Developer.

          7.1.6   Failure to Achieve a Mandatory Milestone.  Subject to Sections 4.2.1 and 4.2.2 above, in the event Developer fails to achieve a Mandatory Milestone by the applicable date set forth in the Mandatory Milestone Schedule of Performance, as such date may be extended pursuant to Section 4.2.1 above, Alameda shall have the right to give an Alameda Default Notice in accordance with Section 7.1 above to Developer.  If Developer fails to cure the default within forty-five (45) business days of having received such notice, Alameda shall have the right to terminate this Agreement by written notice to Developer.

      7.2   Default of Alameda.  In the event that Developer determines in its reasonable discretion that Alameda has failed to negotiate diligently and in good faith as provided in Section 1.1 above, Developer shall have the right to give written notice (the "**Developer Default Notice**") thereof to Alameda specifying in reasonable detail the grounds for such failure. Following the receipt of such notice, Alameda shall have thirty (30) business days to cure the default identified in the Developer Default Notice by re-commencing to negotiate in good faith or by notifying Developer that it does not consider its action or inaction a failure to negotiate diligently and in good faith.  If Alameda fails to cure the default within the applicable cure period (an "**Alameda Event of Default**"), Developer shall have the right to terminate this Agreement by written notice to Alameda, provided that Alameda shall have the right to dispute such termination.

      7.3   Failure to Agree Upon Transaction Documents.  Notwithstanding anything to the contrary in this Agreement, provided that each Party has complied with the provisions of this Agreement, the failure to reach agreement upon any of the Transaction Documents or complete any of the identified tasks set forth in Section 3 above shall not be deemed either an Alameda Event of Default or Developer Event of Default.  If the Term of this Agreement expires prior to reaching agreement pursuant to this Section 7.3, Developer shall not be entitled to the return of the Initial Payment or any interest accrued thereon.

      7.4   Remedies.  In any action at law or equity or other legal or administrative proceeding to remedy a Developer Event of Default or an Alameda Event of Default or otherwise enforce this Agreement, or that otherwise may arise out of this Agreement neither Alameda nor Developer shall be entitled to damages or monetary relief other than as set forth in this Section 7.4.  Permitted remedies shall include (i) mandatory or injunctive relief, (ii) writ of mandate, (iii) termination of this Agreement, or (iv) a contract Claim (as defined Section 15.5 below) to recover money due to Alameda or Developer as a payment of Pre-Development Costs or reimbursement of excess Pre-Development Cost deposits under Section 6 of this Agreement; provided, however, neither Alameda nor Developer shall be liable, regardless of whether the Claim is based in contract or tort, for any special, indirect or consequential damages.

Section 8.  Termination.

      8.1   Termination by Notice.  Upon the occurrence of any of the circumstances contained in this Section 8.1, this Agreement may be terminated by the applicable Party by

Exhibit _4_
Page _51_

written notice to the other. If this Agreement is terminated pursuant to this Section 8.1, Developer shall not be entitled to a refund of the Initial Payment or any interest accrued thereon.

8.1.1   A Developer Event of Default pursuant to Section 7.1 above, provided that an Alameda Default Notice has been sent and any period of a right to cure has passed without such cure occurring.

8.1.2   Developer, in its sole discretion, may terminate this Agreement at any time upon provision of fifteen (15) business days prior written notice to Alameda in the event that during the course of its investigations and evaluation of the Project Site and the Project, Developer determines in good faith that the Project is not commercially feasible or capable of being financed in a commercially reasonable manner.

8.1.3   Developer elects, in writing, not to commence reimbursement of Pre-Development Costs as provided in Section 6.3 above.

8.2   Termination by Alameda Default.  In the event of an Alameda Event of Default pursuant to Section 7.2 above, Developer may terminate this Agreement by delivery of written notice to Alameda, provided that a Developer Default Notice has been sent and any period of a right to cure has passed without such cure occurring.  If this Agreement is terminated pursuant to this Section 8.2, Developer shall be entitled to a refund of the Initial Payment, together with any interest accrued thereon.  Such refund obligation shall survive the expiration or termination of this Agreement.

8.3   Termination by Expiration.  This Agreement will automatically terminate upon expiration of the Exclusive Negotiation Period, as it may be extended pursuant to Section 2.2 above.  If this Agreement terminates pursuant to this Section 8.3, then, absent an Alameda Event of Default, Developer shall not be entitled to a refund of the Initial Payment or any interest accrued thereon.

8.4   Negotiating Costs Account Refund.  If this Agreement terminates pursuant to this Section 8, Alameda shall return to Developer any funds remaining in the Negotiating Costs Account after all applicable payments have been made from the Negotiating Costs Account for the period to and including the termination date.  This Section 8.4 shall survive the termination of this Agreement.

Section 9.   Representations and Warranties; Transfers.

9.1   Representations and Warranties.

9.1.1   Duly Formed and Validly Existing.  Developer represents and warrants that SCC Alameda Point LLC is a Delaware limited liability company duly formed and validly existing under the laws of the State of Delaware and is admitted and in good standing (as a foreign limited liability company) in the State of California.

9.1.2   Developer Authority.  Developer represents and warrants that the person(s) executing this Agreement on behalf of Developer has full right, power and authority to execute this Agreement and to bind Developer hereunder.

19

Exhibit   4
Page   52

9.1.3    Alameda Authority.  Alameda represents and warrants that the persons executing this Agreement on behalf of Alameda have the full right, power and authority to execute this Agreement and to bind Alameda hereunder.

9.2     Transfer of this Agreement.

9.2.1    Purpose of Restrictions on Transfer.  The qualifications and identity of Developer are of particular concern to Alameda, in view of the importance of the entitlement and development of the Project and the Project Site to Alameda.  It is because of the qualifications and identity of Developer that Alameda is entering into this Agreement with Developer. Accordingly, a Transfer (as defined below) of this Agreement is permitted only as provided in Sections 9.2.2 below.

9.2.2    Transfers Prohibited; Alameda Consent.  Developer shall not make or create any Transfer of its interest in this Agreement or any part thereof, nor shall any Person having an Ownership Interest in Developer Transfer any such Ownership Interest without the prior written consent of Alameda, which consent may be given in the sole discretion of Alameda. Any consent or approval of Alameda pursuant to this Section 9.2 shall be as authorized by its Board of Directors, Board of Commissioners and City Council.  In the absence of express written approval by Alameda, no Transfer shall relieve Developer or any other party from any obligations pursuant to this Agreement.

9.2.3    Intentionally Deleted.

9.2.4    Definitions.  For purposes of this Agreement, the capitalized terms defined in this Section 9.2.4 shall have the meanings ascribed to them below:

9.2.4.1    "**Ownership Interest**" shall mean the possession, directly or indirectly, of voting securities or partnership, general partnership, membership or other ownership interests (based upon value or vote) of a Person.

9.2.4.2    "**Person**" shall mean any individual, partnership, corporation (including, but not limited to, any business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture, or any other entity or association.

9.2.4.3    "**Transfer**" shall mean any voluntary or involuntary transfer, sale, assignment, pledge, hypothecation or the like to any Person, including any transfer, sale, assignment, pledge or hypothecation of Ownership Interests in Developer.

9.2.5    Compliance.  Alameda shall have the right, but not the obligation, from time to time, by written notice to Developer, that Developer demonstrate compliance with the requirements of this Section 9.2; provided, however, Alameda may not require such demonstration more than once every six (6) months.  Developer shall provide to Alameda within five (5) business days of receipt of such notice, all documentation reasonably necessary in order to enable Alameda to determine whether Developer is in compliance with the requirements of this Section 9.2.

Exhibit _A_

Page _53_

9.3     Individuals on Development Team.  Developer shall endeavor to retain the key individuals assigned by it to perform the responsibilities identified herein and in the event of changes in such personnel, individuals of substantially equivalent seniority, experience and qualifications shall be assigned.  Developer shall provide written notice to Alameda of changes in its key personnel and their respective responsibilities and shall furnish to Alameda information on the seniority, experience and qualifications of any additional or substituted individuals.

Section 10.  Confidentiality of Information and Negotiations.  Alameda and Developer enter this Agreement with the understanding that Developer may provide certain information of a confidential nature during the negotiations of the Transaction Documents and other tasks identified in Section 3 above.  Such information may be necessary for Alameda to verify information that is relevant to the negotiations of the Transaction Documentation.  Alameda and Developer agree that they will keep confidential and not disclose any information submitted by Developer in the course of the negotiations or preliminary drafts of Transaction Documents or other negotiation preliminary draft documents, including financial analyses, that are identified as privileged or confidential under the law unless ordered to do so by a final order of court.  Developer agrees to bear all costs of any litigation that is filed to determine the applicability of public records law to information and documents submitted by Developer in furtherance of negotiating a DDA or any other agreements contemplated in the Agreement.  Notwithstanding the provisions of this Section 10, in no event shall any party be required to disclose to any other party information which is protected by the attorney-client privilege.

Section 11.  Representatives of the Parties.

11.1     Alameda Representative.  For the purpose of administering the provisions of this Agreement, Alameda shall be represented by the Deputy Executive Director of the ARRA, or such other Alameda staff as shall be designated from time to time to act for a particular matter in writing.

11.2     Developer Representative.  For the purpose of administering the provisions of this Agreement, Developer shall be represented by Bill Myers, or such other employees of Developer as are designated from time to time to act for a particular matter in writing by Developer.  In addition, Developer shall assign personnel to assist in the negotiations and the completion of the tasks set forth in Section 3 above.

Section 12.  Limitations of this Agreement.

12.1     By executing this Agreement, Alameda is not committing itself to, or agreeing to undertake any:  (i) exchange or transfer of land, (ii) disposition of land to Developer, or (iii) other acts or activities requiring the subsequent independent exercise of discretion by ARRA, the CIC, the City or any agency or department thereof.  This Agreement does not constitute a disposition or exchange of property by ARRA, the City or the CIC.  Execution of this Agreement by Alameda is merely an agreement to enter into a period of exclusive negotiations according to the terms thereof, reserving final discretion and approval by the Board of Directors of ARRA, Board of Commissioners of the CIC and the City Council as to a DDA or any other agreement(s) contemplated in this Agreement and all proceedings and decisions in connection therewith.

Exhibit  A
Page  54

12.2    If a DDA has not been executed by the Parties by the expiration of the Exclusive Negotiation Period (as extended pursuant to <u>Section 2.2</u> above) or if this Agreement has otherwise been terminated in accordance with the provisions set forth herein, neither Party shall have any further rights or obligations under this Agreement, except with respect to any obligation which expressly survives the termination or expiration of this Agreement as set forth in <u>Sections 6, 8 and 18</u> of this Agreement.

Section 13.   <u>Approval of DDA</u>.  If negotiations culminate in a DDA between Alameda and Developer following CEQA review of the Project, such DDA shall become effective only after and upon the approval by the Board of Directors of ARRA (if applicable), Board of Commissioners of the CIC and the City Council and execution by Alameda pursuant to direction of the Board of Directors of ARRA (if applicable), Board of Commissioners of the CIC and the City Council.

Section 14.   <u>Alameda Right to Obtain Information and to Consult with Others</u>.  Alameda reserves the right to obtain information concerning the transaction described by this Agreement from any person, entity or group; provided, however, that excepting consultants retained by Alameda to assist in the negotiation process contemplated in this Agreement, Alameda shall not reveal to any such persons or groups confidential or proprietary information or other information kept confidential as provided in <u>Section 10</u> of this Agreement.

Section 15.   <u>Nonliability of ARRA, the CIC and the City</u>.  Subject to Alameda's compliance with the provisions of this Agreement:

15.1    <u>Developer Warrants it Has No Claims Against the ARRA, the CIC or the City</u>. Developer agrees that it does not now have and shall not at any time, whether before or after its execution of this Agreement, have or make any Claim or Claims against Alameda, individually or collectively, or against ARRA, the CIC or City, or the ARRA Property, CIC Property, or City Property (all as hereinafter defined), directly or indirectly, by reason of any or all of the causes set forth in <u>Section 15.3</u> below.

15.2    <u>Nonliability of the ARRA, the CIC and the City of Alameda</u>.  Developer agrees that Alameda shall not have any liability whatsoever of any kind or character, directly or indirectly, by reason of any or all of the causes set forth in <u>Section 15.3</u> below.

