IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCC ALAMEDA POINT LLC,

        Plaintiff,

   v.

CITY OF ALAMEDA,

        Defendant.

_____/

No. C 10-05178 CRB

**ORDER GRANTING MOTION FOR
PARTIAL SUMMARY JUDGMENT**

     This case arises out of ongoing efforts by the City of Alameda ("the City") to develop
a major residential, commercial, and retail project at the former Alameda Naval Air Station
("Alameda Point").  The City entered into an Exclusive Negotiation Agreement ("ENA")
with developer SCC Alameda Point ("SCC Alameda") in 2007 under which both sides were
obligated to negotiate in good faith toward approval of an entitlement application; the
entitlements would give SCC Alameda the right to develop Alameda Point.  After SCC
Alameda spent over $17 million working on the project with the ultimate goal of obtaining
entitlements, the City Council voted to reject SCC Alameda's entitlement application.

     SCC Alameda filed suit claiming, among other things, that Defendants City of
Alameda, Alameda Reuse and Redevelopment Authority, and Community Improvement
Commission (collectively, "the City") breached the ENA.  The City's breach allegedly
caused SCC Alameda to suffer damages amounting to over $117 million ($17 million in
reliance damages and over $100 million in lost profits).  The City claims the damages are

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    limited to the return of a $1 million deposit.  The Court granted the City's motion to dismiss

2    the claim for lost profits damages, as lost profits are not available for breach of an agreement

3    to negotiate under California law.  Dkt. 113.

4         The availability of reliance damages was the subject of a motion to dismiss by the

5    City, and this Court preliminarily found that the damages clause in the ENA was potentially

6    ambiguous, and allowed the parties to conduct discovery regarding the meaning of the

7    damages clause.  Dkt. 93 at 4 ("[T]he parties may conduct discovery only for the purpose of

8    demonstrating their intent as to whether the damage waiver clause would preclude recovery

9    of reliance damages.").  After completing such discovery, the City moved for partial

10   summary judgment on the issue of whether the contract allows for reliance damages other

11   than as specifically laid out in the contract.  Since the extrinsic evidence demonstrates no

12   meeting of the minds on the issue of general reliance damages and does not support such a

13   reading of the contract, the Court GRANTS the motion for partial summary judgment.

14   **I.      FACTUAL BACKGROUND**

15        The parties disagree over the meaning of the Remedies clause of the ENA.  The City

16   argues the ENA contains a damage waiver clause precluding recovery of general money

17   damages, and thus, precludes SCC Alameda's claim for general reliance damages.  SCC

18   Alameda, unsurprisingly, disagrees.  The Remedies Clause of the ENA states:

19        7.4. Remedies.  [N]either Alameda nor Developer shall be entitled to damages
          or monetary relief other than as set forth in this Section 7.4.  Permitted
20        remedies shall include (i) mandatory or injunctive relief, (ii) writ of mandate,
          (iii) termination of this Agreement, or (iv) a contract Claim . . . to recover
21        money due to Alameda or Developer as a payment of Pre-Development Costs[1]
          or reimbursement of excess Pre-Development Cost deposits under Section 6 of
22        this Agreement; provided, however, neither Alameda nor Developer shall be
          liable, regardless of whether the Claim is based in contract or tort, for any
23        special, indirect or consequential damages.

24   ENA § 7.4.  The City argues that the clause precludes recovery of all but a specific subset of

25   reliance damages; SCC Alameda argues that the clause allows for recovery of broad and

26

27        [1] Section 6.2 of the ENA defines Pre-Development Costs as "third-party consultant and legal
     costs and expenses and Alameda staff time, as such staff time shall be reflected in the Annual Budget
28   (as defined below), underlined the negotiation and preparation of this Agreement and the Transaction
     Documents . . . incurred from and after the Effective Date . . . ." (emphasis added).

2

comprehensive reliance damages.  The Court found in a prior discovery order that the clause was arguably facially ambiguous.  The Court allowed discovery on this issue.  The parties have now conducted discovery regarding the clause, and present evidence as to the drafting history to help the Court discern the meaning of the clause.

The Exclusive Negotiation Agreement ("ENA") was heavily negotiated by both sides. The initial draft was produced by Alameda outside counsel JoAnne Dunec based on a "form" used in another transaction.  Newdorf Decl. (dkt. 124) Ex. B ("Dunec Depo." 38:11-21; Ex. F ("Potter Depo." 40:18-21).  The document went through "dozens" of drafts over two months before it was signed by both sides.  Newdorf Decl. Ex. A ("Brandt Depo." 43:24-44:1).  This included the initial draft circulated on May 15, 2007 (Newdorf Decl. Ex. 5), and revisions circulated May 22, 2007 (Id. Ex. 22), June 4, 2007 (Id. Ex. 8); June11, 2007 (Id. Ex. 6), June 16, 2007 (Id. Ex. 16), June 21, 2007 (Id. Ex. 21), July 3, 2007 (Id. Ex. 9.) and July 10, 2007 (Id. Ex. 24).  Both sides made changes in the draft language, with the drafts going back and forth between them.  Brandt Depo. 38:12-18; Newdorf Decl. Ex. C ("Freilich Depo." 57:11-13); Potter Depo. 8:19-21.  In addition, the parties met on a regular basis (weekly at times) to discuss changes in the draft versions of the ENA.  Brandt Depo. 26:5-14; Potter Depo. 10:25-11:12.  Each side was represented by both in-house and outside counsel. Freilich Depo. 26:9-12; Newdorf Decl. Ex. E. ("Myers Depo." 6:1-6).  The negotiations took approximately two months.  Brandt Depo. 25:14-17; Freilich Depo. 15:8-9.  The final ENA was signed and dated July 18, 2007, after being approved by the Alameda City Council. Newdorf Decl. Ex. 1.