15.3    <u>Causes to which Nonliability Apply</u>.  The causes to which the provisions of <u>Sections 15.1</u> and <u>15.2</u> above apply are as follows:

15.3.1  Any aspect of the RFQ, including any information or material set forth therein or referred to therein;

15.3.2  Any aspect of the Developer MOA, including any information or material set forth therein or referred to therein;

15.3.3  Any modification, or suspension of the RFQ or Developer MOA, or informalities or defects therein;



Exhibit A
Page 55

22

15.3.4  Any defects in the selection procedure identifying Developer conducted by Alameda or any act or omission of Alameda with respect thereto, or any release or dissemination of any information submitted by Developer to Alameda prior to the Effective Date;

15.3.5  The expiration of the Exclusive Negotiation Period, whether initial or an extension thereof; or

15.3.6  The exercise of any ARRA, CIC or City discretion, decision and judgment permitted by this Agreement.

15.4  Waiver of Claims.  Developer expressly and absolutely waives any and all Claim or Claims against the ARRA, the CIC, the City of Alameda, ARRA Property, CIC Property or City Property, directly or indirectly, arising out of, or in any way connected with, any or all of the matters set forth in Section 15.3 above.

15.5  Definitions.  For purposes of this Agreement, the words defined in this Section 15.5 shall have the meanings ascribed to them herein:

15.5.1  "**ARRA**", "**CIC**", and "**City**" includes their respective members, officers, employees, agents, consultants, successors, and assigns.

15.5.2  "**ARRA Property**", "**CIC Property**" and "**City Property**" shall include the Project Site and all other property of ARRA, the CIC and the City, real, personal or of any other kind or character.

15.5.3  "**Best Efforts**" shall mean the commercially reasonable expenditure of time and effort on the part of the representatives of the Parties to accomplish a specified task, but shall not mean the expenditure of funds by ARRA, the City or the CIC which are not recoverable under the cost recovery mechanism set forth in Section 6 above, nor shall "Best Efforts" require either Party to incur liabilities unless such act is otherwise explicitly required by this Agreement or by State of California or federal law.

15.5.4  "**Claim**" or "**Claims**" shall mean any and all protests, rights, remedies, interests, objections, claims, demands, actions or causes of action of every kind or character whatsoever, in law or in equity, for money or otherwise, including but no limited to Claims for injury, loss, expense or damage, Claims to property, real or personal, or rights or interest therein, and Claims to contract or development rights or development interests of any kind or character, in any ARRA Property, CIC Property and/or City Property, or Claims that might be asserted against or cloud title to ARRA Property, CIC Property or City Property.

Section 16.  Hold Harmless and Indemnity; Limitation on Liability.

16.1  Indemnity.  Developer shall defend, hold harmless and indemnify ARRA, the CIC and the City from and against any and all Claims made by any third party directly or indirectly arising out of Developer's Response to the RFQ and/or the Developer MOA and/or this Agreement; provided, however, such obligation shall not apply to any Claim resulting solely from an act or omission of ARRA, the CIC and/or the City.

Exhibit _A_
Page_ _56_

16.2   <u>Limitation on Liability</u>.  No member, official or employee of Alameda shall be personally liable to Developer in the event of any default or breach by Alameda, or for any amount which may become due to Developer, or on any obligations under the terms of this Agreement.  No member, officer or employee of Developer or its affiliates shall be personally liable to Alameda in the event of any default or breach by Developer, or for any amount which may become due to Alameda, or on any obligations under the terms of this Agreement.

Section 17.  <u>Notices</u>.  Formal notices, demands and communications between the Parties shall be sufficiently given if, and shall not be deemed given unless, dispatched by certified mail, postage prepaid, return receipt requested, or sent by an express delivery or overnight courier service that maintains written delivery records, to the office of the Parties shown as follows, or such other address as the Parties may designate in writing from time to time:

If to Alameda:

      ARRA:      Alameda Reuse and Redevelopment Authority
                      950 West Mall Square
                      Alameda, California  94501
                      Attention:  Alameda Point Project Manager

      CIC:      Community Improvement Commission of the City of Alameda
                      950 West Mall Square
                      Alameda, California  94501
                      Attention:  Development Services Director

      City:      City of Alameda
                      2263 Santa Clara Avenue
                      Alameda, California  94501
                      Attention:  City Manager

With copies to      City of Alameda
                      2263 Santa Clara Avenue, Room 280
                      Alameda, California  94501
                      Attention:  City Attorney

If to Developer:      SCC Alameda Point LLC
                      c/o SunCal Companies
                      1430 Blue Oaks Boulevard, Suite 200
                      Roseville, California  95747
                      Attention:  Bill Myers

                      SCC Alameda Point LLC
                      c/o SunCal Companies
                      2392 Morse Ave
                      Irvine, California  92614
                      Attention:  Marc Magstadt

Exhibit *A*
Page *52*

SCC Alameda Point LLC
c/o SunCal Companies
2392 Morse Ave
Irvine, California  92614
Attention:  Bruce Cook

Such written notices, demands, and communications shall be effective on the date shown on the written delivery record as the date delivered or the date on which delivery was refused. Notwithstanding the foregoing, Alameda may respond to Developer requests for information by delivering requested information to only the address of the requesting representative of Developer.

Section 18.  <u>Entry On Property</u>.  During the Term of this Agreement, ARRA shall provide Developer with reasonable access to and entry upon the Project Site, during normal business hours and in accordance with the terms and conditions of this <u>Section 18</u>, for the purposes of conducting such non-intrusive inspections and studies as Developer may elect of the physical condition of the Project Site.  Such access, inspections and studies shall be permitted and conducted on the following terms and conditions:

18.1     Developer shall pay for all inspections and studies ordered by Developer.

18.2     Developer shall maintain, and ensure that its contractors maintain, the following insurance:

18.2.1  Developer shall maintain commercial general liability and property damage insurance, contractual liability and worker's compensation insurance as follows:

18.2.1.1  Broad form commercial general liability insurance, in an amount not less than Five Million Dollars ($5,000,000), combined single limit.

18.2.1.2  Workers' compensation, statutory coverage as required by the State of California, and employer's liability in an amount not less than One Million Dollars ($1,000,000).

18.2.1.3  Automobile liability insurance for owned, hired or non-owned vehicles, in an amount not less than One Million Dollars ($1,000,000), combined single limit.

18.2.2  All insurance provided for under this Agreement shall be effected under valid enforceable policies issued by insurers of recognized responsibility having a rating of at least A-VIII in the most current edition of A.M. Best's Insurance Reports, or otherwise acceptable to ARRA' Risk Manager.

18.2.3  All liability policies required hereunder shall be written on an occurrence basis.  The required coverage may be provided by a blanket, multi-location policy.

18.2.4  Should any of the required insurance be provided under a form of coverage that includes a general annual aggregate limit or provides that claims investigation or

25



Exhibit *A*
Page *58*

legal defense costs are to be included in such general annual aggregate limit, such general aggregates limit shall double the occurrence or claims limits specified.

18.2.5  Commercial general liability and automobile liability insurance policies shall be endorsed or otherwise provide the following:

18.2.5.1  Name the Alameda Reuse and Redevelopment Authority (ARRA), the Community Improvement Commission of the City of Alameda (CIC), and the City of Alameda (City) and their councils, commissions, boards, departments, officers, agents, employees and volunteers, as additional insureds, using ISO Additional Insured Endorsement Form CG2026 (or a substitute providing equivalent coverage) or as may be mutually agreed.

18.2.5.2  All policies shall be endorsed to provide thirty (30) days' advance written notice to ARRA' Risk Manager of cancellation, except in the case of cancellation for nonpayment of premium, in which case cancellation shall not take effect until ten (10) days prior written notice has been given.  Developer covenants and agrees to give ARRA reasonable notice in the event that it learns or has any reason to believe that any such policy may be canceled or that the coverage of any such policy may be materially reduced.

18.2.6  All insurance provided under this Agreement shall be primary insurance to any other insurance available to the additional insureds, with respect to any claims arising out of this Agreement, and that insurance applies separately to each insured against whom claim is made or suit is brought.  All policies shall include provisions denying such respective insurer the right of subrogation and recovery against ARRA.  Such policies shall also provide for severability of interests and that an act or omission of one of the named insureds which would void or otherwise reduce coverage shall not reduce or void the coverage as to any insured, and shall afford coverage for all claims based on acts, omissions, injury or damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period.

18.2.7  Developer shall deliver to ARRA certificates of insurance and Additional Insured Endorsements in form reasonably satisfactory to ARRA, evidencing the coverages required hereunder ("**Evidence of Insurance**"), on or before the Effective Date of this Agreement, and Developer shall provide ARRA with Evidence of Insurance thereafter before the expiration dates of expiring policies.  In addition, Developer shall deliver to ARRA complete copies of the relevant policies upon request therefor from ARRA.

18.2.8  Notwithstanding anything to the contrary in this Agreement, Developer's compliance with this Section 18.2 shall in no way relieve or decrease liability of Developer under Section 18.6 below, or any other provision of this Agreement, and no insurance carried by Alameda shall be called upon to satisfy Developer's indemnification obligations under Section 18.6 below or any other obligations of Developer or its employees, agents, consultants, and contractors under this Agreement.

18.3    Developer hereby waives any and all rights of recovery against Alameda and its employees for any loss or damage to the extent these damages are insured by insurance carried by Developer, and the insurance proceeds are actually received by the insured, including amounts within any insurance deductible or self-insured retention.  Developer shall, upon


Exhibit _A_
Page _59_

obtaining policies of insurance required in this Agreement, give notice to the insurance carrier or carriers that the foregoing waiver of subrogation is contained in this Agreement.

18.4    Developer will take all steps necessary to ensure that any conditions on the Project Site created by Developer's entry will not interfere with the normal operation of the Project Site or create any dangerous, unhealthy, unsightly or noisy conditions on the Project Site.

18.5    In connection with any and all entry by Developer or its employees, agents, consultants, and contractors on the Project Site, Developer shall keep the Project Site free of all liens by mechanics, materialmen, laborers, architects, engineers, and any other persons or firms engaged by Developer to perform any work in connection with the Project Site.

18.6    Developer shall indemnify and hold Alameda harmless from and against any costs, damages, liabilities, losses, expenses, liens or claims (including, without limitation, reasonable attorneys' fees) arising out of or relating to any entry on the Project Site by Developer, its agents, employees, consultants or contractors in the course of performing the inspections or studies provided for in this Agreement, or to any conditions on the Project Site created by Developer's entry.  The foregoing indemnity shall survive the expiration or termination of this Agreement.

18.7    Developer's activities on the Project Site shall be subject to the general supervision and inspection of Alameda and to such rules and regulations regarding ingress, egress, safety, sanitation and security as may be reasonably prescribed by Alameda from time to time.

Section 19.  <u>Cooperation</u>.  In connection with this Agreement, the Parties shall reasonably cooperate with one another to achieve the objectives and purposes of this Agreement, including cooperating with each other in preparing and negotiating the Transaction Documents with third parties identified in <u>Section 3</u> above.  In so doing, the Parties shall each refrain from doing anything that would render its performance under this Agreement impossible.

Section 20.  <u>Governmental Contact</u>.  Developer agrees that it will not meet, or engage in negotiations, with any governmental officials or staff (other than Alameda and its staff) whose approval is required to a Transaction Document, concerning the Project or the Project Site without giving the Deputy Executive Director of the ARRA reasonable prior notice and the opportunity to participate with Developer in any such meeting, or negotiations.  ARRA agrees that it will not meet, or engage in negotiations, with any governmental officials or staff whose approval is required to a Transaction Document, concerning the Project or the Project Site without reasonable prior notice to Developer.  ARRA shall keep Developer informed of the substance of any such meetings and negotiations and shall permit Developer to participate in the same.  Further, Alameda and Developer agree to refrain from knowingly engaging in contacts or communications with government officials (other than Alameda staff) in a manner reasonably expected to prejudice the interests of the other Party.

Section 21.  <u>Leases</u>.

21.1    <u>New Lease Termination Rights</u>.  During the Exclusive Negotiation Period (i) ARRA shall consult with Developer with respect to prospective tenants and terms of any leases

27


Exhibit A
Page 60

of any portion of the Project Site, and (ii) without the written consent of Developer, ARRA shall not enter into any leases with respect to the Property or any portion thereof which does not contain the following clause:

> Section __. Compliance with LIFOC. Notwithstanding any provision of this Lease, Landlord and Tenant hereby agree as follows:  (i) Tenant will not do or permit anything to be done in or on the Premises which will cause the occurrence of a default by Landlord under the LIFOC, (ii) if the LIFOC expires or is terminated for any reason, then this Lease shall thereupon terminate, without any liability to Landlord, as if such date were the scheduled expiration date of the Term, as defined in Section __ below, and (iii) this Lease shall be terminable by Landlord without penalty on sixty (60) days advance written notice.