Dunec prepared the first ENA draft on behalf of the City.  Miller Decl. at Ex. A ("Brandt Depo.") at 23:5-9.  The initial draft at Section 7.5 discussed remedies:

> In any action at law or equity or other legal or administrative proceeding to remedy an event of default of this Agreement or otherwise enforce this Agreement, or that otherwise may arise out of this Agreement, the sole and unique remedies shall consist of (a) mandatory or injunctive relief, (b) writ of mandate, or (c) a contract Claim (as defined below) to recover money due to Alameda or Developer as a payment of Pre-development Costs or reimbursement of excess Pre-development Cost deposits under Section 5 of this Agreement.  Neither Alameda nor Developer shall be liable, regardless of whether the Claim is based in contract or tort, for any special, indirect or consequential damages.

United States District Court
For the Northern District of California

Newdorf Decl. Ex. 5 § 7.5 (emphasis added).  Two days later, the parties met for a face-to-face discussion.  In her deposition, Freilich stated she told the City that SCC Alameda should be able to recover reliance damages upon a breach by the City.  Miller Decl. Ex. D ("Freilich Depo.") at 13:23-14:25.  The contemporaneous notes taken by Dunec (the City's outside counsel) at the first meeting, stated in part:

> § 7.5 – Remedies
>
> > – costs incurred up until termination
> >
> > – $1M
>
> § 7.2 – If Alameda defaults – recovery of costs by SunCal [SCC Alameda]
>
> > DB [David Brandt] – won't agree

Newdorf Decl. Ex. 17 at 4.  Brandt testified at his deposition regarding the early discussion of out-of-pocket cost recovery by SCC Alameda:

> Q. And then under 7.2, which is default to Alameda in the draft, there's a note [in Exhibit 17], "If Alameda defaults - recovery of costs by SunCal."
>
> Do you recall who said that at the meeting?
>
> A. That was either going to be Amy [Freilich of SunCal] or Charlie [Thornton, outside counsel for SunCal].
>
> Q. They were referring to recovery of costs other than the true-up?
>
> A. Yes. Their out-of-pocket costs which they had talked about being in the tens of millions of dollars.
>
> Q. The next line is, "DB - won't agree."
> Did you say something along those lines?
>
> A. Yes. I refused to agree to that.

Brandt Depo. 54:11-22.  The parties exchanged numerous additional drafts after the first draft.

The City agreed to a term proposed by SCC Alameda in a May 22, 2007 draft that SCC Alameda would be entitled to a return of the $1 million deposit if the City defaulted. Newdorf Decl. Ex. 22, § 7.2; Brandt Depo. 53:20-54:5.

Approximately twenty days after negotiations commenced, SCC Alameda proposed a "break-up fee," which would have allowed SCC Alameda to recover 110% of its pre-

**United States District Court**
For the Northern District of California

development costs in the event that the City replaced SCC Alameda with another developer after the ENA expired.  Miller Decl. Ex. A ("Brandt Depo.") at 33:4-34:8, 85:8-19; see also id. Ex. F ("Little Depo.") at 36:8-10; id. Ex. C ("Dunec Depo.") at 46:8-24.  Pursuant to the proposed Section 6.4:

> 6.4. <u>Break-Up Fee</u>. In the event that prior to two (2) years <u>after the expiration of the Term,</u> as may be extended as provided herein, Alameda or any constituent thereof solicits, markets, or negotiates with any other person or entity regarding the development of control of the Project Site (or any portion thereof) or solicits or entertains bids or proposals for the disposition of the Project Site, then SunCal shall be entitled, at its election, to (i) the return of the Initial Payment plus any interest accrued thereto and (ii) a break-up fee in an amount equal to one hundred ten percent (110%) of the sum of the Pre-development Costs and any payments made by SunCal to Alameda pursuant to Section 6.3. Such payment shall be made [designate time of payment and payor.]

Newdorf Decl. Ex. 8 § 6.4 (emphasis added).

The City opposed the break-up fee provision, viewing it as a "tax" that would discourage a future developer from taking on the Project in the event that the City and SCC Alameda failed to reach a deal.  Miller Decl. Ex. A ("Brandt Depo.") at 34:13-35:1, 43:1-9, 59:21-60:18.  SCC Alameda agreed to delete the "break-up fee" provision from the subsequent June 16, 2007 draft.  Id. at 38:17-39:2, 44:12-25; Newdorf Decl. Ex. 16.

David Brandt testified about the City's opposition to the Break-Up Fee:

Q. Under part III (of Ex. 14), "Other Issues," there's a section d, "Break-Up Fee Deletion."

A. Yes.

Q. Do you have an understanding of what that refers to?

A. Yes. It refers to the city's position that we wanted that provision deleted from the draft.

Q. There was pushback from SunCal on that?

A. Yes.

Q. Do you recall how that was resolved?

A. They finally agreed to delete it. (Brandt 38:17-39:2)

MR. NEWDORF: Q. So how would you characterize the importance of the city's position on deletion of the break-up fee?

[Objection omitted]

5

1          THE WITNESS: It was of critical importance. (Brandt Depo. 43:1-5)

2   After the Break-Up Fee was removed, neither party added draft contract language that

3   explicitly referred to the recovery of SCC Alameda's general out-of-pocket costs.

4          In a later draft, dated June 21, 2007, the City proposed adding language that would

5   further limit SCC Alameda's remedies.  Specifically, it sought to prevent SCC Alameda from

6   placing a lien on the Project Site: "[i]n no event shall Developer have any right (and

7   Developer waives any such right) to file a lien, encumbrance or lis pendens against the

8   Project Site or to file an action for specific performance relating to the transfer of all or any

9   portion of the Project Site."  Newdorf Decl. Ex. 21.  SCC Alameda rejected the City's

10  proposal four days later, striking the limitation from the following draft.  Miller Decl. Ex. K;

11  id. Ex. D ("Freilich Depo.") at 56:11-21.  Freilich stated in her deposition that, "[t]his is part

12  of the continuing discussion about th[ese] remedies that just never really stopped throughout

13  the process."  Freilich Depo. at 56:19-21.