21.2    Existing Uses. Notwithstanding anything to the contrary in this Section 21, as a condition precedent to the DDA, ARRA or its governmental successors or assigns shall be able to enter into the following leases of the Property with consultation, but without the consent of Developer:

> 21.2.1  City Hall West (Building 1)

> 21.2.2  Fire Station No. 5 (Building 6)

> 21.2.3  O'Club (Building 60) (collectively, Sections 21.2.1 through 21.2.3 shall be referred to as the "**City Buildings**")

Such leases shall provide that it shall be an event of default for the subject tenant (or its permitted successors in interest under this Section 21.2) to cease active use of or cease to occupy said property for a period of greater than three (3) months.  Further, such leases shall contain provisions that prohibit the assignment, transfer, sublet, or other disposition of the lease to any party other than Alameda or its constituent bodies.  Developer shall accept conveyance of the portions of the Property on which such leases are located subject to such leases, provided that Developer may, at its sole cost and expense, relocate such use of any or all of the City Buildings on terms and conditions approved by Alameda, which approval shall not be unreasonably withheld.

21.3    APT Headend Lease. Notwithstanding anything to the contrary in Section 21.1 above, Alameda has an interest in continuing the lease with APT of Building 2, Wing 3 (the "**APT Headend Lease**") due to the service provided by APT from the leased premises and the related equipment installed thereon, and shall condition conveyance of the portion of the Property subject to the APT Headend Lease on extension of the APT Headend Lease for a long-term, market-rate lease.

Section 22.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Section 23.  Entire Agreement. This Agreement contains the entire agreement of the Parties regarding the Project.  This Agreement may be modified only by written agreement signed by the Parties hereto.

Exhibit _A_
Page _61_

Section 24.  <u>Captions</u>.  Captions at the beginning of each section of this Agreement are for reference only and shall in no way define or interpret any provision hereof.

Section 25.  <u>Construction</u>.  The provisions of this Agreement have been jointly drafted by the Parties and shall be constructed as to the fair meaning and not for or against any Party based upon any attribution of such Party as the sole source of the language in question.

Section 26.  <u>Non-Waiver</u>.  No waiver made by either Party with respect to the performance, or manner or time of performance, or any obligation of the other Party or any condition to its own obligation under this Agreement will be considered a waiver with respect to the particular obligation of the other Party or condition to its own obligation beyond those expressly waived to the extent of such waiver, or a waiver in any respect in regard to any other rights of the Party making the waiver or any other obligations of the Party.

Section 27.  <u>Time Periods</u>.  Any time period to be computed pursuant to this Agreement shall be computed by excluding the first day and including the last day.  If the last day falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that Alameda is open for business, but in no event shall the extension be for more than three (3) calendar days.  All references to days in this Agreement shall mean calendar days unless otherwise expressly specified.

Section 28.  <u>Time of the Essence</u>.  Time is of the essence with respect to each provision of this Agreement, including, without limitation, each Mandatory Milestone set forth in the Mandatory Milestone Schedule of Performance attached hereto as <u>Exhibit B-1</u>.

Section 29.  <u>Parties Not Co-Venturers</u>.  Nothing in this Agreement is intended to or does establish the Parties as partners, co-venturers, or principal and agent with one another.

Section 30.  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, representatives, successors and assigns as permitted by this Agreement.

Section 31.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

Section 32.  <u>Exhibits</u>.  References in this Agreement to exhibits (unless the context otherwise requires) is to the exhibits described on the List of Exhibits attached hereto, all of which exhibits are hereby incorporated by reference into this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit _A_
Page _62_

IN WITNESS WHEREOF, the Parties, who have had the opportunity to consult with their attorneys with respect hereto and who fully and completely understand the terms and provisions hereof, have executed this Agreement as of the date first set forth above.

**ARRA**:

ALAMEDA REUSE AND REDEVELOPMENT AUTHORITY,
a joint powers authority formed under California law

By: _____      Approved as to form: _____

Name: _David Brandt_      By: _____

Title: _Acting Executive Director_      Name: _Teresa L. Highsmith_

     Title: _General Counsel_


[ SIGNATURES CONTINUE ]


Exhibit _A_
Page _63_

**CIC**:

COMMUNITY IMPROVEMENT COMMISSION OF THE CITY OF ALAMEDA,
a public body, corporate and politic

By: _____

Name: _David Brandt_

Title: _Acting Executive Director_

Approved as to form:

By: _____

Name: _Teresa L. Highsmith_

Title: _General Counsel_

[ SIGNATURES CONTINUE ]

Exhibit _A_
Page _64_

**City**:

CITY OF ALAMEDA,
a municipal corporation

By: _____

Name: __David Brandt__

Title: __Acting iCity Manager__

Approved as to form:

By: _____

Name: __Teresa L. Highsmith__

Title: __City Attorney__

[ SIGNATURES CONTINUE ]

Exhibit __A__
Page __65__

**Developer:**

SCC ALAMEDA POINT LLC,
a Delaware limited liability company

By: _____

Name: _Bruce V. Cook_

Title: _General Counsel_

Exhibit _A_
Page _66_

**LIST OF EXHIBITS**

Exhibit A        Map of the Project Site

Exhibit B-1      Schedule of Performance (Mandatory Milestones)

Exhibit B-2      Schedule of Performance (Non-Mandatory Milestones)

Exhibit C        Annual Budget

Exhibit ___A___
Page ___67___

## Exhibit A

**Map of the Project Site**

[Attached]

## Exhibit B-1

### Schedule of Performance
### (Mandatory Milestones)

All terms not defined herein shall have the respective meanings ascribed to them in the Agreement to which this Exhibit B-1 is attached.

Unless otherwise provided, all Mandatory Milestones are measured from the Effective Date (for example, eight (8) months means the date which is eight (8) months after the Effective Date).

| | | | |
|---|---|---|---|
| A. | Mandatory Milestone | | Submission Date |
| | 1. | Master Project Schedule: | Thirty (30) business days |
| | 2. | Development Concept: | Eight (8) months |
| | 3. | Infrastructure Plan: | Eight (8) months |
| | 4. | Business Plan: | Eight (8) months |
| | 5. | Entitlement Application: | Ten (10) months |
| B. | Mandatory Milestone | | Completion Date |
| | 1. | Project Pro Forma: | Ten (10) months |

Exhibit  A
Page   69

## Exhibit B-2

### Schedule of Performance
### (Non-Mandatory Milestones)

All terms not defined herein shall have the respective meanings ascribed to them in the Agreement to which this Exhibit B-2 is attached.

Unless otherwise provided, all Non-Mandatory Milestones are measured from the Effective Date (for example, eight (8) months means the date which is eight (8) months after the Effective Date).

Non-Mandatory Milestones described below are good faith estimates by the Parties of the time required to complete the Transaction Documents.

| Non-Mandatory Milestone | Completion Date |
|---|---|
| **1.    EDC MOA Amendment** | **18 months** |
| a.  Finalize Navy Term Sheet | 6 months |
| b.  Submit EDC application | 10 months |
| c.  Finalize EDC MOA Amendment | 18 months |
| | |
| **2.    NEPA Supplemental Environmental Impact Statement (SEIS)** | **24 months** |
| a. Project scoping | 11 months |
| b. Circulate Draft SEIS | 18 months |
| c. Hearings and comments | 18-24 months |
| d. Finalize SEIS | 24 months |
| | |
| **3.    Section 106 Memorandum** | **24 months** |
| a.  Revise historic resources report | 7 months |
| b.  Economic study on buildings | 15 months |
| c. Finalize Section 106 Memorandum amendment | 24 months |
| | |



Exhibit _A_

Page _70_

| 4. | **USFWS/NMFS Biological Documents** | **24 months** |
|---|---|---|
| | a. Biological Assessment/reinitiate Section 7 consultation with USFWS | 6 months |
| | b. Finalize new Biological Opinion with USFWS | 18 months |
| | c. Predator Management Agreement | 24 months |
| | d. Determine if NMFS Biological Opinion necessary/conduct Biological Assessment | 6 months |
| | e. Finalize NMFS Biological Opinion | 18 months |
| | | |
| 5. | **Early Transfer Documents** | **24 months** |
| | a. Finalize Draft Navy Term Sheet | 6 months |
| | b. Draft ETCA | 12 months |
| | c. Draft Administrative Order (AOC) with Environmental Protection Agency (EPA), Department of Toxic Substances Control, Regional Water Quality Control Board | 15 months |
| | d. Draft FOSET | 18 months |
| | e. Public Comment/Finalize ETCA, AOC, FOSET, submit to Governor/EPA | 21 months |
| | f. Approval by Governor/EPA | 24 months |
| | g. Final remediation contract and environmental insurance policies | 24 months |
| | | |
| 6. | **CEQA Documents** | **24 months** |
| | a. Project scoping | 10 months |
| | b. Notice of Preparation | 11 months |
| | c. Circulate Draft Environmental Impact Report (EIR) | 18 months |
| | d. Hearings and comments/finalize EIR | 24 months |
| | | |



| 7. | CAA/DDA | 24 months |
|---|---|---|
| | a. CAA executed | 12 months |
| | b. Draft DDA | 18 months |
| | c. Public hearings | 18-24 months |
| | d. Approval of DDA | 24 months |
| | | |
| 8. | Development Agreement/Entitlements | 24 months |
| | a. Submit Entitlement Application | 10 months |
| | b. Public hearings/approvals | 18-24 months |
| | c. Development Agreement finalized and approvals granted | 24 months |
| | | |
| 9. | Tidelands Trust Exchange Agreement | 12 months |
| | a. Submit draft Tidelands Trust Exchange Agreement to California State Lands Commission (CLSC) | 3 months |
| | b. Reach agreement on language with CLSC staff | 9 months |
| | c. Obtain approval of CLSC | 12 months |
| | | |
| 10. | Public Planning Process | 24 months |
| | a. Introductory meetings/ constraints analysis | 3 months |
| | b. First round public planning charrettes | 4-6 months |
| | c. Second round public planning charrettes | 6-8 months |
| | d. Development Concept public review | 10 months |
| | e. Historic Preservation Plan public review | 10-12 months |
| | f. Focused topic community meetings | 12-18 months |
| | g. Hearings and comments on EIR/DDA/entitlements | 18-24 months |



Exhibit _A_
Page _72_

**<u>Exhibit C</u>**

**Annual Budget**

[Attached]

Exhibit   *A*

Page   *73*

## SUNCAL COMPANIES
### ENA Cost Recovery Budget

| | Salary | Benefits | Total | 24-Month Duration | 24-Month | 1st Quarter Negotiating Deposit |
|---|---|---|---|---|---|---|
| **City Staff Salary and Benefits** | | | | | | |
| **City Manager Staff** | | | | | | |
| Assistant City Manager* | $188,351 | $56,505 | $244,856 | 25.00% | $122,428 | $15,303 |
| **Development Services Staff** | | | | | | |
| Director, Development Services Department | $172,430 | $51,729 | $224,159 | 25.00% | $112,079 | $14,010 |
| Base Reuse Division Manager* | $135,645 | $40,694 | $176,339 | 75.00% | $264,508 | $33,063 |
| Redevelopment Manager* | $104,907 | $31,472 | $136,379 | 30.00% | $81,827 | $10,228 |
| Contract Administrator | $68,478 | $20,543 | $89,021 | 3.00% | $5,341 | $668 |
| Office Assistant, Base Reuse | $62,132 | $18,640 | $80,771 | 15.00% | $24,231 | $3,029 |
| **Other City Staff** | | | | | | |
| Assistant City Attorney | $154,838 | $46,451 | $201,289 | 15.00% | $60,387 | $7,548 |
| Director, PW | $171,887 | $51,566 | $223,453 | 5.00% | $22,345 | $2,793 |
| City Engineer, PW | $127,914 | $38,374 | $166,288 | 15.00% | $49,886 | $6,236 |
| Supervising Civil Engineer, PW | $111,740 | $33,522 | $145,262 | 15.00% | $43,578 | $5,447 |
| Traffic Engineer, PW | $71,473 | $21,442 | $92,915 | 15.00% | $27,874 | $3,484 |
| Manager, Planning | $115,671 | $34,701 | $150,372 | 50.00% | $150,372 | $18,797 |
| Director, Finance | $155,668 | $47,000 | $203,668 | 3.00% | $12,220 | $1,528 |
| **Subtotal Salary and Benefits** | | | | | $977,079 | $122,135 |
| | | | | | | |
| **Consultant/Legal Services** | | | | | | |
| **Legal** | | | | | | |
| Ellman Burke Hoffman & Johnson (CAA, DDA) | | | | | $252,000 | $31,500 |
| Fragner, Seifert, Pace and Winograd (CAA, DDA) | | | | | $180,000 | $22,500 |
| Shute, Mihaly & Weinberger (Tidelands Trust, CEQA, Navy MOA, ETCA, etc.) | | | | | $475,000 | $59,375 |
| **Contractual** | | | | | | |
| Economic & Planning Systems (Land Economics and Fiscal Impact Analysis) | | | | | $365,000 | $45,625 |
| Keyser Marston Associates (Land Economics) | | | | | $20,000 | $2,500 |
| MARC Associates (Inter-governmental Relations) | | | | | $168,000 | $21,000 |
| Russell Resources (Environmental) | | | | | $200,000 | $25,000 |
| Engineering Consultants | | | | | $100,554 | $12,569 |
| **Subtotal Consultant/Legal Services** | | | | | $1,760,554 | $220,069 |
| | | | | | | |
| **TOTAL** | | | | | $2,737,633 | $342,204 |

\* These staff members will be billed monthly to the project at a fixed percent Full-Time Equivalent employee; the remaining City staff and consultants will use timesheets to bill time expended on the project

EXHIBIT C

7/20/2007

Exhibit ___A___

Page ___74___

# EXHIBIT B

**FIRST AMENDMENT**
**TO**
**ALAMEDA POINT**
**EXCLUSIVE NEGOTIATION AGREEMENT**

THIS FIRST AMENDMENT TO ALAMEDA POINT EXCLUSIVE NEGOTIATION AGREEMENT ("**First Amendment**") is made as of _March 6_, 2008 (the "**Effective Date**"), by and between **ALAMEDA REUSE AND REDEVELOPMENT AUTHORITY**, a Joint Powers Authority established by the City of Alameda and the Community Improvement Commission under the California Joint Exercise of Powers Act and a public entity lawfully created and existing under the State of California (the "**ARRA**"), the **COMMUNITY IMPROVEMENT COMMISSION OF THE CITY OF ALAMEDA**, a public body corporate and politic ("**CIC**"), and the **CITY OF ALAMEDA**, a municipal corporation (the "**City**", and together with ARRA and CIC, "**Alameda**") and **SCC Alameda Point LLC, a Delaware limited liability company** ("**Developer**"). Alameda and Developer are individually referred to as a "**Party**" and collectively referred to as the "**Parties**".