14         On July 3, 2007, two weeks before the agreement was finalized and executed, SCC

15  Alameda circulated a draft that included revisions of the "Remedies" provision.  This was the

16  first substantive change related to the Remedies section since the initial form draft.  The

17  changes (adopted in substance in the final version of the agreement) are shown in red-line

18  below:

19         7.4 ~~7.5~~ <u>Remedies.</u> In any action at law or equity or other legal or administrative
       proceeding to remedy ~~an~~ <u>a Developer Event of Default or an Alameda Event</u> of
20     Default ~~of this Agreement~~ or otherwise enforce this Agreement, or that
       otherwise may arise out of this Agreement~~, the sole and unique remedies shall~~
21     ~~consist of~~ <u>neither Alameda nor Developer shall be entitled to damages or</u>
       <u>monetary relief other than as set forth in this Section. Permitted remedies shall</u>
22     <u>include</u> (i) mandatory or injunctive relief, (ii) writ of mandate, ~~or (iii)~~<u>(iii)</u>
       <u>termination of this Agreement or (iv)</u> a contract Claim (as defined Section 15.5
23     below) to recover money due to Alameda or Developer as a payment of
       Pre-development Costs or reimbursement of excess Pre-development Cost
24     deposits under Section 6 of this Agreement~~. Neither;~~ <u>provided, however that</u>
       neither Alameda nor Developer shall be liable, regardless of whether the Claim
25     is based in contract or tort, for any special, indirect or consequential damages.

26  Newdorf Decl. Ex. 9. § 7.4

27         The change was accepted in the next draft.  <u>See</u> July 3, 2007 draft ENA attached to

28  Miller Decl. Ex. L.  The parties had different recollections of the purpose and meaning of this

United States District Court
For the Northern District of California

6

United States District Court
For the Northern District of California

revision.  SCC Alameda witnesses now say they would not have entered into the ENA had

the City rejected this proposed change.  Miller Decl. Ex. H ("Myers Depo.") at 43:3-9; id.

Ex. B ("Cook Depo.") at 61:8-13.  Based on the City's acceptance of the proposed language,

SCC Alameda witnesses testified in deposition that they understood that out-of-pocket costs

were now recoverable.  Myers Depo. at 41:7-25; Freilich Depo. at 81:2-12.

 Most of the City's witnesses could not recall any discussions relating to this change to

Section 7.4 or who made the change.  Miller Decl. at Ex. G ("Mooney Depo.") at 29:12-16,

30:20-25; Dunec Depo. at 30:9-13, 39:12-19, 50:4-51:8, 54:3-25; Little Depo. at 41:4-44:4.

David Brandt apparently misremembered the chronology and testified that he – not SCC

Alameda – requested this change:

> Q: Were these changes proposed by you in Exhibit 9?
>
> A: Yes.
>
> Q: I see the strikeout of "sole and unique remedies." And then the next
> sentence starts "permitted remedies shall include." How did this make it
> more clear that SunCal could not recover its costs?
>
> [objection omitted]
>
> A: I don't recall why Joanne [Dunec] actually used the words that ended
> up in that particular sentence. My instructions to her were I wanted all the
> terms to relate back to defined terms.
>
> Q: So you don't recall why that language was used, that switch, the
> deletion of "sole and unique remedies" and the addition of "permitted
> remedies"?
>
> A: No, I can't say that I do.
>
> Miller Decl. Ex. A (Brandt Depo.) at 72:2-19.)

Brandt did further explain the City's position as to out of pocket costs.

> Q. Did you express to SunCal either in a phone conference or in a joint
> face-to-face session that the provisions proposed in the remedies section were
> to more strongly support the previously expressed position of the city that their
> [sic] would be a waiver of damages and that the city's financial risk was
> limited to potentially returning the $1 million initial payment and any
> remaining funds in the predevelopment cost account?
>
> A. Yes.
>
> [Objection omitted.]

THE WITNESS: I expressed those issues directly to SunCal, particularly to Amy Freilich, repeatedly. (Brandt Depo. 64:15-65:2.)

* * *

Q. At that point SunCal said we just don't agree on this clause, the parties weren't on the same page with respect to whether SunCal could get its costs back in the event of an Alameda default, right?

[Objection omitted.]

THE WITNESS: No. I believe they conceded relatively quickly. We told them we would walk away from the discussions if they didn't drop that position.

MR. MILLER: Q. Who at SunCal conceded?

A. Well, it never showed up in a draft, so I think essentially it was a group concession. (Brandt Depo. 67:9-19.)

In discussing the City's potential monetary liability arising from the ENA, the City's negotiators stated in deposition that they made clear to SCC Alameda that the return of the $1 million deposit was SCC's recourse in the event of default. Leslie Little, one of the members of the City's negotiating team, testified:

Q. And you recall SunCal not seeing eye to eye with the City and saying we want to be able to recover our costs, correct?

A. I recall SunCal acknowledging the City's position more than once. I recall SunCal asking for an exception to that more than once.

(Little Depo. 29:19-24.)

Q. And I understand your position and your belief as far as what the ENA means, but do you recall any specific discussion with SunCal where they agreed on the issue?

A. I believe I do remember discussions where they agreed to those terms, that's correct.

Q. And who from SunCal?

A. I would say it was specifically Amy Freilich and Pat Keliher.

Q. And what did they say about the issue?

A. That they accepted those terms from us.

Q. And when you say "those terms," which terms are you referring to?

A. The limitations on their ability to recover pre-development costs most specifically.

Little Depo. 32:12-33:5.

Deponents from both sides confirmed that no one from SCC Alameda ever explicitly, and in those words, agreed that all out-of-pocket costs would be unavailable in the event of a breach.  Miller Decl. Ex. F ("Little Depo.") at 31:13-20; Brandt Depo. at 67:9-22, 69:11-22, 71:4-17; Dunec Depo. at 33:17-34:18; Thornton Depo. at 26:1-9.  There was also not testimony that SCC Alameda explicitly told the City the revision to the Remedies Section was intended to allow such costs and no testimony that the City ever acceded to such a position in discussions with SCC Alameda.

The parties executed the Final ENA on July 18, 2007.  Newdorf Decl. Ex. 1 at 1.