RECITALS

This First Amendment is entered upon the basis of the following facts, understandings and intentions of the Parties.

A.      The Parties entered into that certain Alameda Point Exclusive Negotiation Agreement, dated as of July 18, 2007 (the "**Original Agreement**"), which shall be amended by this First Amendment.

B.      Developer has requested an extension of the Mandatory Milestones set forth in Exhibit B-1 of the Original Agreement pursuant to Section 4.2.1 of the Original Agreement.

C.      The Parties hereto now desire to amend the Original Agreement on the terms and conditions hereinafter set forth.

D.      The Original Agreement, as amended by this First Amendment, shall hereinafter collectively be referred to as the "**Agreement**".

AGREEMENT

NOW, THEREFORE, in consideration of the mutual terms, covenants, conditions and promises set forth herein, the ARRA, the CIC, the City and Developer agree as follows:

1.      Definitions. All capitalized terms used herein shall have the definitions given in the Original Agreement, unless otherwise expressly stated herein.

1

2.    Document Delivery.  Notwithstanding anything to the contrary in Sections 3.8.1 pertaining to completion and internal review by Developer, and consistent with Section 3.8.3 of the Agreement, on or before the date which is fifteen (15) days from the Effective Date of this First Amendment Developer shall deliver to Alameda copies of the following technical and financial information prepared or commissioned by Developer for the Project and/or the Project Site:  (a) all technical feasibility analysis conducted on the historic preservation/adaptive reuse program for the Project; (b) third-party market reports or studies of land uses considered at the Project Site completed in connection with securing financing, including, without limitation, the market study prepared by the Concord Group; and (c) the most current draft Project Pro Forma (in pdf form) for high density and low density alternatives.  Developer may provide confidential or proprietary information directly to Alameda's consultants.

3.    Amended Section 6.  Section 6 of the Agreement is hereby amended as follows:

a.    Amended Heading.  The Section 6 heading is hereby deleted and replaced with the following:  "Section 6.  Alameda Cost Recovery/Reimbursement; Developer Consultant Costs Account."

b.    Amended Section 6.2.  Section 6.2 of the Agreement is hereby amended to add the following:  "Alameda shall provide monthly invoices or timesheets, as appropriate, to Developer for Pre-Development Costs to be reimbursed by Developer pursuant to this Section 6."

c.    Amended Section 6.3.  Section 6.3 of the Agreement is hereby amended to add the following:  "Alameda shall have the right without Developer's consent to adjust line item amounts shown in the Annual Budget so long as such adjustments do not exceed the Annual Budget.  By way of example, such adjustments may include adding new consultants, or adjusting funds allocated to staff to consultants or vice versa.  If Alameda makes such adjustments, Alameda shall provide the adjusted Annual Budget to Developer within thirty (30) days of completion of such adjustments."

d.    Amended Section 6.3.1.1.  Section 6.3.1.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

6.3.1.1  On the ninetieth (90th) day following the Approval Date, Developer shall deposit additional funds into the Negotiating Costs Account equal to twenty-five percent (25%) of the Annual Budget (each a "**Quarterly Deposit**").  Commencing as of April 19, 2008, Developer shall deposit sufficient funds into the Negotiating Costs Account to have a beginning balance of twenty-five percent (25%) of the Annual Budget (e.g., if twenty-five percent (25%) of the Annual Budget equals Three Hundred Forty-Two Thousand Two Hundred Four Dollars ($342,204) and there is a beginning balance of One Hundred Thousand Dollars ($100,000), Developer shall deposit Two Hundred Forty-Two Thousand Two

2



Exhibit ___B___
Page ___76___

Hundred Four ($242,204)).  Developer shall continue this process for each ninety (90) day negotiating period until this Agreement is terminated; provided, however, that in any twelve (12) month period, Developer shall not be responsible for reimbursement of Pre-Development Costs in excess of the Annual Budget as attached hereto or as revised as provided below, however, such excess costs shall be shown as an accrued deficit in the Negotiating Costs Account Ledger.

      e.     Amended Section 6.3.1.2.  Section 6.3.1.2 of the Agreement is hereby deleted in its entirety and replaced with the following:

      6.3.1.2 (a)     If a deficit of greater than ten percent (10%) of the pro-rated Annual Budget has accrued in the Negotiating Costs Account Ledger for three (3) successive quarters, or for three (3) quarters in any calendar year, Developer and Alameda shall meet and confer in good faith to assess the sufficiency of the Annual Budget amount, and may upon the written consent of each, adjust the Annual Budget accordingly.  Thereafter, Quarterly Deposits shall consist of twenty-five percent (25%) of the Annual Budget as revised, plus any deficit accrued in the Negotiating Costs Account Ledger.

      (b)     The Parties may, upon the written consent of each, adjust the Annual Budget.  If Alameda determines that an increase in the Annual Budget is necessary and Developer does not agree, then Alameda shall have no obligation to perform, or cause to be performed, any Pre-Development Work for which such increased amount is necessary, pending resolution of the dispute.

      f.     New Section 6.3.2.  Section 6 of the Agreement is hereby amended to add the following new Section 6.3.2:

      6.3.2    Use of Negotiating Costs Account Funds Accrued as of the Effective Date of the First Amendment.  The Parties acknowledge that as of the Effective Date of the First Amendment, the Negotiating Costs Account balance equals Four Hundred Twenty-Five Thousand Thirty-Seven Dollars ($425,037).  Alameda shall apply the balance as follows:  (a) Three Hundred Forty Two Thousand Two Hundred Four Dollars ($342, 204) shall be applied as the Quarterly Deposit due on January 18, 2008; and (b) Alameda shall reimburse to Developer the surplus funds in the amount of Eighty-Two Thousand, Eight Hundred Thirty-Three Dollars ($82,833).

3



Exhibit _B_

Page _77_

g.     New Section 6.4.  Section 6 of the Agreement is hereby amended to add the following new Section 6.4:

6.4     Initial Deposit; Developer Consultant Costs Account Ledger.

6.4.1.1  On or before April 19, 2008, (a) Developer and Alameda shall jointly establish an escrow account (the **"Developer Consultant Costs Account"**) with First American Title Company at its office located in Pleasanton, California (**"Escrow Holder"**) solely for purposes of paying consultant and legal fees and costs of Developer's third-party consultants and attorneys incurred solely from work on the Project on and after April 19, 2008 (collectively, **"Developer Consultant Costs"**) except as provided in Sections 6.4.1 and 6.4.5 below, (b) Developer shall deposit cash in the amount of Three Hundred Fifty Thousand Dollars ($350,000) into the Developer Consultant Costs Account (the **"Initial Developer Consultant Deposit"**), and (c) Developer shall provide a list of consultants Developer has engaged, or intends to engage, to work on the Project (the "Consultant List").  Developer shall have the right to update and/or revise the Consultant List.

6.4.1.2  Interest earned on funds in the Developer Consultant Costs Account shall accrue to that account.  Developer shall pay all escrow fees related to the Developer Consultant Costs Account, which may be paid out of the funds in that account.

6.4.1.3  All invoices and charges for Developer Consultant Costs made against that account (including invoices and charges paid pursuant to Section 6.4.2 below) shall be recorded on a separate ledger (the **"Developer Consultant Costs Account Ledger"**).

6.4.1.4  If Developer's actual Developer Consultant Costs for such ninety (90) day period exceed the Initial Developer Consultant Deposit, Developer shall fund such costs from its own sources.

6.4.1     Federal Transportation Authority Grant.  Alameda has obtained a Federal Transportation Authority (**"FTA"**) grant for transportation feasibility analyses.  Matching funds in the amount of Sixty Thousand Dollars ($60,000) are required for the release of the FTA grant funds.  Immediately upon deposit of the Initial Developer Consultant Deposit into the Developer Consultant Costs

4



Exhibit _B_
Page _78_

Account, Developer shall instruct Escrow Holder to pay to Alameda Sixty Thousand Dollars ($60,000) of the Initial Developer Consultant Deposit, which Alameda shall apply as the matching funds for the FTA grant.

6.4.2   Mechanism for Funding Ongoing Developer Consultant Costs.  On July 19, 2008 and each ninetieth (90th) day thereafter, Developer shall deposit additional funds into the Developer Consultant Costs Account equal to Three Hundred Fifty Thousand Dollars ($350,000) (each a **"Developer Consultant Cost Quarterly Deposit"**).  Developer shall continue this process for each ninety (90) day negotiating period until this Agreement is terminated.  Any extension of this Agreement as provided herein shall extend the procedures set forth in this Section 6.4.2.

Section 6.4.3   Monthly Reporting.  Commencing on April 19, 2008 and every thirty (30) days thereafter, Developer shall provide a report (the **"Monthly Report"**) to Alameda.  The first Monthly Report shall cover the period commencing on the Effective Date of the First Amendment through April 19, 2008 and shall include payments made pursuant to Section 6.5.2 below as part of the documentation required pursuant to this Section 6.4.3. The Monthly Report shall, at a minimum, include:  (a) a narrative of the tasks accomplished and activities undertaken by Developer's consultants and attorneys on the Project; (b) updates and/or revisions to the Consultant List, if applicable; (c) copies of all invoices for Developer Consultant Costs paid pursuant to Section 6.5.2 below (solely as part of the first Monthly Report); (d) copies of all invoices for Developer Consultant Costs billed to the Developer Consultant Cost Account; and (e) a tally of monthly and cumulative expenditures paid pursuant to Section 6.5.2 below and from the Consultant Cost Account.  If Alameda disputes any invoice or charge to the Developer Consultant Costs Account, Alameda shall notify Developer, and if the Parties so agree that an invoice or charge has been inappropriately charged against the Developer Consultant Costs Account, Developer shall promptly replenish the Developer Consultant Costs Account in the amount of the inappropriate invoice(s) or charge(s).

Section 6.4.4   Payment Rate.  Developer shall pay Developer Consultant Costs from the Developer Consultant Costs Account at a rate of One Hundred Seventeen Thousand Dollars ($117,000) per month plus or minus ten percent (10%).  If Developer satisfies all of the Mandatory Milestones (except to the

5

Exhibit  B
Page  79

extent the Mandatory Milestone for the Project Pro Forma has been waived by Alameda pursuant to <u>Section 4.2.2</u> above) on or before the submission and completion dates provided on <u>Exhibit B-1</u> attached hereto, the Parties shall meet and confer in good faith to re-evaluate the amount and/or rate to be expended by Developer thereafter pursuant to this <u>Section 6.4.4</u> based on mutually acceptable projections and shall revise <u>Section 7.1.7</u> below to reflect any mutually agreed upon amount and/or rate adjustment consistent with mutually agreed upon revisions to this <u>Section 6.4.4</u>.

      6.4.5   <u>Termination</u>.  As part of the establishment of the Developer Consultant Costs Account pursuant to <u>Section 6.4.1.1</u> above, the Parties shall instruct Escrow Holder that upon termination of this Agreement any surplus funds in the Developer Consultant Costs Account remaining after (a) the completion of the ninety (90) day negotiating period during which this Agreement was terminated, and (b) payment of Developer Consultant Development Costs incurred by Developer after the Effective Date of the First Amendment and prior to such termination, shall be paid either to Alameda pursuant to a termination pursuant to <u>Section 8.1</u> of this Agreement, or to Developer pursuant to a termination pursuant to <u>Sections 8.2 or 8.3</u> of this Agreement.  Alameda shall have no obligation whatsoever to pay any Developer Consultant Costs, whether incurred prior to or after termination of this Agreement.  This <u>Section 6.4.5</u> shall survive the expiration or termination of this Agreement.

    h.   <u>New Section 6.5</u>.  Section 6 of the Agreement is hereby amended to add the following new <u>Section 6.5</u>:

      Section 6.5   <u>Payment of Consultants</u>.