## II.      LEGAL STANDARD

Whether language in a contract is ambiguous is a question of law to be determined by the court.  Producers Dairy Delivery Co. v. Sentry Ins. Co., 41 Cal.3d 903, 904 (1986). Interpretation of an unambiguous contract is also a question of law.  Abifadel v. Cigna Ins. Co., 8 Cal. App. 4th 145, 159 (1992) ("The interpretation of a contract is a question of law when the contract terms are unambiguous.").

"The threshold issue of whether to admit the extrinsic evidence – that is, whether the contract is reasonably susceptible to the interpretation urged – is a question of law . . . ." Abers v. Rounsavell, 189 Cal. App. 4th 348, 357 (2010).  "[T]he first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over."  Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384, 393 (2006) (quoting Southern Cal. Edison Co. v. Superior Court, 37 Cal. App. 4th 839, 847 (1995)).

If the Court does determine there is an ambiguity in the contract as written, California courts engage in a two-step process to resolve ambiguities in a written agreement:

> First, the court provisionally receives (without actually admitting) all credible
> evidence concerning the parties' intentions to determine "ambiguity," i.e.,
> whether the language is "reasonably susceptible" to the interpretation urged by
> a party.  If in light of the extrinsic evidence the court decides the language is
> "reasonably susceptible" to the interpretation urged, the extrinsic evidence is
> then admitted to aid in the second step – interpreting the contract.

**United States District Court**
For the Northern District of California

1   WYDA Associates v. Merner, 42 Cal. App. 4th 1702, 1710 (1996); accord Centigram

2   Argentina, S.A. v. Centigram Inc., 60 F. Supp. 2d 1003, 1007 (N.D. Cal. 1999).  If the Court

3   concludes, after completing this process, that the parties' competing interpretations are

4   equally plausible, it cannot grant summary judgment. WYDA Associates, 42 Cal. App. 4th at

5   1710 ("[w]hen two equally plausible interpretations of the language of a contract may be

6   made . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting

7   a question of fact which precludes summary judgment if the evidence is contradictory");

8   Centigram, 60 F. Supp. 2d at 1007 ("[i]nterpretation of the contract is an issue of law if . . .

9   the contract is ambiguous but no parol evidence is admitted or the parol evidence is not in

10   conflict" (emphasis added)).

11       During the first stage, lower courts provisionally receive all credible extrinsic

12   evidence to ensure that both sides are advancing a reasonable interpretation of the agreement.

13   Tahoe Nat'l Bank v. Phillips, 4 Cal. 3d 11, 22 (1971) ("[r]ecent decisions make clear that, in

14   most cases, extrinsic evidence must be admitted provisionally in order that the court may

15   determine if that evidence is relevant to establish an interpretation of the instrument to which

16   it is reasonably susceptible").  If, after such provisional consideration, the court concludes

17   that the contract is fairly susceptible to competing interpretations, it will admit the evidence

18   and undertake the task of resolving the ambiguity.  Skilstaf, Inc. v. CVS Caremark Corp.,

19   669 F.3d 1005, 1015 (9th Cir. 2012) ("[i]f the court decides, after consideration of this

20   evidence, that the language of a contract, in the light of all the circumstances, is fairly

21   susceptible of either one of the two interpretations contended for, extrinsic evidence relevant

22   to prove either of such meanings is admissible").

23       However, if, after considering all credible extrinsic evidence, the court concludes that

24   the contract is not "reasonably susceptible" to the construction supported by that evidence,

25   the inquiry ends there.  See Barris Indus., Inc. v. Worldvision Enters., Inc., 875 F.2d 1446,

26   1450 (9th Cir. 1989).

27   **III.   DISCUSSION**

28

10

The parties first argue that the contract is only reasonably susceptible to their respective interpretations of its plain language.  The parties then argue that the drafting history and deposition testimony surrounding the remedies language in the contract support their respective interpretations.  Thus, the Court will examine the issues in turn in the framework described above.

**A.    Reasonable Susceptibility of Recovering Reliance Damages**

The Court has already made a preliminary statement on this issue in the Order allowing further discovery, where the Court found the Remedies language was potentially ambiguous.[2]  The Court now turns to each party's argument to determine if the contract language is reasonably susceptible to the reading put forth.

**1.    City Interpretation**

The City argues the Remedies clause must be examined as a whole, and that taking all the language together, it is not susceptible to an interpretation that provides recovery of all general restitution costs.  The City points first to the first sentence of the remedies clause, which states "neither Alameda nor Developer shall be entitled to damages or monetary relief

---

[2]  The Order stated:

Section 7.4 is ambiguous and subject to different interpretations.  It first lists the "permitted" monetary remedies available to the parties in the event of a breach.  Its list of remedies, as City Defendants assert, includes only one type of claim for monetary recovery: "a contract Claim . . . to recover money due to Alameda or Developer as a payment of Pre-Development Costs or reimbursement of excess Pre-Development Cost deposits."  If the provision ended there, then City Defendants' interpretation might be persuasive.  However, the provision continues, and creates an important exception: neither party may recover "special, indirect or consequential damages."
        . . . .

When interpreting contracts, the agreement must be "read as a whole in a manner which reconciles apparent repugnancies and, to the extent possible, gives some meaning to each clause."  S. Pac. Land Co. v. Westlake Farms, Inc., 188 Cal. App. 3d 807, 823 (1987) (finding that an inconsistency between two lease terms gave "rise to a facial ambiguity which invite[d] the admission of extrinsic evidence").  City Defendants ask this Court to interpret section 7.4 in a way that leaves the exception for special, indirect, and consequential damages superfluous and without meaning or effect.  That the parties specifically included an exception for such damages suggests that they believed that without the exception, the provision would have allowed them to recover such damages.  Because the parties created an exception for special, indirect, and consequential damages, and did not create an exception for reliance damages, the clause appears subject to an interpretation that allows for recovery of reliance damages. Dkt. 93.

United States District Court
For the Northern District of California

other than as set forth in this Section 7.4." Thus, the City argues that unless affirmatively "set forth" in Section 7.4, "damages or monetary relief" are not available as a remedy.