      6.5.1   <u>July 18, 2007 through Effective Date</u>.  Developer represents and warrants that it shall pay within thirty (30) days of the Effective Date of the First Amendment, all unpaid Developer Consultant Costs incurred during the period from July 18, 2007 to the Effective Date of the First Amendment, except to the extent any such Developer Consultants Costs are subject to dispute between Developer and the applicable consultant.

      6.5.2   <u>Effective Date through April 19, 2008</u>.  Commencing on the Effective Date of the First Amendment,

6

Developer shall pay Developer's costs incurred solely from work on the Project (including consultant and legal fees and costs of Developer's third-party consultants and attorneys) incurred during the period from the Effective Date of the First Amendment to April 19, 2008 at a rate of One Hundred Seventeen Thousand Dollars ($117,000) per month plus or minus ten percent (10%) (prorated for the partial months).

    i.    <u>Amended Section 7.1.2</u>. Section 7.1.2 of the Agreement is hereby deleted in its entirety and replaced with the following:

    7.1.2    <u>Failure of Developer to Make Requested Deposits</u>.

    7.1.2.1 In the event Developer fails to make the Initial Deposit or any Quarterly Deposit pursuant to the procedure set forth in <u>Section 6</u> of this Agreement, Alameda shall have the right to give written notice thereof to Developer specifying the amount of the deposit which was not made. Following the receipt of such notice, Developer shall have fifteen (15) business days to make the required deposit and Alameda shall have the right to suspend all Pre-Development Work being performed by third parties paid by Alameda during such cure period. If Developer has not then made the required deposit, Alameda shall have the right to terminate this Agreement by written notice to Developer.

    7.1.2.1 In the event Developer fails to make the Initial Developer Consultant Deposit or any Developer Consultant Cost Quarterly Deposit pursuant to the procedure set forth in <u>Section 6</u> of this Agreement, Alameda shall have the right to give written notice thereof to Developer specifying the amount of the deposit which was not made. Following the receipt of such notice, Developer shall have fifteen (15) business days to make the required deposit. If Developer has not then made the required deposit, Alameda shall have the right to terminate this Agreement by written notice to Developer.

    j.    <u>New Section 7.1.7</u>. Section 7 of the Agreement is hereby amended to add the following <u>Section 7.1.7</u>:

    7.1.7    <u>Failure of Developer to Pay Developer Consultant Costs</u>.

    7.1.7.1 If at the end of the thirty (30) day period following each Developer Consultant Cost Quarterly Deposit, Developer has failed to expend Three Hundred Fifty Thousand

7



Dollars ($350,000) (subject to the ten percent (10%) tolerance provided in Section 6.4.4 above) during the prior quarter, then such failure shall be a Developer Event of Default and Alameda shall have the right to terminate this Agreement by written notice to Developer.

7.1.7.2  If as of April 19, 2008, Developer has failed to expend One Hundred Seventeen Thousand Dollars ($117,000) per month plus or minus ten percent (10%) (prorated for the partial months) required by Section 6.5.2 above), then such failure shall be a Developer Event of Default and Alameda shall have the right to terminate this Agreement by written notice to Developer.

4.      Amended Exhibit B-1.  Exhibit B-1 to the Agreement is deleted in its entirety and replaced with Exhibit B-1 attached hereto.

5.      Amended Exhibit B-2.  Exhibit B-2 to the Agreement is deleted in its entirety and replaced with Exhibit B-2 attached hereto.

6.      Amended Exhibit C.  Exhibit C to the Agreement is deleted in its entirety and replaced with Exhibit C attached hereto.

7.      Authority.  The persons signing below represent that they have the authority to bind their respective party, and that all necessary board of directors', shareholders', partners', redevelopment agency's or other approvals have been obtained.

8.      Counterparts.  This First Amendment may be signed by different parties hereto in counterparts with the same effect as if the signatures to each counterpart were upon a single instrument.  All counterparts shall be deemed an original of this First Amendment.

9.      Agreement in Full Force and Effect.  Except as otherwise expressly modified by the terms of this First Amendment, the Agreement remains unchanged and in full force and effect.

*[Remainder of page intentionally blank.]*

8

Exhibit____*B*____

Page____*82*____

IN WITNESS WHEREOF, the Parties have executed this First Amendment as of the day and year first above written.

ARRA:

Alameda Reuse and Redevelopment Authority,
a joint powers authority formed under California law

By: _____

Name: *Debra Kurita*

Title: *Executive Director*

Approved as to form:

By: _____

Name: DONNA MOONEY

Title: ASSISTANT GENERAL COUNSEL


CIC:

Community Improvement Commission of the City of Alameda,
a public body, corporate and politic

By: _____

Name: *Debra Kurita*

Title: *Executive Director*

Approved as to form:

By: _____

Name: Teresa L. Highsmith

Title: General Counsel


CITY:

City of Alameda,
a municipal corporation

By: _____

Name: *Debra Kurita*

Title: City Manager

Approved as to form:

By: _____

Name: Teresa L. Highsmith

Title: City Attorney


9

DEVELOPER:

SCC Alameda Point LLC,
a Delaware limited liability company

By: _____

Name: _____
Bruce V. Cook

Title: _____
General Counsel

10

## Exhibit B-1

### Schedule of Performance
### (Mandatory Milestones)

All defined terms not defined herein shall have the respective meanings ascribed to them in the Agreement to which this Exhibit B-1 is attached.

Unless otherwise provided, all Mandatory Milestones are measured from the Effective Date of the Original Agreement (July 18, 2007).

| | | Mandatory Milestone | Submission Date |
|---|---|---|---|
| A. | | | |
| | 1. | Master Project Schedule | Thirty (30) business days; updated quarterly thereafter |
| | 2. | Development Concept | September 19, 2008 |
| | 3. | Infrastructure Plan | September 19, 2008 |
| | 4. | Business Plan | September 19, 2008 |
| | 5. | Entitlement Application | November 19, 2008 |
| B. | | Mandatory Milestone | Completion Date |
| | 1. | Project Pro Forma | November 19, 2008 |

11



Exhibit ___B___
Page ___85___

<u>Exhibit B-2</u>

**Schedule of Performance**
**(Non-Mandatory Milestones)**

All terms not defined herein shall have the respective meanings ascribed to them in the Agreement to which this <u>Exhibit B-2</u> is attached.

Unless otherwise provided, all Non-Mandatory Milestones are measured from the Effective Date (for example, eight (8) months means the date which is eight (8) months after the Effective Date).

Non-Mandatory Milestones described below are good faith estimates by the Parties of the time required to complete the Transaction Documents.

| <u>Non-Mandatory Milestone</u> | <u>Completion Date</u> |
|---|---|
| **1.    EDC MOA Amendment** | **24 months** |
| a.  Submit EDC application | 19 months |
| b.  Finalize EDC MOA Amendment | 24 months |
| | |
| **2.    NEPA Supplemental Environmental Impact Statement (SEIS)** | **24 months** |
| a. Project scoping | 14 months |
| b. Circulate Draft SEIS | 19 months |
| c. Hearings and comments | 19-24 months |
| d. Finalize SEIS | 24 months |
| | |
| **3.    Section 106 Memorandum** | **24 months** |
| a.  Revise historic resources report | 13 months |
| b.  Complete economic study on buildings | 15 months |
| c. Finalize Section 106 Memorandum amendment | 24 months |

12

Exhibit _B_
Page _86_

| | |
|---|---|
| **4.**    **USFWS/NMFS Biological Documents** | **24 months** |
| a.  Biological Assessment/reinitiate Section 7 consultation with USFWS | 12 months |
| b.  Finalize new Biological Opinion with USFWS | 24 months |
| c.  Predator Management Agreement | 24 months |
| d.  Determine if NMFS Biological Opinion necessary/conduct Biological Assessment | 18 months |
| e.  Finalize NMFS Biological Opinion | 24 months |
| **5.**    **Early Transfer Documents** | **24 months** |
| a.  Finalize Draft Navy Term Sheet | 18 months |
| b.  Draft ETCA | 15 months |
| c.  Draft Administrative Order (AOC) with Environmental Protection Agency (EPA), Department of Toxic Substances Control, Regional Water Quality Control Board | 17 months |
| d.  Draft FOSET | 18 months |
| e.  Public Comment/Finalize ETCA, AOC, FOSET, submit to Governor/EPA | 21 months |
| f. Approval by Governor/EPA | 24 months |
| g.  Final remediation contract and environmental insurance policies | 24 months |
| **6.**    **CEQA Documents** | **24 months** |
| a.  Project scoping | 14 months |
| b.  Notice of Preparation | 15 months |
| c.  Circulate Draft Environmental Impact Report (EIR) | 19 months |

13


Exhibit ___B___
Page ___87___

| | |
|---|---|
| d. Hearings and comments/finalize EIR | 24 months |
| | |
| **7.**     **CAA/DDA** | **24 months** |
| a. CAA executed | 14 months |
| b. Draft DDA | 18 months |
| c. Public hearings | 18-24 months |
| d. Approval of DDA | 24 months |
| **8.**     **Development Agreement/Entitlements** | **24 months** |
| a. Submit Entitlement Application | 16 months |
| b. Public hearings/approvals | 18-24 months |
| c. Development Agreement finalized and approvals granted | 24 months |
| **9.**     **Tidelands Trust Exchange Agreement** | **24 months** |
| a. Submit draft Tidelands Trust Exchange Agreement to California State Lands Commission (CLSC) | 12 months |
| b. Reach agreement on language with CLSC staff | 18 months |
| c. Obtain approval of CLSC | 24 months |
| | |
| **10.**    **Public Planning Process** | **24 months** |
| a. Introductory meetings/ constraints analysis | 3 months |
| b. First round public planning charrettes | 4-6 months |
| c. Second round public planning charrettes | 6-14 months |
| d. Development Concept public review | 14 months |

Exhibit __B__
Page __88__

| | |
|---|---|
| e.  Historic Preservation Plan public review | 14-16 months |
| f.  Focused topic community meetings | 14-18 months |
| g.  Hearings and comments on EIR/DDA/entitlements | 18-24 months |

Exhibit  O

Page  89

**Exhibit C**

**Annual Budget**

[Attached]

16

Exhibit _B_

Page _90_

## SUNCAL COMPANIES
## Annual ENA Cost Recovery Budget

| City Staff Salary and Benefits | Salary | Benefits | Total | 12-Month Duration | Current Negotiating Deposit |
|---|---|---|---|---|---|
| **City Manager Staff** | | | | | |
| Assistant City Manager* | $188,351 | $56,505 | $244,856 | 25.00% | $61,214 | $15,303 |
| **Development Services Staff** | | | | | |
| Director, Development Services Department | $172,430 | $51,729 | $224,159 | 20.00% | $44,832 | $11,208 |
| Base Reuse Division Manager* | $135,645 | $40,694 | $176,339 | 75.00% | $132,254 | $33,063 |
| Redevelopment Manager | $104,907 | $31,472 | $136,379 | 30.00% | $40,914 | $10,228 |
| Contract Administrator | $68,478 | $20,543 | $89,021 | 3.00% | $2,671 | $668 |
| Office Assistant, Base Reuse | $62,132 | $18,640 | $80,771 | 15.00% | $12,116 | $3,029 |
| **Other City Staff** | | | | | |
| Assistant City Attorney | $154,838 | $46,451 | $201,289 | 15.00% | $30,193 | $7,548 |
| Director, PW | $171,887 | $51,566 | $223,453 | 5.00% | $11,173 | $2,793 |
| City Engineer, PW | $127,914 | $38,374 | $166,288 | 15.00% | $24,943 | $6,236 |
| Supervising Civil Engineer, PW | $111,740 | $33,522 | $145,262 | 15.00% | $21,789 | $5,447 |
| Traffic Engineer, PW | $71,473 | $21,442 | $92,915 | 15.00% | $13,937 | $3,484 |
| Director, Planning and Building | $166,764 | $59,367 | $226,131 | 5.00% | $11,257 | $2,814 |
| Manager, Planning | $115,671 | $34,701 | $150,372 | 50.00% | $75,186 | $18,797 |
| Director, Finance | $156,668 | $47,000 | $203,668 | 3.00% | $6,110 | $1,528 |
| **Subtotal Salary and Benefits** | | | | | $488,588 | $122,147 |
| | | | | | | |
| **Consultant/Legal Services** | | | | | |
| | | | | | | |
| **Legal** | | | | | |
| Ellman Burke Hoffman & Johnson (CAA, DDA) | | | | | $126,000 | $31,500 |
| Fragner, Seifert, Pace and Winograd (CAA, DDA) | | | | | $90,000 | $22,500 |
| Shute, Mihaly & Weinberger (Tidelands Trust, CEQA, Navy MOA, ETCA, etc.) | | | | | $237,500 | $59,375 |
| | | | | | | |
| **Contractual** | | | | | |
| Economic & Planning Systems (Land Economics and Fiscal Impact Analysis) | | | | | $182,500 | $45,625 |
| Keyser Marston Associates (Land Economics) | | | | | $10,000 | $2,500 |
| MARC Associates (Inter-governmental Relations) | | | | | $84,000 | $21,000 |
| Russell Resources (Environmental) | | | | | $100,000 | $25,000 |
| **Engineering Consultants** | | | | | $50,229 | $12,557 |
| **Subtotal Consultant/Legal Services** | | | | | $ 880,229 | $220,057 |
| **TOTAL** | | | | | $ 1,368,817 | $342,204 |

* These staff members will be billed monthly to the project at a fixed percent if a Full Time Equivalent employee; the remaining City staff and consultants will use timesheets to bill time expended on the project.