The second sentence sets out four "permitted remedies," the fourth of which is relevant here: "a contract Claim (as defined in Section 15.5 below) to recover money due to Alameda or Developer as a payment of Pre-Development Costs or reimbursement of excess Pre-Development Cost deposits under Section 6 of this Agreement; . . . ." Defined in Section 6, the permitted "contract Claim" refers to a narrow category of costs – whatever positive or negative balance remains in the Negotiating Cost Account after termination of the ENA.

The City then argues that the final clause refers back to the "permitted remedies" set out in the second sentence: "provided, however, neither Alameda nor Developer shall be liable, regardless of whether the Claim is based in contract or tort, for any special, indirect or consequential damages." The City argues that this final clause makes it clear that the monetary relief specifically permitted in the second sentence of Section 7.4 – the "contract Claim" related to deposits into the Negotiating Cost Account – does not permit recovery of "any special, indirect or consequential damages." For example, the City could recover the underpaid amounts for its Pre-Development Costs but it could not recover a late fee charged by a consultant who was not timely paid because of a deficit in the Negotiating Costs Account. The City argues that since the parties had created an express remedy for a category of out of pocket costs in the immediately preceding sentence, it would have been contradictory to add "reliance damages" or "out-of-pocket costs" to the list of prohibited damages in the final clause. The City provides a graphic to illustrate their understanding of the structure of the section:

United States District Court
For the Northern District of California

Remedies.  In any action at law or equity or other legal or administrative proceeding to remedy a Developer Event of Default or an Alameda Event of Default or otherwise enforce this Agreement, or that otherwise may arise out of this Agreement, *neither Alameda nor Developer shall be entitled to damages or monetary relief other than as set forth in this Section 7.4*.

General rule excluding damages/monetary relief



Permitted remedies shall include (i) mandatory or injunctive relief, (ii) writ of mandate, (iii) termination of this Agreement, or (iv) a contract Claim (as defined in Section 15.5 below) to recover money due to Alameda or Developer as a payment of Pre-Development Costs or reimbursement of excess Pre-Development Cost deposits under Section 6 of this Agreement;

Exception to rule of exclusion



provided, however, neither Alameda nor Developer shall be liable, regardless of whether the Claim is based in contract or tort, for any special, indirect or consequential damages.

Qualification to exception

The clause is reasonably susceptible to such an interpretation of the plain language.

### 2.     SCC Alameda Interpretation

SCC Alameda argues generally that reliance damages are allowed because the parties did not explicitly agree to preclude reliance damages in Section 7.4.  See Copeland v. Baskin Robbins U.S.A., 96 Cal. App. 4th 1251, 1262-63 (2002) (reliance damages generally available for breach of a contract to negotiate an agreement).  SCC Alameda argues that Section 7.4 specifically excludes "special, indirect or consequential damages," but does not list reliance damages, and thus, they are not excluded.  SCC cites to our prior order to support the argument that their interpretation is plausible.  Dkt. 93.

13

1       SCC Alameda then argues that when the ENA is read as a whole, it supports the

2   award of all reliance damages.  In general, when interpreting contracts, the agreement must

3   be "read as a whole in a manner which reconciles apparent repugnancies and, to the extent

4   possible, gives some meaning to each clause."  S. Pac. Land Co. v. Westlake Farms, Inc., 188

5   Cal. App. 3d 807, 823 (1987).  SCC Alameda argues the City's interpretation in inconsistent

6   with the language of the rest of the ENA.

7       First, SCC argues that Section 7.4 was not intended to be an exhaustive list of

8   remedies under the contract.  SCC Alameda points out that the ENA provides for remedies

9   not found in Section 7.4, which the City acknowledges.  The City stated that "liability for

10  breach would be limited to returning the $1 million deposit."  Mot. at 5:10-13.  SCC

11  Alameda's right to a refund of the $1 million deposit in the event of a breach by the City is

12  not mentioned anywhere in Section 7.4, but rather, is provided for in Section 8.2 of the ENA:

13          In the event of an Alameda Event of Default pursuant to Section 7.2 above,
            Developer may terminate this Agreement by delivery of written notice to
14          Alameda, provided that a Developer Default Notice has been and any period of
            a right to cure has passed without such cure occurring. If this agreement is
15          terminated pursuant to Section 8.2, Developer shall be entitled to a refund of
            the Initial Payment, together with any interest accrued thereon. Such refund
16          obligation shall survive the expiration or termination of this Agreement.

17  Newdorf Decl. Ex. 1 § 8.2.  Thus, the City contends that Section 8.2 – not Section 7.4 –

18  entitles SCC Alameda to the return of the $1 million deposit in the event the City breaches its

19  obligation to negotiate in good faith.  Mot. at 10:25-11:11 (citing Little Depo. at 32:15-33:5).

20  SCC argues that the City cannot have it both ways – Section 7.4 either contains an exhaustive

21  list of remedies, or it does not.  This is possible way to interpret the language.  Still, Section

22  8.2 refers to the return of the $1 million Initial Payment as a "refund," and as an obligation

23  that would survive the termination or expiration of the ENA.  Thus, it is cast in a different

24  light than a simple remedy for a breach of the agreement, like the remedies (listed

25  specifically as remedies for breach of the ENA) in Section 7.4.  Yet, this may create some

26  ambiguity in the contract.

27      SCC Alameda's other main argument relates to the definition of pre-development

28  costs in Section 7.4.  SCC argues that subdivision (iv) of Section 7.4 treats "money due to

United States District Court
For the Northern District of California

Alameda or Developer as a payment of Pre-development Costs" separate and apart from any "reimbursement of excess Pre-Development Costs" because they are separated by the word "or."[3]  SCC then argues that this allows them to be reimbursed for all their pre-development costs.  This is not a reasonable interpretation of the Section language.

"Pre-Development Costs" was a defined term from the first draft of the ENA (Newdorf Decl. Ex. F §§ 5.2, 5.3) through the final agreement (Id. Ex. 1 §§ 6.2, 6.3).  It referred exclusively to City costs that SCC Alameda funded through the Negotiating Cost Account.[4]  Given the definition of Pre-Development Costs, it is not possible to interpret the reference to a contract Claim for Pre-Development Costs to mean a claim for all of SCC Alameda's out-of-pocket expenses.  Even adopting the reading urged by SCC (i.e., reading the first part separate and apart from the last part) does no good since the term is defined specifically in a way that clearly does not include all out-of-pocket costs.  Thus, this argument is unavailing.