EXHIBIT C

Exhibit ___18___
Page ___91___

3/6/2008

# EXHIBIT C

# SECOND AMENDMENT
## TO
## ALAMEDA POINT
## EXCLUSIVE NEGOTIATION AGREEMENT

THIS SECOND AMENDMENT TO ALAMEDA POINT EXCLUSIVE NEGOTIATION AGREEMENT ("**Second Amendment**") is made as of October 7, 2008 (the "**Effective Date**"), by and between **ALAMEDA REUSE AND REDEVELOPMENT AUTHORITY**, a Joint Powers Authority established by the City of Alameda and the Community Improvement Commission under the California Joint Exercise of Powers Act and a public entity lawfully created and existing under the State of California (the "**ARRA**"), the **COMMUNITY IMPROVEMENT COMMISSION OF THE CITY OF ALAMEDA**, a public body corporate and politic ("**CIC**"), and the **CITY OF ALAMEDA**, a municipal corporation (the "**City**", and together with ARRA and CIC, "**Alameda**") and **SCC Alameda Point LLC, a Delaware limited liability company** ("**Developer**").  Alameda and Developer are individually referred to as a "**Party**" and collectively referred to as the "**Parties**".

## RECITALS

This Second Amendment is entered upon the basis of the following facts, understandings and intentions of the Parties.

A.     The Parties entered into that certain Alameda Point Exclusive Negotiation Agreement, dated as of July 18, 2007 (the "**Original Agreement**") as amended by that certain First Amendment to Alameda Point Exclusive Negotiation Agreement, dated as of March 6, 2008 (the "**First Amendment**"), which shall be amended by this Second Amendment.

B.     The Original Agreement, as amended by the First Amendment, and as amended by this Second Amendment, shall hereinafter collectively be referred to as the "**Agreement**".

C.     Pursuant to <u>Section 9.2.1</u> of the Agreement, the qualifications and identity of Developer are of particular concern to Alameda, in view of the importance of the entitlement and development of the Project (as defined in the Agreement) and the Project Site (as defined in the Agreement) to Alameda, and it was because of the qualifications and identity of Developer that Alameda entered into the Agreement with Developer.

D.     Pursuant to <u>Section 9.2.2</u> of the Agreement, Developer has requested the consent of Alameda to Transfer of an Ownership Interest in SCC Alameda Point LLC to a new entity.

E.     Alameda's consent to the Transfer is conditioned upon certain modifications to the Agreement and the Parties have agreed to those modifications and to certain additional

1



Exhibit _C_
Page _92_

modifications to the terms and conditions of the Agreement as hereinafter set forth.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual terms, covenants, conditions and promises set forth herein, the Alameda and Developer agree as follows:

1.      <u>Definitions</u>.  All capitalized terms used herein shall have the definitions given in the Agreement, unless otherwise expressly stated herein.

2.      <u>Submittals</u>.  Alameda acknowledges that Developer satisfied the Mandatory Milestones for submittal of the Development Concept, Infrastructure Plan and draft Business Plan by submission of such Plans on September 19, 2008 and, as of the Effective Date of this Second Amendment, is in compliance with the terms of the Agreement.  Developer acknowledges that refinement of such Plans is necessary for submission of the draft Master Plan (as defined below), the final Business Plan, and Project Pro Forma on December 19, 2008.

3.      <u>Amended Recital A of the Original Agreement</u>.  Recital A of the Original Agreement is hereby deleted in its entirety and replaced with the following:

A.      The United States of America, acting by and through the Department of the Navy ("**Navy**") is the owner of certain real property located within the City of Alameda, State of California commonly referred to as the former Alameda Naval Air Station, now known as "**Alameda Point**", which was closed as a military installation and is subject to disposal pursuant to and in accordance with the Defense Base Closure and Realignment Act of 1991, as amended (Pub. Law No. 101-510).  The property that is the subject of this Agreement is a portion of Alameda Point, which consists of approximately 960 acres of uplands and approximately 673 acres of submerged lands (collectively, the "**Project Site**"), certain of which lands are subject to public trust restrictions.  The Project Site is shown on the "**Map of the Project Site**", attached hereto as <u>Exhibit A</u>.  The Project Site is sometimes referred to as the "**Property**".

4.      <u>Amended Section 1.2</u>.  Section 1.2 is hereby deleted in its entirety and replaced with the following:

1.2     <u>Exclusive Negotiations</u>.  During the Exclusive Negotiation Period, Alameda covenants and agrees that it shall negotiate exclusively with Developer regarding the Project and the Project Site and shall not solicit, market to, or negotiate with any other person or entity regarding the

2


Exhibit C
Page 93

Project and the Project Site or solicit or entertain bids or proposals to do
so.

5.     Amended Section 2.  Section 2 is hereby deleted in its entirety and replaced with
the following:

Section 2.  Term; Extension.

2.1     Term.  The term of this Agreement (the "**Exclusive Negotiation
Period**" or the "**Term**") shall commence on the Effective Date
and, subject to extension pursuant to Sections 2.2 and 5 below,
shall terminate on July 20, 2010.  Upon such expiration or any
termination permitted by this Agreement, neither Party shall have
any future right or obligation under this Agreement except with
respect to any obligation which expressly survives the termination
or expiration of this Agreement.

2.2     Extension for Alameda Final Determination.  If Alameda can make
the following findings (as determined by its governing board (with
respect to the ARRA), Commission and City Council):  (i) that
Developer has met all of the Mandatory Milestones (as defined in
Section 4.2 below), as the same have been extended as provided
herein, or except to the extent the Mandatory Milestone for the
Project Pro Forma (as defined in Section 3.2.4 below) has been
waived by Alameda pursuant to Section 4.2.3 below; (ii)
Developer has provided a Project description sufficient to permit
the City to review the Project under the California Environmental
Quality Act (Public Resources Code §§ 21000-21177) ("**CEQA**");
and (iii) Developer's completed Entitlement Application (defined
in Section 3.2.5.1 below) or Optional Entitlement Application (as
defined in Section 3.2.5.2 below, as applicable, has been filed with
the City, the Exclusive Negotiation Period shall be extended
automatically until Alameda has made its final determination with
respect to the approvals requested in the Entitlement Application or
the Optional Entitlement Application, as applicable, and, subject to
the time limit in Section 5 below, the period for any legal challenge
thereto has passed without such challenge, or if such challenge has
been made, such challenge has been fully and finally resolved.

6.     Amended Section 3.1.  The following sentence is hereby inserted at the end of
Section 3.1:  "Developer and the ARRA acknowledge that the ARRA cannot achieve the
Finalized Navy Term Sheet unless Developer agrees to all of its terms."

3


Exhibit C
Page 94

7.      Amended Section 3.2.1.  Section 3.2.1 is hereby amended to clarify that the Development Concept provided by Developer on September 19, 2008, shall include a draft of the updated Sports Complex Master Plan.  Developer shall provide the final updated Sports Complex Master Plan on December 19, 2008.

8.      Amended Section 3.2.5.  Section 3.2.5 is hereby deleted in its entirety and replaced with the following:

> 3.2.5   Ballot Initiative; Entitlement Application; Subsequent Approvals.  Developer shall elect in writing no later than April 30, 2009 to either submit the Entitlement Application (as defined in Section 3.2.5.1 below), or pursue a ballot initiative for the Project in compliance with 14 Cal. Code Regs. Section 15378(b)(3) (the "**Ballot Initiative**").  If as of April 30, 2009, Developer elects to submit an Entitlement Application, then Developer shall submit the Entitlement Application no later than June 15, 2009.  Notwithstanding the foregoing, if Developer elects to pursue a Ballot Initiative but the initiative fails to qualify for the ballot as determined by the City Election Official, then Developer shall submit the Entitlement Application (as defined in Section 3.2.5.1 below) no later than forty-five (45) days from the date of the decision of the City Election Official that the initiative has failed to qualify.

> 3.2.5.1 Entitlement Application.  The entitlement application (the "**Entitlement Application**") shall include the following: (a) an application for all land use entitlements and approvals it will seek from the City, including (i) a General Plan amendment, if required, (ii) a master plan (the "**Master Plan**") pursuant to Section 30-4.20(f) of the Alameda Municipal Code for the development of the Project Site, which pertains to MX District development, provided however, pursuant to Section 30-4.20(f)(1) a market analysis will not be required as part of the Master Plan submittal because the Project Site is within a redevelopment area, (iii) a zoning amendment(s), (iv) subdivision approval to the extent requested by Developer, (v) a development agreement (the "**Development Agreement**") prepared pursuant to California Government Code Section 65864 *et seq.*, vesting in Developer the right to develop the Project to the scope, uses, densities and intensities described in the Master Plan and other implementing regulatory documents, and necessary to implement the Development Plan, and (vi) such other entitlements and approvals as Developer may request for the Project Site; (b) application for environmental review pursuant to CEQA; and (c) an agreement between Developer and Alameda to provide for expedited processing by the City of all land use entitlement applications including all environmental review

4

Exhibit __C__
Page __95__

required under CEQA and funding thereof by Developer. Subsequent to submittal of the Entitlement Application, Developer shall use Best Efforts (as defined in Section 15.5 below) to submit all required supplemental information sufficient for the Entitlement Application to be promptly determined to be complete by Alameda.

    3.2.5.2 Optional Entitlement Application. If Developer elects to pursue the Ballot Initiative, then, whether or not the Ballot Initiative passes, Developer shall have the right, but shall not be obligated, to submit an entitlement application as described in Section 3.2.5.1 above, but which shall be referred to herein as the "**Optional Entitlement Application**". Such application shall not be a Mandatory Milestone unless Developer elects to make such application, and, if the Ballot Initiative shall have passed, shall include only those land use approvals and entitlements that Alameda, in consultation with Developer, determines are necessary to permit development of the Project consistent with the Ballot Initiative. If Developer elects to submit the Optional Entitlement Application, then Developer shall submit the Optional Entitlement Application no later than January 15, 2010. Except as otherwise provided in Sections 2.2 and 5 of this Agreement, the Term of this Agreement shall not be extended for such submission (unless mutually agreed to in writing by the Parties).

    3.2.5.3 Subsequent Approvals. Subsequent approvals will be necessary in order to develop the Project, which may include, without limitation, development plans; master demolition, infrastructure, grading and phasing plan; subdivision approvals; design review approvals; demolition permits; improvement agreements; infrastructure agreements; grading permits; building permits; site plans; sewer and water connection permits; and other similar requirements.

    9.    Amended Section 3.2.6. Section 3.2.6 is hereby deleted in its entirety and replaced with the following:

    3.2.6   Master Plan. Developer shall submit an initial draft of the Master Plan no later than December 19, 2008, which shall be consistent with the Plans submitted on September 19, 2008 unless otherwise agreed by the Parties. Following the submittal of the draft Master Plan by Developer, the term "Plans" shall include the draft Master Plan, together with any refinements, updates and modifications thereof.

5



Exhibit _C_
Page _96_

10.     New Section 3.2.7.  Section 3 of the Agreement is hereby amended to add the following new Section 3.2.7:

> 3.2.7   Project Master Schedule.  Developer shall prepare and maintain a project master schedule (the "**Project Master Schedule**") that sets forth, in reasonable detail, the expected tasks necessary to complete all of the Mandatory and Non-Mandatory Milestones, entitlements (whether through an Entitlement Application or Ballot Initiative), and at the Developer's discretion, subsequent approvals and the anticipated dates that these tasks are expected to be completed.  Developer shall submit the initial Project Master Schedule to the ARRA within thirty (30) business days from the Effective Date of the Original Agreement and shall update such schedule and deliver the updated schedule to the ARRA on a quarterly basis thereafter.