Still, as discussed above, the language of the Remedies clause is reasonably susceptible to the meaning put forth by SCC Alameda.  Thus, since the language is reasonably susceptible to both meanings, the Court will turn to the extrinsic evidence.

**B.      Extrinsic Evidence**

Since the language is reasonably susceptible to interpretations put forth by both parties, the Court examines the proffered extrinsic evidence to see if it supports the contract

---

[3] Clause (iv) states: "a contract Claim . . .  to recover money due to Alameda or Developer as a payment of Pre-Development Costs or reimbursement of excess Pre-Development Cost deposits under Section 6 of this Agreement . . . ."

[4]  "Pre-Development Costs" is defined in Section 6.2 as follows:

> Developer shall reimburse Alameda for its pre-development costs, which shall consist of third-party consultant and legal costs and expenses and Alameda staff time, as such staff time shall be reflected in the Annual budged (as defined below), related to the negotiation and preparation of this Agreement and the Transaction Documents (the "Pre-Development Work"), incurred from and after the Effective Date (the "Pre-Development Costs') .
> . . . (emphasis in original).

Under Section 6 of the ENA, SCC Alameda funded Alameda's Pre-Development Costs by making "Quarterly Deposits" into a "Negotiating Cost Account," from which the City's costs were reimbursed. ENA §§ 6.3, 6.3.1.

15

1    being reasonably susceptible to the interpretation provided by either party.  There are two

2    key pieces of evidence that shed light on the contract's meaning – contemporaneous notes of

3    the first negotiating meeting and the language of the drafts that were exchanged back and

4    forth – along with a large amount of deposition testimony.  The deposition testimony largely

5    discusses only each party's internal discussions and intent rather than demonstrating whether

6    intentions were communicated to the other side such that there was a meeting of the minds.

7         Undisclosed communications and understandings are not credible extrinsic evidence

8    and may not be used by the Court to determine the parties' mutual intent.  Brant v. California

9    Diaries, Inc., 4 Cal. 2d 128, 133 (1935) (finding defendant's testimony as to his personal

10   belief of what contract meant was "incompetent and inadmissible").  Thus, testimony

11   regarding what the parties thought about the meaning of the language, or plans they did not

12   discuss with the other side, cannot be taken into account in determining the parties' mutual

13   intent and the meaning of the contract language.

14        **1.       Contemporaneous Notes and Related Deposition Testimony**

15        At the first meeting between the parties, the City's outside counsel, JoAnne Dunec,

16   took contemporaneous handwritten notes of the meeting.  Newdorf Decl. Ex. 17; Dunec Dep.

17   39:20-40:11; 40:19-41:9.  Ms. Dunec wrote that one attendee said: "If Alameda defaults –

18   recovery of costs by SunCal."  According to the notes, Alameda's David Brandt, lead

19   negotiator for the City, responded that he "won't agree."  Newdorf Decl. Ex. 17.  This

20   demonstrates that the City clearly expressed to SCC Alameda that it would not include a

21   provision for the recovery of all out-of-pocket costs in the contract.

22        The deposition testimony is not as clear on this point.  Brandt testified that he said

23   directly to SCC Alameda that he refused to agree to a return of out-of-pocket costs.  Brandt

24   Depo 54:22 ("I refused to agree to that.").  SCC Alameda parties testified that they brought

25   up that they wished to recover out-of-pocket costs, and were upset that it was not included in

26   the initial draft of the contract:

27        Q. Now, in section the notes refer to section 7.5, Remedies, which is also in
          this draft. It says, "Costs incurred up until termination and $1 million."

28

16

Do you recall, you or someone else on behalf of SunCal, stating that as a remedy that SunCal wanted?

A. Yes. Again, my most clear recollection is at the meeting in David Brandt's office; but again, it was a very important point for us to bring up. Yes, I do remember bringing it up.

Q. And in section 7.2, JoAnne Dunec's notes say – in section 7.2, if you look at the draft, it says, "Default of Alameda."  JoAnne Dunec's notes say, "If Alameda defaults, recovery of costs by SunCal. DB won't agree."

Now, you remember a discussion with David Brandt after a joint meeting. Do you remember this discussion during a joint meeting?

A. He may have said it in that meeting as well. I don't specifically agree, but I remember that his – I don't recall him specifically saying that the City wouldn't agree. I remember him saying it was an important issue for the City.

Myers Depo. 29:7-30:3, cited at p. 6, line 11 of the Opposition [Miller Decl. Ex. H].

Q. Right. So what is the most specific you can recall in terms of the discussions – not the internal discussions, but the discussions that included the City of Alameda on the issue of monetary recovery by SunCal in the event of a breach by the City of the ENA?

A. We were clearly not willing to accept the language in their initial draft. And we told them so.

Q. What specific language do you recall that you told the City SunCal wasn't willing to accept?

[Objection omitted.]

THE WITNESS: I recall that we indicated that we needed to be able to get back our cost if Alameda were in default.

Freilich Depo. 13:23-14:12, cited p. 6, line 9 of the Opposition [Miller Decl. Ex. D].

Still, the Court finds the contemporaneous notes are the most reliable extrinsic evidence available, and they demonstrate only that the City clearly stated disagreement with the proposal.

### 2.    Drafting Revisions and Related Deposition Testimony

After the first meeting, the ENA went through "dozens" of drafts exchanged between the parties. Brandt Depo. 43:24-44:1.  Three of those changes are relevant to the issue at hand.  These are the return of the $1 million deposit, the addition and then removal of the "break-up fee" provision, and the changes to the language of Section 7.4 itself.

**United States District Court**
For the Northern District of California

SCC Alameda on May 22, 2007 proposed draft language that permitted SCC Alameda to recover its $1 million deposit in the event of an Alameda Default. Newdorf Decl. Ex. 22 § 7.2. The City conceded this point, and the provision for return of the deposit in the event of Alameda Default was included in the final ENA. Newdorf Decl. Ex. 1 § 8.2. However, the drafts demonstrate that SCC Alameda never proposed specific language that would have allowed SCC Alameda to "get back our cost if Alameda were in default," as Ms. Freilich claimed it had "needed" from the outset.