11.     Amended Section 3.3.  Section 3.3 is hereby amended to insert the following sentence immediately after the first sentence:  "The term Property Transfer(s) as used herein shall mean conveyance in fee or, with respect to land subject to the public trust, conveyance by long term lease(s) pursuant to State law."

12.     Amended Section 3.4.  Section 3.4 is hereby deleted in its entirety and replaced with the following:

> 3.4   CEQA Documents.  The Plans, together with the Entitlement Application submittals or Optional Entitlement Application submittals, as applicable, shall be of sufficient specificity to permit the subsequent preparation of the documents required for environmental review of the Project as required by CEQA (the "**CEQA Documents**"); including an environmental impact report or such other information and reports as may be required to permit Alameda to comply with the requirements of CEQA.  Execution of the DDA by the parties thereto and the closing of the Property Transfer(s) under the DDA shall be contingent on compliance with CEQA.

13.     Amended Section 3.5.7.  Section 3.5.7 is hereby amended to replace "NEPA" with "National Environmental Policy Act ("**NEPA**")".

14.     Amended Section 3.5.8.  Section 3.5.8 is hereby amended to add the following phrase:  "or as approved through the Ballot Initiative" immediately after "Entitlement Application filed with Alameda".

6

Exhibit     C
Page        97

15.    Amended Section 3.6.2.  Section 3.6.2 is hereby deleted in its entirety and replaced with the following:

3.6.2    Transaction Documents.  All applicable terms of the completed Transaction Documents, and provision for completion and incorporation of applicable terms of all Transaction Documents that are to be completed after execution of the DDA, and if applicable, prior to close of escrow.

3.6.2.1  The Parties acknowledge that their ability to prepare the Transaction Documents is dependent to some extent on reaching agreement with certain third parties, including the California State Lands Commission (with respect to the public trust), and may also be dependent on achieving certain regulatory approvals and satisfying certain other conditions that are outside of their control.  If before the execution of the DDA by the parties thereto, any of such third-party agreements, regulatory approvals or other conditions are not finalized, obtained or satisfied, then to the extent practical the Parties shall in good faith negotiate the DDA and characterize such third-party agreements, regulatory approvals or other conditions as conditions precedent to the obligations of the Parties to the close of escrow for conveyance of the Property pursuant to the DDA.

16.    Amended 3.6.6.  Section 3.6.6 of the Agreement is hereby deleted in its entirety and replaced with the following:

3.6.6    Transfers.  Provisions for Transfer (as defined in Section 9.2.4.5 below), which shall include (i) a mechanism for parties contributing debt or equity to the Project to remove SunCal Affiliate (as defined in Section 9.2.2.1 below) or, if applicable, the qualified developer approved by Alameda pursuant to Section 9.2.2.2 below as the replacement manager of Developer (“**Replacement Manager (per ENA)**”) from day-to-day management of the entity that executes the DDA (the “**DDA Development Entity**”) pursuant to the terms of the DDA Development Entity's operating or partnership agreement, provided that SunCal Affiliate or Replacement Manager (per ENA), as applicable, is concurrently replaced with a substitute developer (“**Replacement Manager (per DDA)**”) controlling day-to-day management that meets the specified criteria as a “qualified developer” provided in the DDA, including the approval of Alameda, which approval will not be unreasonably withheld, conditioned or delayed, and (ii) the right of owners of Ownership Interests (as defined below) in Developer to Transfer, on or

7


Exhibit  *C*
Page  *98*

after the date on which the DDA is signed, their Ownership Interests in Developer so long as (A) SunCal Affiliate or Replacement Manager (per ENA) or Replacement Manager (per DDA), as applicable, shall continue to manage Developer on a day-to-day basis and (B) Alameda has determined that Developer has the financial ability, including debt and/or equity financing, to carry out its obligations under the DDA, which determination by Alameda shall not be unreasonably withheld, conditioned or delayed.

17.     Amended Section 4.2.  Section 4.2 is hereby amended as follows:  (a) to delete the first paragraph of Section 4.2 in its entirety; (b) to re-number Sections 4.2.1 and 4.2.2 of the Agreement to Sections 4.2.2 and 4.2.3, respectively; (c) to insert the following new Section 4.2.1 to the Agreement:

4.2.1   Mandatory Milestones.  The mandatory milestones (the "**Mandatory Milestones**") shall be:

4.2.1.1  the submission of the Project Master Schedule as described in Section 3.2.5.1, above;

4.2.1.2  the submission of the Development Concept as described in Section 3.2.1 above;

4.2.1.3  the submission of the Infrastructure Plan as described in Section 3.2.2 above;

4.2.1.4  the submission of the draft Business Plan as described in Section 3.2.3 above;

4.2.1.5  mutual agreement of the Parties on the Project Pro Forma as described in Section 3.2.4 above;

4.2.1.6  Developer's election in writing to either submit the Entitlement Application or pursue the Ballot Initiative as described in Section 3.2.5.1 above;

4.2.1.7  if Developer elects to submit the Entitlement Application or, if the Ballot Initiative fails to qualify for the ballot as determined by the City Election Official, then an additional Mandatory Milestone is the submission of the Entitlement Application as described in Section 3.2.5.1 above;

8

Exhibit  C

Page  9 9


4.2.1.8  the submission of an initial draft of the Master Plan as described in <u>Section 3.2.6</u> above, together with the final Business Plan as described in <u>Section 3.2.3</u> above;

4.2.1.9  the submission of the Optional Entitlement Application as described in <u>Section 3.2.5.2</u> above (if Developer elects to make such submittal);

4.2.1.10  attainment of the Finalized Navy Term Sheet as described in <u>Section 3.1</u> above; and

4.2.1.11  mutual agreement of the Parties to the form and substance of the DDA pursuant to <u>Section 3.6</u> above or if at the time of the Mandatory Milestone for the DDA, mutual agreement has not been achieved, then Developer shall submit its best and final offer of the form of DDA acceptable to Developer.

and (d) to add the following at the end of the re-numbered <u>Section 4.2.2</u>:

Notwithstanding anything in the foregoing to the contrary, no later than thirty (30) days prior to the Mandatory Milestone for the attainment of the Finalized Navy Term Sheet set forth in the Schedule of Performance attached hereto as <u>Exhibit B-1</u>, Alameda's staff shall make a presentation to the governing board of the ARRA, the Commission and the City Council regarding the status of efforts to attain the Finalized Navy Term Sheet and Alameda (by its governing board (with respect to the ARRA), Commission and City Council) shall have the right, in its sole and absolute discretion, to extend the Mandatory Milestone for attainment of the Finalized Navy Term Sheet.

18.    <u>Amended Section 4.3</u>.  <u>Section 4.3</u> is hereby amended to replace "(by its Board of Directors, Board of Commissioners and City Council)" with "(by its governing board (with respect to the ARRA), Commission and City Council)".

19.    <u>Amended Section 5</u>.  <u>Section 5</u> of the Agreement is hereby deleted in its entirety and replaced with the following:

Section 5.  <u>Litigation Force Majeure</u>.  The Exclusive Negotiation Period, and the dates for performance of Mandatory Milestones, shall be extended for the period of any Litigation Force Majeure (as defined below); provided that any extension as a consequence of Litigation Force Majeure shall operate to extend the date for achievement of any Mandatory Milestone only to the extent that the Mandatory Milestone is affected by

9



Exhibit _C_

Page _100_

the event or events constituting the Litigation Force Majeure. Notwithstanding anything to the contrary in the foregoing, in no event shall Litigation Force Majeure pursuant to Section 5.1(b) below extend the Mandatory Milestone for the DDA. Furthermore, notwithstanding anything to the contrary in the foregoing, in no event shall Litigation Force Majeure extend either the Exclusive Negotiation Period or any Mandatory Milestone date beyond July 20, 2017. The Parties may elect to amend this Agreement to reflect extensions pursuant to this Section 5, and such amendments shall reflect which Mandatory Milestones and Transaction Documents (and related Non-Mandatory Milestones) are so affected.

     5.1    **"Litigation Force Majeure"** means any action, proceeding, application or request before any court, tribunal, or other judicial, adjudicative or legislative decision-making body, including any administrative appeal, that is brought by a third party and seeks to challenge: (a) the validity of any action taken by Alameda with respect to a Transaction Document(s), including Alameda's selection of Developer as the developer of the Project Site, the approval by Alameda of any of the proposed Transaction Documents, the performance of any action required or permitted to be performed by Alameda hereunder or under the proposed Transaction Documents, or any findings upon which any of the foregoing are predicated; (b) the Ballot Initiative; or (c) the validity of any other approval that is required for the conveyance, management or redevelopment of the Project Site as contemplated hereby and would prevent the Parties from executing the DDA with conditions, as provided above, or prevent the DDA from becoming effective, or require a material modification of the DDA, the Plans, the Entitlement Application or the Project.

20.    New Section 6.6.  Section 6 is hereby amended to add the following new Section 6.6:

     6.6    CEQA Funding.  No later than April 30, 2009, Developer shall deposit with the City's Planning and Building Department funds in the amount of Two Hundred Fifty Thousand Dollars ($250,000) (the **"Initial CEQA Deposit"**) for the City's use, in accordance with standard procedures, to commence environmental review pursuant to CEQA of the Project (as described in the Master Plan submittal described in Section 3.2.6 above).  Developer acknowledges that it may be required to deposit additional funds for such CEQA review.  The City shall reimburse to Developer any portion of the Initial CEQA Deposit (or any additional



Exhibit___*C*___
Page___*101*___

funds deposited by Developer for CEQA review) which is not used for
such CEQA review.

21.      Amended Section 7.1.  Section 7.1 of the Agreement is hereby amended in the
following ways:  First, Section 7.1.2 is re-titled:  "Failure of Developer to Make Required
Deposits".  Second, Section 7.1.2 is hereby amended to correct the numbering.  There are two
subsections each numbered 7.1.2.1, the second is hereby corrected to 7.1.2.2.  In addition, the
timeframes of "fifteen (15) business days" provided in Sections 7.1.2.1 and 7.1.2.2 are hereby
deleted and replaced with "ten (10) business days".  Lastly, Section 7.1 is hereby amended to add
the following new Section 7.1.2.3 to the Agreement:

> 7.1.2.3 In the event Developer fails to make the Initial CEQA
> Deposit (or any additional funds deposited by Developer for CEQA
> review) as required pursuant to Section 6.6 of this Agreement, Alameda
> shall have the right to give written notice thereof to Developer specifying
> that the deposit was not made.  Following receipt of such notice,
> Developer shall have ten (10) business days to make the required deposit.
> If Developer has not then made the required deposit, Alameda shall have
> the right to terminate this Agreement by written notice to Developer.

22.      Amended Section 7.1.3.  Section 7.1.3 is hereby amended to delete the timeframe
of "forty-five (45) business days" and replace it with "thirty (30) days".

23.      Amended Section 7.1.6.  Section 7.1.6 is hereby amended to delete the timeframe
of "forty-five (45) business days" and replace it with "thirty (30) business days".

24.      Amended Section 9.2.  Section 9.2 is hereby amended to replace "by its Board of
Directors, Board of Commissioners and City Council" with "by its governing board (with respect
to the ARRA), Commission and City Council".

25.      New Sections 9.2.2.1 through 9.2.2.4.  Section 9.2 is hereby further amended to
add the following new Sections 9.2.2.1, 9.2.2.2, 9.2.2.3 and 9.2.2.4 to the Agreement:

> 9.2.2.1 Pursuant to Section 9.2.2 of the Agreement,
> Developer has requested the consent of Alameda to a Transfer of an
> Ownership Interest in SCC Alameda Point LLC, which is the entity
> described in this Agreement as Developer, to a new entity to be owned by
> WM Development Group LLC ("SunCal Affiliate"), which is an affiliate
> of the current owner of SCC Alameda Point LLC, and D.E. Shaw Real
> Estate Portfolios 20, L.L.C. ("DESCO"), which new entity is Cal Land
> Venture, LLC, a Delaware limited liability company ("Cal Land").  To
> implement the Transfer, SCC Acquisitions LLC ("SunCal"), the current
> sole owner of SCC Alameda Point LLC shall assign and transfer its

Exhibit  C
Page  102

ownership interest in SCC Alameda Point LLC to an affiliate of SunCal, which shall assign and transfer its ownership interest to Cal Land, and in connection therewith, the operating agreement of SCC Alameda Point LLC shall be amended and restated (the "**Operating Agreement**"). Developer further represents to Alameda that it has provided a true and correct and fully executed copy of the Operating Agreement. The Operating Agreement submitted by Developer to Alameda provides that SunCal Affiliate has been appointed as the manager with responsibility for day-to-day management of Developer subject to the terms and conditions of the Operating Agreement. Developer acknowledges that it shall be a default under this Agreement for either Cal Land or Developer to exercise its right to remove SunCal Affiliate as the manager of Developer for reasons other than a material uncured default under the Operating Agreement consisting of gross negligence, fraud, willful misconduct, prohibited transfer, or misappropriation or misapplication of funds, malfeasance and/or criminal acts (collectively, "**Causes for Removal**").