SCC Alameda does point to deposition testimony where the parties make assertions that it would never have signed an agreement that did not allow it to recover all of its out-of-pocket costs in the event of a City breach, citing in part the deposition of its General Counsel, Bruce Cook, for his understanding of what the ENA terms meant regarding recoverability of reliance damages. Yet, Mr. Cook never attended any ENA negotiation sessions or spoke to any City officials before signing the ENA.[5] His testimony accordingly lacks probative value regarding the intent of the parties. See Winet v. Price, 4 Cal. App. 4th 1159, 1166 n.3 (1999). The larger problem with this testimony is that SCC Alameda does not point to any extrinsic evidence that SCC Alameda communicated to the City that it actually would not sign the ENA without the ability to recover all out-of-pocket costs. In contrast, there is extrinsic evidence that the City communicated to SCC Alameda that it would not agree to the inclusion of recovery of all SCC Alameda's out-of-pocket costs.

---

[5] The City cites to Mr. Cook's deposition, where he testified he did not attend any of the negotiating sessions nor have any direct communications with any officials or employees of the City of Alameda. Reply Decl. (dkt. 131) Ex. B. SCC Alameda objects to the Reply Declaration's introduction of three excerpts of deposition testimony by arguing that submission of new facts in a reply brief is improper if they should have been presented with the opening brief. Dkt. 133. SCC Alameda states there was no reason the testimony put in the Reply Declaration could not have been in the opening brief, since it was all available at that time. Opp'n at 1-2. The City replies that it could not have introduced the evidence in the opening brief because it was introduced for the purpose of showing that some of SCC Alameda's evidence in the Opposition (specifically the impression of General Counsel Bruce Cook, a statement of Leslie Little, and the scope of remedies available) lacked a foundation of personal knowledge or were incomplete. Dkt. 134. Federal Rule of Civil Procedure 56(c)(4) requires evidence in support of or in opposition to a summary judgment motion to be based on "personal knowledge" and show that the witness "is competent to testify on the matters stated." The reply evidence demonstrates some of the SCC Alameda evidence fails to meet this standard, and thus, the Court DENIES the objection to the introduction of the new testimony.

**United States District Court**
For the Northern District of California

Despite the discussion concerning remedies at the first face-to-face meeting – and Ms. Freilich's insistence that SCC Alameda was "clearly not willing to accept the language in [Alameda's] initial draft" – SCC Alameda points to only one provision it proposed throughout the negotiating period that would have allowed it to recover its costs other than any unspent deposits made for the City's Pre-Development Costs.  That is the "Break-up Fee," proposed in a draft dated June 11, 2007.[6]  SCC Alameda agreed to delete the 'break-up fee' provision from the subsequent June 16, 2007 draft.  There is no evidence in the record of any other draft language proposed by SCC Alameda that <u>explicitly</u> concerned recovery of general out-of-pocket costs.  David Brandt's testimony on this point is undisputed:

> Q. Do you ever recall SunCal proposing a clause where it could – saying we get back our predevelopment costs in the event of breach?
>
> A. I don't think they actually drafted something. They proposed it at the first meeting.
>
> Q. But you don't recall ever seeing that request in a draft?
>
> A. No.

Brandt Depo. 86:3-10.  Thus, this drafting history demonstrates that the introduction of language explicitly allowing SCC Alameda recovery of general out-of-pocket costs was rejected.

SCC Alameda points to the revision of Section 7.4 as the decisive change in favor of its position.  It argues that the pivotal change in the drafting language was "that the list of remedies would be permissive (i.e., non-exhaustive) rather than exclusive (i.e., exhaustive)."

---

[6] The Break Up Fee Provision stated:

In the event that prior to two (2) years <u>after the expiration of the Term</u>, as may be extended as provided herein, Alameda or any constituent thereof solicits, markets, or negotiates with any other person or entity regarding the development of control of the Project Site (or any portion thereof) or solicits or entertains bids or proposals for the disposition of the Project Site, then SunCal shall be entitled, at its election, to (i) the return of the Initial Payment plus any interest accrued thereto and (ii) a break-up fee in an amount equal to one hundred ten percent (110%) of the sum of the Pre-development Costs and any payments made by SunCal to Alameda pursuant to Section 6.3. Such payment shall be made [designate time of payment and payor.]

Newdorf Decl. Ex. 8 § 6.4 (emphasis added).

19

United States District Court
For the Northern District of California

Opp'n at 6.  SCC Alameda argues that its intention in changing the language from "sole and unique remedies" to "permitted remedies" was "to ensure that the list was not exhaustive and that reliance damages would be available in the event of a breach by the City."  Opp'n at 19. This argument is not convincingly borne out by the changes actually made, which are shown redlined below:

> 7.4 ~~7.5~~ Remedies. In any action at law or equity or other legal or administrative proceeding to remedy ~~an~~ a Developer Event of Default or an Alameda Event of Default ~~of this Agreement~~ or otherwise enforce this Agreement, or that otherwise may arise out of this Agreement, ~~the sole and unique remedies shall consist of~~ neither Alameda nor Developer shall be entitled to damages or monetary relief other than as set forth in this Section. Permitted remedies shall include (i) mandatory or injunctive relief, (ii) writ of mandate, ~~or (iii)~~(iii) termination of this Agreement or (iv) a contract Claim (as defined Section 15.5 below) to recover money due to Alameda or Developer as a payment of Pre-development Costs or reimbursement of excess Pre-development Cost deposits under Section 6 of this Agreement. ~~Neither;~~ provided, however that neither Alameda nor Developer shall be liable, regardless of whether the Claim is based in contract or tort, for any special, indirect or consequential damages.

Newdorf Decl. Ex. 9 § 7.4.