9.2.2.2 If SunCal Affiliate is removed as the manager of Developer during the Term of this Agreement for Causes for Removal, then no later than sixty (60) days after such removal, Cal Land shall provide to Alameda for its approval in its reasonable discretion, a qualified developer to replace SunCal Affiliate as the manager of Developer, together with all documentation required for Alameda's determination of such developer's qualifications (collectively, the "**Complete Submittal**"). Alameda shall make its determination as to the approval or disapproval of such replacement manager within thirty (30) days of its receipt of the Complete Submittal. If, notwithstanding the foregoing, Alameda fails to make such determination within such thirty (30) day period, then the remaining Mandatory Milestones shall be extended day-for-day until such determination is made. If Alameda disapproves of the replacement manager, then Cal Land shall have sixty (60) days to propose an alternate manager and submit a new Complete Submittal. If Cal Land shall fail within such time period to propose an alternate manager or if Alameda shall disapprove, in its reasonable discretion, such alternate manager, then Alameda shall have the right to terminate this Agreement by provision of written notice to Developer. It is reasonable for Alameda to reject an alternative manager on the basis of its qualifications, prior experience, and financial capacity, among other criteria, as such relate to the implementation of the Project. An alternative manager, including key team members, must have qualifications and successful experience working as a master developer on public-private partnerships for large-scale, multi-use urban reuse or redevelopment projects similar to the scope

12

Exhibit    C

Page    103

and scale of the Project.  For purposes herein, the phrase "public-private partnership" shall not be construed to establish the parties as partners, co-venturers or principal or agent with one another.

        9.2.2.3 If SunCal Affiliate is removed as the manager of Developer during the Term of this Agreement for any reason other than Causes for Removal, Alameda shall have the right to provide an Alameda Default Notice pursuant to Section 7.1 above to Developer that such actions constitute a default under this Agreement.  Failure to cure such default within thirty (30) days shall constitute a Developer Event of Default pursuant to Section 7.1 above.

        9.2.2.4 Alameda hereby consents to the foregoing Transfer of an Ownership Interest for the Term of this Agreement, but such consent shall not be deemed to be a waiver of Alameda's right to require different or additional criteria regarding Transfer in the CAA and/or the DDA, provided that such provisions shall be consistent with the Transfer provisions agreed upon in Section 3.6.6 above.

26.    Amended Section 12.1.  Section 12.1 is hereby amended to replace "by the Board of Directors of ARRA, Board of Commissioners of the CIC and the City Council" with "by the governing board of the ARRA, the Commission and the City Council".

27.    Amended Section 12.2.  Section 12.2 is hereby amended to delete the following parenthetical "(as extended pursuant to Section 2.2 above)" and replace it with "(subject to extension pursuant to Sections 2.2. and 5 above)".

28.    Amended Section 13.  Section 13 is hereby deleted in its entirety and replaced with the following:

Section 13.    Approval of DDA.  If negotiations culminate in a DDA between Alameda and Developer following CEQA review of the Project, such DDA shall become effective only after and upon the approval by the governing board of the ARRA (if applicable), the Commission and the City Council and execution by Alameda pursuant to direction of the governing board of the ARRA (if applicable), the Commission and the City Council.

29.    Amended Section 16.1.  Section 16.1 is hereby deleted in its entirety and replaced with the following:

16.1    Indemnity.  Developer shall defend, hold harmless and indemnify the ARRA, the CIC and the City from and against any and all Claims

Exhibit _C_

Page _104_

made by any third party directly or indirectly arising out of Developer's Response to the RFQ and/or the Developer MOA and/or the Ballot Initiative; provided, however, such obligation shall not apply to any Claim resulting solely from an act or omission of the ARRA, the CIC and/or the City.

30.    Amended Section 17.  Section 17 is hereby amended to delete the first notice address for Developer in its entirety and replace it with the following:

> SCC Alameda Point LLC
> c/o SunCal Companies
> Bay Area Division
> 300 Frank H. Ogawa Plaza, #342
> Oakland, California  94512
> Attention:  Pat Keliher, Vice President Operations

Section 17 is hereby further amended to add the following notice address for Developer:

> Cal Land Venture, LLC
> c/o D.E. Shaw & Co., L.L.C.
> 120 West 45th Street
> Tower 45, 39th Floor
> New York, New York  10036
> Attention:  Chief Financial Officer

31.    Amended Section 20.  Section 20 is hereby deleted in its entirety and replaced with the following:

Section 20  Governmental Contact.

> 20.1    Developer Contact.  Developer agrees that it will not meet, or engage in negotiations, with any governmental officials or staff (other than Alameda and its staff) whose approval is required to a Transaction Document, concerning the Project or the Project Site without giving the Deputy Executive Director of the ARRA reasonable prior notice and the opportunity to participate with Developer in any such meeting or negotiations.  Notwithstanding anything to the contrary in the foregoing, Developer is authorized to communicate directly with the Navy regarding the Project or the Project Site so long as Developer promptly keeps Alameda informed of all such communications.

> 20.2    Alameda Contact.  ARRA agrees that it will not meet, or engage in negotiations, with any governmental officials or staff

14



Exhibit  C
Page  105

whose approval is required to a Transaction Document, concerning the Project or the Project Site without reasonable prior notice to Developer. ARRA shall keep Developer informed of the substance of any such meetings and negotiations and shall permit Developer to participate in the same. Subject to this Section 20.2, Alameda may, in the routine course of governmental affairs, contact (or be contacted by), discuss, or meet with the Navy or any other governmental entity, and Developer acknowledges that such contact, discussions, meetings, or responses may pertain in whole, or in part, to the Project and/or the Project Site.

     20.3   <u>Prejudice Parties Interests</u>.  Alameda and Developer agree to refrain from knowingly engaging in contacts or communications with government officials (other than Alameda staff) in a manner reasonably expected to prejudice the interests of the other Party.

32.    <u>Amended Exhibit A</u>.  <u>Exhibit A</u> to the Agreement is deleted in its entirety and replaced with <u>Exhibit A</u> attached hereto.

33.    <u>Amended Exhibit B-1</u>.  <u>Exhibit B-1</u> to the Agreement is deleted in its entirety and replaced with <u>Exhibit B-1</u> attached hereto.

34.    <u>Amended Exhibit B-2</u>.  <u>Exhibit B-2</u> to the Agreement is deleted in its entirety and replaced with <u>Exhibit B-2</u> attached hereto.

35.    <u>Authority</u>.  The persons signing below represent that they have the authority to bind their respective party, and that all necessary board of directors', shareholders', partners', redevelopment agency's or other approvals have been obtained.

36.    <u>Counterparts</u>.  This Second Amendment may be signed by different parties hereto in counterparts with the same effect as if the signatures to each counterpart were upon a single instrument.  All counterparts shall be deemed an original of this Second Amendment.

37.    <u>Agreement in Full Force and Effect</u>.  Except as otherwise expressly modified by the terms of this Second Amendment, the Agreement remains unchanged and in full force and effect.

15

Exhibit _C_
Page _106_

IN WITNESS WHEREOF, the Parties have executed this Second Amendment as of the day and year first above written.

ARRA:

Alameda Reuse and Redevelopment Authority,
a joint powers authority formed under California law

By: _____          Approved as to form:
    Debra Kurita, Executive Director
                                 By: _____
                                    Donna Mooney
                                    Assistant General Counsel

CIC:

Community Improvement Commission of the City of Alameda,
a public body, corporate and politic

By: _____          Approved as to form:
    Debra Kurita, Executive Director
                                   By: _____
                                    Donna Mooney
                                    Assistant General Counsel

CITY:

City of Alameda,
a municipal corporation

By: _____          Approved as to form:
    Debra Kurita, City Manager
                                   By: _____
                                    Donna Mooney
                                    Assistant City Attorney

*[Signatures continue on following page.]*

16

Exhibit _C_
Page _107_

DEVELOPER:

SCC Alameda Point LLC,
a Delaware limited liability company

By:   _____
        Bruce V. Cook, General Counsel

17

Exhibit    C
Page    108

## Exhibit A

**Map of the Project Site**

[Attached]

Exhibit _C_
Page _109_



** Submerged lands to be declared surplus by Navy

* Submerged land

NOT A PART

PROJECT SITE

**

*

MAIN ST.

Bayport

USCG

Alameda Landing

Exhibit   C
Page   110

**Exhibit B-1**

**Schedule of Performance**
**(Mandatory Milestones)**

All defined terms not defined herein shall have the respective meanings ascribed to them in the Agreement to which this Exhibit B-1 is attached.

Unless otherwise provided, all Mandatory Milestones are measured from the Effective Date of the Original Agreement (July 18, 2007).

A.   Mandatory Milestone                                  Submission Date

1.   Master Project Schedule                             Thirty (30) business days
                                                         [submitted];

                                                         Updated quarterly thereafter

2.   Development Concept                                 September 19, 2008 [submitted]

3.   Infrastructure Plan                                 September 19, 2008 [submitted]

4.   draft Business Plan                                 September 19, 2008 [submitted]

5.   Master Plan Draft (as described
     in Section 3.2.6 above),
     final Business Plan (as described
     in Section 3.2.3 above) and final
     updated Sports Complex Master Plan
     (as described in Section 3.2.1 above)               December 19, 2008

6.   Ballot Initiative Determination
     (Developer's written
     election to either
     submit the Entitlement
     Application or pursue
     the Ballot Initiative)                              April 30, 2009

7.   Entitlement Application

     a.   If Developer elects not to
          submit a Ballot Initiative,
          then the Entitlement
          Application shall be
          submitted on:                                  June 15, 2009

Exhibit___C___
Page____111___

b.   If Developer elects to
submit a Ballot Initiative,
but the City Election Official
determines that the petition
has failed to meet requirements
to be placed on the ballot,
the Entitlement Application
shall be submitted on:

The date that is forty-five
(45) days following the date
of the determination by the
City Election Official (as
described in <u>Section 3.2.5</u>
above)

8.   Optional Entitlement Application
(as described in <u>Section 3.2.5.2</u> above)
(if Developer elects to make such
submittal):

January 15, 2010

9.   Finalized Navy Term Sheet

July 31, 2009

10.  DDA as agreed by the Parties or
Developer's best and final offer
(as described in <s>Section 4.2.1.11 above</s>)

<s>July 20, 2010</s>

B.   <u>Mandatory Milestone</u>

<u>Completion Date</u>

1.   Project Pro Forma

December 19, 2008

Exhibit  C
Page  112

**Exhibit B-2**

**Schedule of Performance**
**(Non-Mandatory Milestones)**

      All terms not defined herein shall have the respective meanings ascribed to them in the Agreement to which this <u>Exhibit B-2</u> is attached.  Non-Mandatory Milestones described below are good faith estimates by the Parties of the time required to complete the Transaction Documents.

| Non-Mandatory Milestone | Completion Date |
|---|---|
| 1.    EDC MOA Amendment (if applicable) | July 20, 2010 |
| 2.    NEPA Supplemental Environmental Impact Statement (SEIS) | July 20, 2010 |
| 3.    Section 106 Memorandum | July 20, 2010 |
| 4.    USFWS/NMFS Biological Documents | July 20, 2010 |
| 5.    Early Transfer Documents | July 20, 2010 |
| 6.    CEQA Documents | July 20, 2010 |
| 7.    CAA | April 30, 2009 |
| 8.    DDA | July 20, 2010 |
| 9.    Development Agreement/Entitlements | July 20, 2010 |
| 10.    Tidelands Trust Exchange Agreement | July 20, 2010 |
| 11.    Public Planning Process | December 19, 2008 |



Exhibit _C_
Page _113_

# EXHIBIT D



NAS Alameda

Exhibit ___D___
Page ___114___



NAS Alameda

Exhibit____
Page____ 115

**PROOF OF SERVICE**

1
2   STATE OF CALIFORNIA,          )
                                  )          SS.
3   COUNTY OF LOS ANGELES         )

4       I am a citizen of the United States and employed in the County of Los Angeles, State of
    California.  I am over the age of eighteen (18) years and not a party to the within action.  I am
5   employed by MILLER BARONDESS, LLP and my business address is 1999 Avenue of the Stars,
    Suite 1000, Los Angeles, California 90067.

6       On **November 10, 2011**, I e-filed **THIRD AMENDED COMPLAINT** with the Clerk of the
    Court using the CM/ECF system, which will then send a notification of such filing (NEF) to those
7   recipients.

8       Executed on **November 10, 2011**, at Los Angeles, California.

9
10  **Carole Conklin**                                    **/s/ Carole Conklin**
    Type or Print Name                                    Signature

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

78256.1