SCC Alameda's argument focuses exclusively on the highlighted portion of the revised draft and ignores the proposed addition of a new first sentence prohibiting recovery of any "damages or monetary relief" other than those "set forth."  SCC Alameda made all of these revisions to Section 7.4 at the same time.

SCC Alameda mentions the first sentence prohibiting "damages or monetary relief" in support of its argument that Section 7.4 is not "exhaustive" because (as the parties agree) the Developer may recover its $1 million deposit in the event of a City breach, and this remedy is not mentioned in Section 7.4.

There is some tension between the first sentence of Section 7.4 and Section 8.2, which expressly states that the Developer may recover a refund of its Initial Payment in the event of an Alameda Default.  Arguably, if there were a dispute as to the recoverability of the $1 million deposit, the Court would have to harmonize both provisions and give effect to both to the extent practicable.  The specific provisions of Section 8.2 as to the deposit would likely prevail over the general waiver of all "damages or monetary relief" except as "set forth" in Section 7.4.  Still, the City agrees that if SCC Alameda were to prevail in this lawsuit, it

20

United States District Court
For the Northern District of California

1   could recover the $1 million deposit.  It argues instead that nothing about the interface

2   between sections 7.4 and 8.2 supports SCC Alameda's contention that reliance damages are

3   categorically recoverable.  This is not completely convincing, but as discussed above, there

4   are elements that distinguish the sections in a reasonable way – that Section 8.2 is a refund

5   that would survive the termination of the ENA.  Most importantly at this stage, as discussed

6   further below, there is no convincing extrinsic evidence that the parties agreed this change

7   would allow the broad recovery of general reliance damages.  In fact, it demonstrates the

8   wording was chosen because SCC Alameda know the City would not explicitly agree to that.

9       SCC Alameda offers no extrinsic evidence concerning the meaning of the first

10  sentence of Section 7.4 and is silent concerning any interpretation that differs from its plain

11  meaning.  It makes no attempt to harmonize that sentence with the rest of Section 7.4.  It

12  simply suggests that the first sentence of Section 7.4 should be ignored because it is not

13  "exhaustive" in light of Section 8.2.

14      SCC Alameda's approach – to in essence ignore the first sentence of Section 7.4 –

15  runs afoul of one of the fundamental rules of contract interpretation.  "The whole of a

16  contract is to be taken together, so as to give effect to every part, if reasonably practicable,

17  each clause helping to interpret the other."  Cal. Civil Code § 1641.[7]

18      While the contractual prohibition on "special, indirect and consequential damages"

19  was part of the original form language from another transaction, the first sentence of Section

20  7.4 was added (by SCC Alameda) after the parties had discussed the recoverability of

21  out-of-pocket costs.  This language therefore cannot be dismissed as mere surplusage that

22  adds nothing to the final clause prohibiting "special, indirect or consequential damages."

23      SCC Alameda's witnesses testified that they understood that the original and early

24  drafts of the ENA did not permit SCC Alameda to recover its reliance damages.  Myers

25

26      _____

27      [7] SCC Alameda cannot avail itself of any uncertainty based on the conflict between the
first sentence of Section 7.4 and Section 8.2 because SunCal itself created any possible
uncertainty.  It drafted and proposed these two conflicting terms. See Cal. Civil Code § 1654

28  ("In cases of uncertainty not removed by the preceding rules, the language of a contract should
be interpreted most strongly against the party who caused the uncertainty to exist.").

Depo. 43:3-9, cited at p. 7, line 13 of the Opposition [Miller Decl. Ex. H]. SCC Alameda's

main argument is that the changes it proposed to the Remedies provision in a July 3, 2007

draft "would ensure that reliance damages were recoverable." Opp'n at 6.

　　　　According to SCC Alameda's Myers, there was no discussion of the change in Section

7.4 that purportedly allowed recovery of all general reliance damages:

> MR. NEWDORF: Q. Was there any communication that you had with the City of Alameda that led you to believe that the City representatives agreed that SunCal could recover its out-of-pocket costs in the event of an Alameda default?
>
> A. Not that I recall, other than our acceptance of the language. So, no. But no conversations, no.
>
> Q. Did you have an understanding that with the changes made in section 7.4, that Alameda – excuse me – that SunCal would be entitled to recover its out-of-pocket costs in the event of an Alameda default?
>
> A. Yes.
>
> Q. But you never expressed that understanding to anyone at the City of Alameda?
>
> [Objection omitted.]
>
> THE WITNESS: I never had a – I don't recall having a conversation about it. They accepted the language, so we believe the issue was put to rest.

SCC Alameda negotiator and in-house counsel Amy Freilich testified at deposition

that she was less certain than Myers as to the import of this change. She said "we would

[have] liked to express [] clearly" that reliance damages were recoverable (Freilich Depo.

67:14-15), but "we felt that we were going to be able to – not to move the City any further

but that this gave us the room to make an argument for reliance damages" (Freilich Depo.

69:3-7 [Newdorf Decl. Ex. C].) Thus, SCC Alameda did not propose any language that

would have specifically and explicitly allowed general reliance damages because it knew the

City would reject such language. Moreover, this demonstrates there was no discussion of the

alleged broad expansion wrought by this change and thus, no evidence supporting mutual

intent supporting SCC Alameda's interpretation of the language.

　　　　The evidence demonstrates that the original draft did not include explicit language

allowing out-of-pocket costs, that the City clearly expressed their unwillingness to agree to

inclusion of the recovery of such costs, and though SCC Alameda states they were unhappy and would not have signed a final version to this effect, they present no extrinsic evidence that demonstrates they introduced language that would clearly allow for such costs, or stated openly to the City that they thought the revisions to the contract allowed for such costs. Thus, the extrinsic evidence demonstrates only a meeting of the minds that the City would not agree to the recovery of out-of-pocket costs, and thus the section is not reasonably susceptible to an alternate explanation based on the extrinsic evidence.  This is supported by a plain reading of the language that does not allow for recovery of such general costs.

IV.     CONCLUSION

        For the forgoing reasons, the Court GRANTS the motion for partial summary judgment.

        **IT IS SO ORDERED.**


Dated: September 13, 2012                    _____
                                             CHARLES  R. BREYER
                                             UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California